Ajay Gupta, Esq. (#242132)
GUPTA EVANS AND ASSOCIATES, PC
1620 5th Avenue, Suite 650
San Diego, CA  92101
(619) 866-3444
(619) 330-2055 Facsimile
e-mail:  ag@SoCal.law

**Attorneys for Plaintiffs Christopher Williams
and Legacy Global Development LLC**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER WILLIAMS; LEGACY GLOBAL DEVELOPMENT LLC,

Plaintiffs,

v.

THOMAS KULA; JOANNE KULA; ELIZABETH DIAZ; KATHI OSTEEN; STEPHEN HONEYBILL; LINDSEY STEWART; THERESA RAGLEN; ROGER "ARI" KAHN; and DOES 1-20, inclusive,

Defendants.

CASE NO.:  **'20 CV 1120 GPC AHG**

**VERIFIED COMPLAINT FOR:**
(1) **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**
(2) **DEFAMATION;**
(3) **TRADE LIBEL;**
(4) **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**
(5) **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.**

Plaintiffs allege as follows:

### PARTIES

1.      At all times mentioned herein, Plaintiff CHRISTOPHER WILLIAMS (hereinafter "Williams") was and is a natural person.  Williams resides in the State of California, County of San Diego.

2.      Plaintiff LEGACY GLOBAL DEVELOPMENT LLC (hereinafter "Legacy"; collectively, with Williams, "Plaintiffs") is a Delaware limited liability company conducting business within and with its principal place of business in San Diego County, State of California.

3.      Defendant Thomas Kula (hereinafter "Mr. Kula") is an individual and, at all times

mentioned herein, resided in the State of Texas.

4.     Defendant Joanne Kula (hereinafter "Mrs. Kula") is an individual and, at all times mentioned herein, resided in the State of Texas.

5.     Defendant Elizabeth Diaz (hereinafter "Diaz") is an individual and, at all times mentioned herein, resided in Belize.

6.     Defendant Kathi Osteen (hereinafter "Osteen") is an individual and, at all times mentioned herein, resided in Belize.

7.     Defendant Stephen Honeybill (hereinafter "Honeybill) is an individual and, at all times mentioned herein, resided in Belize.

8.     Defendant Lindsey Stewart (hereinafter "Stewart") is an individual and, at all times mentioned herein, resided in the State of Illinois.

9.     Defendant Theresa Raglen (hereinafter "Raglen") is an individual and, at all times mentioned herein, resided in Belize.

10.     Defendant Ari Kahn (hereinafter "Kahn") is an individual and, at all times mentioned herein, resided in the State of New York.

11.     At all times material hereto, all Defendants operated through a common plan and scheme designed to harm Plaintiffs.  The plan and scheme to harm Plaintiffs was completed, ratified and/or confirmed by each Defendant herein, and each Defendant performed the tortious acts set forth herein for its own monetary gain and as a part of a common plan developed and carried out with the other Defendants.

12.     Plaintiffs are informed and believe, and thereon allege that DOES 1-20 are persons or entities whose names and capacities are unknown to Plaintiffs at this time.  Plaintiffs allege that DOES 1-20 are in some way involved in the actions complained of herein as either independent actors, or as agents or principals of the other named defendants. Plaintiffs will amend this complaint to allege the true identities, capacities and roles of DOES 1-20 as and when they are ascertained.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction based on diversity jurisdiction under 28 U.S.C. § 1332.  Plaintiffs are citizens of California and none of the Defendants are citizens of California.  The

amount in controversy exceeds $75,000.

14.     Venue is proper in this Court pursuant to 28 U.S.C, § 1391(b)(2), in that a substantial part of the events giving rise to the claim occurred in this judicial district.

15.     This Court has personal jurisdiction over the parties as the Defendants aimed their conduct at the State of California.

## FACTUAL BACKGROUND

16.     Plaintiff Legacy is a luxury property development company engaged in the business of developing and selling vacation properties internationally, with a special focus on Central America and the Caribbean regions.  Plaintiff Williams is the Chief Executive Officer of Legacy.

17.     Legacy's primary clientele are Americans looking to purchase international luxury real estate as a vacation home, or as a permanent, expatriate residence.

18.     In or around 2016, after extensive negotiations, Legacy took over the development responsibilities for a luxury real estate development in Corozal Town, Belize, known as Orchid Bay. Prior to that point, the developer in charge of Orchid Bay was Orchid Bay Marketing, LLC (hereinafter "Orchid Bay Marketing").  Orchid Bay Marketing's Chief Executive Officer was and is Defendant Kahn.

19.     Kahn and Orchid Bay Marketing (and Orchid Bay Marketing's affiliates) had left Orchid Bay's development, finances, and general organization in disarray.  Legacy began doing damage control on the mess it inherited.

### Williams Risks His Life by Wearing a Wire to Prevent Orchid Bay from Being Extorted for Inflated Back Taxes.

20.     Orchid Bay Marketing had neglected to register Orchid Bay with the Belize Department of General Sales Tax ("GST") for taxation purposes.  As a result, at the time Plaintiffs took over development of Orchid Bay, Orchid Bay owed a significant amount in back taxes—approximately $300,000 Belize dollars ("BZD"), by Williams' calculation.

21.     In early 2017, Reynaldo Verde (hereinafter "Verde"), the Assistant Commissioner of the Department of General Sales Tax, contacted Plaintiff Williams through an intermediary third party and requested a meeting to discuss Orchid Bay's back taxes.  Plaintiff Williams agreed.

22.     On January 19, 2017, Williams and Verde met at the Radisson Hotel in Belize City.

Williams, sensing that something was awry, recorded their conversation. Verde told Williams that Orchid Bay owed approximately $1 million BZD—approximately $500,000 U.S. dollars—in back taxes. Williams was incredulous that Orchid Bay could owe that amount, having calculated Orchid Bay's tax liability to be approximately one third of Verde's figure. Verde told Williams that if Williams started a new company, moved unsold Orchid Bay units to said new company, and paid approximately 50% of Orchid Bay's tax liability, Verde could "make [the tax issue] disappear." Williams interpreted this conversation as a request for a bribe.

23. In the weeks following the meeting at the Radisson, Verde began corresponding with Verde via WhatsApp. In these messages, Verde inflated Orchid Bay's tax liability to $8 million BZD and requested that Williams pay him $4 million BZD. Verde later asked Williams if he would accept Verde's "proposed offer" or, if not, it would be necessary for Verde to "register" the debt.

24. In July of 2017, a GST employee came to the Orchid Bay development and spoke with an Orchid Bay employee. The GST employee intimated that Williams would be detained if he entered Belize again. That Orchid Bay employee notified Williams of the substance of this exchange via email.

25. Perturbed by these communications, and utterly uninterested in being extorted or paying a bribe, Williams, of his own volition, contacted the Federal Bureau of Investigation ("FBI") several times. Eventually, Williams' reports gained traction with the Miami office of the FBI. Williams worked diligently and cooperatively with the FBI to both preserve the operating budget of Orchid Bay and to avoid contributing to the broader problem of corruption in Belize.

26. On November 13, 2017, Williams, in the presence of two FBI agents, made a phone call to Verde. During the call, Verde said the offer for a compromise payment to Verde was still on the table.

27. After this call, and in collaboration with the FBI, Williams communicated with Verde to arrange a face to face meeting in Mexico, given that Williams was justifiably afraid to enter Belize given that he had been threatened with imprisonment if he returned to the country. After several meetings—painstakingly arranged fell through when Verde backed out at the eleventh hour, Verde eventually gave Williams the ultimatum that he would only meet Williams at Orchid Bay.

28. On August 24, 2019, FBI agents outfitted Williams with a recording device so that he could record his conversation with Verde. That same day, despite tremendous personal risk to his safety,

Williams met an openly armed Verde at the restaurant at Orchid Bay.  In that conversation, Verde admitted that the tax issue was why government approvals for construction at Orchid Bay had been delayed.  Verde probed Williams for how much he would be willing to pay Verde—at one point requesting $500,000.  Williams replied that he would only be able to give him $200,000.  They ultimately agreed on $350,000 BZD to be paid in cash.  Williams made a $1,000 USD "deposit" to Verde and they ended their meeting.

29.    A few weeks later, thanks to the evidence provided by Williams, FBI agents detained Verde as he was traveling through Washington Dulles International Airport en route back to Belize from a work trip to Belgium.  Verde is currently awaiting a criminal trial on extortion charges in the Southern District of Florida.

30.    Despite the controversy over the amount owed, Plaintiffs were resolved to pay their fair share of back taxes to the GST.  In 2019, Legacy paid over $600,000 BZD on behalf of Orchid Bay to become current with the Government of Belize.

31.    Contrary to the assertions by Defendants that Williams is an unethical businessman (*see infra* ¶¶ 40-60), Williams went above and beyond his role as CEO of Legacy to see that the Orchid Bay community was not extorted.  Moreover, even after he successfully assisted in Verde's apprehension and thwarted the tax bribery scheme, Williams saw to it that Orchid Bay paid its fair share of taxes to the Government of Belize.

**Plaintiffs Inherit an Insolvent, Bureaucratically-Delayed Development and a Homeowners Association ("HOA") with No Funds and a Running Yearly Deficit.**

32.    Orchid Bay's HOA has been active since its inception in 2008.  When Legacy took over Orchid Bay in fall of 2016, the Orchid Bay development's bank accounts contained a total of only $24,032.39.  Defendant Kahn, by virtue of his prior control of the Orchid Bay project, knew of the financial state of the project and the amount in the Orchid Bay bank accounts at the time Plaintiffs took over the project.

33.    Orchid Bay, as a project, was also insolvent, in that its costs far exceeded its revenues.

34.    Orchid Bay Marketing had sold 99 residential lots to buyers but had only transferred title on 66 of them.  The remaining 33 buyers title transfers were bogged down in bureaucratic delays which

had been exacerbated in part by Verde's machinations as punishment for Orchid Bay Marketing's failure to register with GST, and Williams' staunch refusal to "play ball."

35.    As for the HOA, every year since the takeover, it has operated at a deficit.  Each year, Legacy contributes to the HOA to make up for the shortfall.  For example, as of May 31, 2020, the Orchid Bay HOA has collected $75,856 in community dues, while it has spent a total of $67,322 in community expenses.  By the end of the year, the HOA will be in a deficit yet again.  A copy of this report is attached to this Complaint as Exhibit 1.

36.    Moreover, the HOA sends out reports on the HOA's financials once a year to every Orchid Bay homeowner, save for those who have opted out of email communications from Legacy.  Those yearly reports break down the source of the HOA funds and the categories of HOA expenses.  Copies of the yearly HOA financial reports from 2017, 2018, and 2019 are attached to this Complaint as Exhibit 2.

**COVID-19 Hits Orchid Bay.**

37.    Legacy had made great progress in continuing the development of Orchid Bay by the spring of 2020.  As recounted above, Plaintiffs helped Orchid Bay avoid an extortionate tax scheme—and had the perpetrator brought to justice—and buoyed the shortfalls in the HOA's budget.  Construction had started to resume now that the chief roadblock to progress—Verde's tax shakedown and punitive bureaucratic red tape—had been removed.

38.    Then the COVID-19 pandemic hit.  The Government of Belize instituted a state of emergency on April 1, 2020.  Due to financial constraints, Legacy was forced to furlough employees—with appropriate severance—and reduce wages to lower the HOA's overhead.

39.    However, despite the staffing cuts, construction at Orchid Bay continued on eleven residences, illustrating Plaintiffs' commitment to completing the Orchid Bay project.

**Defendants Conspire to Force a Reversion of Orchid Bay to Defendant Kahn by Disrupting Legacy's Sales to Existing and Prospective Buyers and Partners.**

40.    Despite the demonstrable progress made by Plaintiffs at Orchid Bay considering the state of disarray the project was in at the time they took over, upon information and belief, a cadre of Orchid Bay residents have conspired to damage Plaintiffs' reputations until they are forced to turn Orchid Bay

back over to Orchid Bay Marketing and Defendant Kahn.  Upon information and belief, Kahn, having been found personally liable in two proceedings various claims, including breach of contract and fraud, brought by Orchid Bay residents, is seeking to re-take the Orchid Bay project in order to turn a profit and cut his losses.[1]  Upon information and belief, Defendants seek to accomplish this goal by defaming Plaintiffs, chiefly via libelous and derogatory posts in a Facebook group—the "Orchid Bay Homeowners Association Forum" (the "Facebook Group"), a private Facebook group administrated by Orchid Bay owners Dean and Sue Roberts and Dean Helmick.

41.    Upon information and belief, Kahn began the conspiracy to remove Legacy and Williams from the Orchid Bay project by contacting various Orchid Bay owners to disseminate false and defamatory statements about Plaintiffs, as well as encouraging other owners to repeat those same false and defamatory statements to other owners and prospective buyers via posts in the Facebook Group and other means, make their own false and defamatory statements about Plaintiffs to other owners and prospective buyers via posts in the Facebook Group and other means, and otherwise disparage Plaintiffs in the Facebook Group and by other means.  Upon information and belief, Kahn has convinced the other Defendants that it is in their best interest to have Kahn's company re-take control of the project and that in order for that to happen, Defendants must defame and disparage Plaintiffs' reputation such that prospective buyers—and owners that have purchased homes and/or land that are awaiting completion of construction—will back out, the project will become financially distressed, and Kahn can reacquire the now-distressed project and associated entities from Plaintiffs.

42.    Kahn told one such buyer that, when Plaintiffs took over the project, Plaintiffs took that buyer's approximately $162,000 deposit (made prior to Plaintiffs' takeover of the project from Kahn) and spent it on their own expenses, rather than on construction of the buyer's home at Orchid Bay.  However, as discussed above, *supra* ¶¶ 32-36, Plaintiffs inherited an Orchid Bay project with only approximately $24,000 in the bank.  Kahn knew this fact by virtue of his position as the prior developer on the project.

---

[1] Moreover, the other business Kahn is involved with, Bridgeline Digital, Inc. ("Bridgeline"), is currently experiencing financial distress.  Bridgeline's most recent Form 10-Q disclosure reported on May 14, 2020 that Bridgeline's "management believes there is substantial doubt about the Company's ability to continue as a going concern for at least twelve months following the issuance of this Form 10-Q."  Upon information and belief, Bridgeline's admitted severe financial distress formed another basis for Kahn's motivation to reacquire the Orchid Bay project and recoup some of his losses.  A copy of Bridgeline most recent Form 10-Q disclosure is attached to this Complaint as Exhibit 3.

43.     Upon information and belief, Kahn also told Defendant Osteen that there was anywhere from $1 million to $1.5 million in the Orchid Bay bank accounts when Plaintiffs took over the project. Again, by virtue of his prior position as the developer of the project, Kahn knew this to be untrue.

44.     In and around May of 2020, Defendants Mr. and Mrs. Kula posted a series of false and defamatory remarks about Plaintiffs in the Facebook Group.  Those defamatory remarks include the following statements made by the following speakers:

    a.     Thomas Kula:

        i.     "Ask the folks who bought a lot that was already owned by someone else.. that's [sic] also what sanctuary bay [sic] did."

        ii.     "Unfortunately [sic] much of our HOA money and new buyers [sic] money is spent on his legal fees and our court system allows him to continue to delay hearings."

        iii.     "Belize laws turn a blind eye to this kind of developer fraud.  His continued greasing of palms keeps him out of jail."

        iv.     Referring to a loan made by Mr. Kula to Legacy (hereinafter the "Kula-Legacy Loan"): "He has stolen from us and we continue to look at every way possible to put a stop to this."

    b.     Joanne Kula:

        i.     "@Laurie Gyles exactly!! No accounting of funds or any records at all!!"

45.     Mr. Kula also made a series of false and defamatory statements to another Orchid Bay owner in private Facebook messenger conversations.  These statements include:

    a.     Referring to the Kula-Legacy Loan: "[Plaintiffs] [m]ade no attempt to pay us or refund buyer."

46.     However, in that same private Facebook messenger conversation with a fellow Orchid Bay owner, Mr. Kula admitted that he knew his prior statements regarding the supposed "double sale" were false.  Mr. Kula admitted that he had lied about the circumstances surrounding the supposed "double-selling" of his property.  Kula admitted to this owner that his property had not been sold twice, but rather, it had in fact been inadvertently used as collateral for a loan to the Orchid Bay project.  A copy of the private Facebook message to another Orchid Bay owner from Mr. Kula, as provided to

Williams via a WhatsApp message from the other Orchid Bay owner, is attached to this Complaint as Exhibit 4.

47.     Additionally, Mr. Kula, in an open letter to Orchid Bay owners, admitted that the property had not been "double-sold," as well as admitting that the Kula-Legacy Loan is in the process of being repaid.  Mr. Kula's open letter is attached to this Complaint as Exhibit 5.

48.     Several owner Defendants repeated the false and defamatory statements made by Kahn as part of the conspiracy to interfere with Plaintiffs' business.  The following Defendants repeated Kahn's claims as follows:

    a.     Kathi Osteen

        i.     "CW received the title to the OB ppty [sic], plus $1million [sic] of OB money, that's all gone."

    b.     Elizabeth Diaz

        i.     "There was $1.5 [million] in OB when he took over, WHERE IS IT! No one knows."

49.     A compilation of screenshots of the Facebook Group posts referenced in paragraphs 44 and 48 are attached to this Complaint as Exhibit 6.

50.     Beyond the defamatory statements themselves, Defendants have posted in the Facebook Group about the conspiracy orchestrated by Kahn.  These statements include the following statements by the following speakers in the Facebook Group:

    a.     Thomas Kula:

        i.     "Ari has said as recently as last week that he wants to help."

    b.     Elizabeth Diaz:

        i.     "I also like Ari's Plan! GET RID OF THE CANCER!!"

    c.     Kathi Osteen:

        i.     "Ari has a plan, it makes sense, I like it and I'm supporting it. He is happy to share it with anyone. He tried working with CW and found him to be delusional, so he's been working in the background with some OB owners…"

        ii.     "I asked [Ari] what we can do in the meantime, do we have any leverage.

He said speak up and speak out."

           iii.    "I asked Dean [Helmick] . . . he needed the same answers . . . next stop was Ari. I told him this group was emerging…"

        d.    Stephen Honeybill:

           i.    When asked about "Ari's plan" by Kerry Snider, Stephen Honeybill posted Kahn's phone number.

        e.    Dean Helmick:

           i.    When asked how to get information on "the plan," Helmick posted "contact Ari Kahn at 516-684 9017 ari.kahn@outlook.com."

51.    Kathi Osteen has also made at least one statement in a private Facebook messenger chat with another Orchid Bay owner that indicate a conspiracy with Kahn:

        a.    "Ari, myself and some others are working behind the scenes to return OB ownership to the owners and we would love to have you join us."

52.    A compilation of the Facebook Group posts and Facebook messages regarding the Kahn-orchestrated conspiracy referenced in paragraphs 50 through 51 are attached to this Complaint as Exhibit 7.

53.    Defendant Stewart also openly posted on the Facebook Group about the concerted, conspiratorial intent and effort to disrupt Plaintiffs' business when she wrote, "[C]reating some serious problems for CW would stop him from selling to new people.  This would get his attention."  A copy of Stewart's Facebook Group post is attached to this Complaint as Exhibit 8.

54.    The coordinated nature of the efforts to interfere with Legacy's business relationships through a campaign of defamation and disparagement designed to force the ouster of Legacy and Williams is borne out by the fact that Mr. Kula designed t-shirts that read "Stop the Orchid Bay Scam – Join the Revolution – Take Back What's Ours" on the front and "Chris Williams MUST GO" on the back.  Mr. Kula noted that he was "taking orders" for those that wanted t-shirts and that he "plan[ned] to wear them during upcoming Sales Tours."  A copy of the post to the Facebook Group regarding the t-shirt campaign is attached to this Complaint as Exhibit 9.

55.    In response to these inflammatory posts about Plaintiffs, owner Diana VanAlstine McKee

(hereinafter "VanAlstine McKee") posted in the Facebook Group and urged against a concerted effort to disrupt Plaintiffs' sales efforts.  In particular, VanAlstine McKee wrote, "This site is for the purpose of Orchid Bay owners to share our personal experience's [sic] through pictures videos, and conversation and to promote, get to know each other and inform members of the activities and progress at our beautiful Orchid Bay Community. . . . This group is just for owners, so how is it helpful to "WARN" others of what has happened in the past. . . . I understand that future sales will be 'discouraged', [sic] but how does that help those of us who have purchased land and/or are having houses built?"

56.    In response to this post, Defendant Raglen replied, "How are we going to get the word out to discourage future buyers. You. That's the underling [sic] reason. I have talking points for you to answer those questions."

57.    VanAlstine McKee replied to Raglen, "are you talking to me about discouraging people. Not I. I'm not going.to [sic] discourage anyone. I'm good."  A copy of the VanAlstine McKee and Raglen exchange is attached to this Complaint as Exhibit 10.

58.    This is but a small sampling of the derogatory statements made about Plaintiffs with the intent to interfere with Plaintiffs' business relationships.  A compendium of other derogatory posts is attached to this Complaint as Exhibit 11.

59.    The conspiratorial intent to harm Plaintiffs can also be inferred from the fact that numerous posts from the Facebook Group were deleted in early June of 2020.  A compilation of deleted posts is attached to this Complaint as Exhibit 12.

60.    Upon information and belief, the conspiracy to interfere with Plaintiffs' business relations encompasses other parties whose identities are currently unknown to Plaintiffs—the Doe Defendants.

**The Conspiracy to Interfere with Plaintiffs' Business Results in Actual Disruption as Multiple Buyers and Prospective Buyers Express Doubts About Working with Plaintiffs.**

61.    The conspiracy to interfere with Plaintiffs' business achieved its goals when several buyers and prospective buyers began expressing doubts about moving forward as a result of the statements circulated online by the conspirators.

62.    Buyers Rick Smith and Kathleen Calligan had originally signed a contract to have a condominium built at Orchid Bay.  They have since pivoted to negotiating with Plaintiffs to have a

bungalow built instead. Similarly, buyers Danny and David Herrera (hereinafter "the Herreras"), who had signed a contract to have a villa built at Orchid Bay, also pivoted to negotiating with Plaintiffs to have a bungalow built at Orchid Bay instead. Smith, Calligan, and the Herreras have all expressed doubts about continuing to move forward with contract negotiations regarding their respective bungalows. Upon information and belief, this reluctance was caused because of the defamatory and derogatory posts of Defendants.

63. Similarly, other buyers who have signed contracts for bungalows have also expressed their concerns about working with Plaintiffs. Beth and Hans Lux (hereinafter "the Luxes") originally had signed a contract to have a condominium built. The Luxes later decided to switch to a bungalow and signed a contract to have one built. They later posted on the Facebook Group soliciting advice about the purchasing process. As a result, they were exposed to the defamatory and derogatory statements on the Facebook Group. Thereafter, they required repeated assurances from Plaintiffs about the construction process. Brian and Kerri Snider (hereinafter "the Sniders")—who, after contracting to purchase two lots, had also contracted for the construction of a bungalow—also expressed doubts to Plaintiffs about proceeding.

64. Dr. Mark Sorensen purchased two lots at Orchid Bay. Thereafter, Dr. Sorenson entered into discussions with Williams regarding the possibility of launching a joint venture with Legacy. After the derogatory and defamatory posts started circulating on the Facebook Group, Dr. Sorensen remarked to Williams that he was not sure about partnering with Williams because he seemed not well-liked by the Orchid Bay community.

## FIRST CLAIM

### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

### (By Plaintiff Legacy against all named Defendants and Does 1 - 12)

65. Plaintiffs reallege all relevant paragraphs above and incorporate them by reference herein.

66. There was a contract between OBM and (1) Rick Smith and Kathleen Calligan; and (2) the Herreras; (3) the Luxes; and (4) the Sniders (the "Construction Contracts"). Legacy was a third-party beneficiary of these contracts.

67. Defendants knew of the Construction Contracts.

68.     Defendants' conduct prevented performance or made performance more expensive or difficult.

69.     Defendants intended to disrupt the performance of the Construction Contracts or knew that disruption of performance was certain or substantially certain to occur.

70.     Legacy was harmed and Defendants' conduct was a substantial factor in causing Legacy's harm.  Defendants were all each other's coconspirators.  Defendants were aware that Defendants planned to intentionally interfere with Legacy's contractual relations.  Defendants agreed with each other and intended that the intentional interference be committed.

## SECOND CLAIM

### DEFAMATION

### (By Plaintiffs against Kahn, Mr. Kula, and Mrs. Kula)

71.     Plaintiffs reallege all relevant paragraphs above and incorporate them by reference herein.

72.     Defendants made the false and defamatory statements identified in paragraphs 42 through 45 to the members of the Facebook Group and/or other Orchid Bay owner(s).

73.     The members of the Facebook Group and/or other Orchid Bay owner(s) reasonably understood these false and defamatory statements to refer to Williams and/or Legacy.

74.     The members of the Facebook Group and/or other Orchid Bay owner(s) reasonably understood these false and defamatory statements to mean that:

        a.      Williams had taken over the Orchid Bay project when it had around $1 million in its operating bank accounts;

        b.      Williams had converted, embezzled, stole, "skimmed," or otherwise unlawfully or unethically "pocketed" HOA funds for his own personal uses;

        c.      Legacy and/or Williams had "double sold" one of the Orchid Bay lots to two distinct buyers;

        d.      Legacy and/or Williams had bribed Belizean government officials with HOA money;

        e.      Legacy and/or Williams had failed to repay the Kula-Legacy Loan at all; and

        f.      Legacy keeps no records or accounts of HOA or Orchid Bay funds.

75.    The defamatory statements identified in paragraphs 42 through 45 are false.

76.    Defendants knew that the false and defamatory statements identified in paragraphs 42 through 45 were false when they made them, or Defendants had serious doubts about the truth of the statements.

77.    Plaintiffs were harmed by the false and defamatory statements identified in paragraphs 42 through 45.

78.    The defamatory statements in paragraphs 42 through 44 were a substantial factor in causing Plaintiffs' harm.

## THIRD CLAIM

### TRADE LIBEL

**(By Plaintiff Legacy against Kahn, Mr. Kula, and Mrs. Kula)**

79.    Plaintiffs reallege all relevant paragraphs above and incorporate them by reference herein.

80.    Defendants made statements identified in paragraphs 42 through 45 that would be clearly or necessarily understood to have disparaged the quality of Legacy's property development.

81.    Defendants made those statements to the members of the Facebook Group and/or other Orchid Bay owner(s).

82.    The statements identified in paragraphs 42 through 45 were false.

83.    Defendants knew the statements identified in paragraphs 42 through 45 were false, or they acted with reckless disregard for the truth or falsity of those statements.

84.    Defendants knew or should have recognized that someone else might act in reliance on the statement, causing Plaintiffs financial loss.

85.    Legacy suffered direct financial harm because someone else acted in reliance on the statement.

86.    Defendants' conduct was a substantial factor in causing Legacy's harm.

87.    Defendants were all each other's coconspirators. Defendants were aware that Defendants planned to commit trade libel against Legacy. Defendants agreed with each other and intended that the trade libel be committed.

///

**FOURTH CLAIM**

**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

**(By Plaintiff Legacy against all named Defendants and Does 10 - 20)**

88.     Plaintiffs reallege all relevant paragraphs above and incorporate them by reference herein.

89.     Plaintiff Legacy and Dr. Mark Sorensen, and Plaintiff Legacy and Deborah Thornton-Knight were in an economic relationship that probably would have resulted in an economic benefit to Legacy.  Plaintiff Legacy was also in an economic relationship with Rick Smith and Kathleen Calligan, as well as the Herreras (collectively, with Smith and Calligan, the "Prospective Bungalow Buyers") that probably would have resulted in an economic benefit to Legacy, by virtue of its status as a third party beneficiary to the contemplated bungalow construction contracts.

90.     Defendants knew of the relationships between Legacy and Dr. Sorensen, Legacy Ms. Thornton-Knight, and Legacy and the Prospective Bungalow Buyers.

91.     Defendants engaged in defamation and trade libel intended to disrupt the relationship between Legacy and Dr. Sorensen, Legacy and Ms. Thornton-Knight, and Legacy and the Prospective Bungalow Buyers.

92.     The relationship between Legacy and Dr. Sorensen, Legacy and Ms. Thornton-Knight, and Legacy and the Prospective Bungalow Buyers was disrupted.

93.     Legacy was harmed and Defendants' conduct was a substantial factor in causing Legacy's harm.

94.     Defendants were all each other's coconspirators.  Defendants were aware that Defendants planned to intentionally interfere with Legacy's prospective economic advantage.  Defendants agreed with each other and intended that the intentional interference be committed.

**FIFTH CLAIM**

**NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**

**(By Plaintiff Legacy against all named Defendants and Does 10 - 20)**

95.     Plaintiffs reallege all relevant paragraphs above and incorporate them by reference herein.

96.     Plaintiff Legacy and Dr. Mark Sorensen, and Plaintiff Legacy and Deborah Thornton-Knight were in an economic relationship that probably would have resulted in an economic benefit to

Legacy.  Plaintiff Legacy was also in an economic relationship with the Prospective Bungalow Buyers that probably would have resulted in an economic benefit to Legacy, by virtue of its status as a third-party beneficiary to the contemplated bungalow construction contracts.

97.     Defendants knew or should have known of the relationship between Legacy and Dr. Sorensen, Legacy and Ms. Thornton-Knight, and Legacy and the Prospective Bungalow Buyers.

98.     Defendants knew or should have known that this relationship would be disrupted if they failed to act with reasonable care.

99.     Defendants failed to act with reasonable care.

100.     Defendants engaged in wrongful conduct through defamation and trade libel of Plaintiffs.

101.     The relationship between Legacy and Dr. Sorensen, Legacy and Ms. Thornton-Knight, and Legacy and the Prospective Bungalow Buyers was disrupted.

102.     Legacy was harmed and Defendants' conduct was a substantial factor in causing Legacy's harm.

## JURY DEMAND

Plaintiffs demand trial by jury.

///

///

///

///

///

///

///

///

///

///

///

///

///

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment and order against Defendants, and each of them, as to each and every cause of action, jointly and severally, as follows:

1. For all compensatory, economic and money damages, past, present and future, in an amount to fully compensate Plaintiff according to proof;

2. For all applicable special damages, as appropriate, according to proof;

3. For punitive and exemplary damages, as appropriate, according to proof;

4. For incidental and/or consequential damages, as appropriate, according to proof;

5. For appropriate equitable relief such as injunctive relief;

6. For reasonable attorneys' fees and costs according to proof; and

7. That such other and further relief the Court may deem just and proper be awarded as well.


Dated:   June 18, 2020                              GUPTA EVANS AND ASSOCIATES, PC


                                                    /s/Ajay Gupta
                                                    Ajay Gupta, Esq.
                                                    Attorney for Plaintiffs
                                                    LEGACY GLOBAL DEVELOPMENT, LLC and
                                                    CHRISTOPHER WILLIAMS

# EXHIBIT 1

Orchid Bay

General Fund HOA Income Statement

5/31/20

HOA Income

| | | |
|---|---|---|
| Casita Income | $ | 19,440.00 |
| Condo Income | $ | 15,688.00 |
| Lot Income | $ | 69,488.00 |
| Less Pymts Not Received | $ | (28,760.00) |
| 2020 HOA Cash Collected | $ | 75,856.00 |

HOA Expenses - January thru November

| | |
|---|---|
| Lovers Beach Amenity | (7,075.67) |
| Mosquito and Garbage | (3,225.00) |
| Repairs | (1,941.23) |
| Sand and Gravel for Beaches | (5,987.50) |
| Salaries for local staff | (37,924.00) |
| Internet Tech Support | (1,750.00) |
| Pool Expense | (4,793.60) |
| Social Security Exp | (2,500.00) |
| Utilities | (2,125.50) |
| HOA Expenses through 5/31/20 | (67,322.50) |

| | | |
|---|---|---|
| HOA Net Cash | $ | 8,533.51 |

# EXHIBIT 2

Orchid Bay
General Fund HOA Income Statement
12/31/17

HOA Income

| | | |
|---|---|---|
| Casita Income | $ | 21,600.00 |
| Condo Income | $ | 16,500.00 |
| Lot Income | $ | 72,398.00 |
| Less Pymts Not Received | $ | (15,300.00) |
| **2017 HOA Cash Collected** | **$** | **95,198.00** |

HOA Expenses

| | |
|---|---|
| Condo Insurance Expense | (6,489.00) |
| Beaches and Parks | (7,710.00) |
| Amenities | (12,152.00) |
| Mosquito Spray and Garbage | (13,698.00) |
| Equipment | (11,093.50) |
| Salaries for local staff | (82,784.00) |
| Social Security | (7,945.50) |
| **HOA Expenses for 2017** | **(141,872.00)** |

| | | | |
|---|---|---|---|
| **HOA Net Cash** | **$** | **(46,674.00)** | Paid by Legacy |

Orchid Bay
General Fund HOA Income
Statement
12/31/18

HOA Income

| | | |
|---|---|---|
| Casita Income | $ | 21,600.00 |
| Condo Income | $ | 16,500.00 |
| Lot Income | $ | 65,928.00 |
| Less Pymts Not Received | $ | (30,300.00) |
| **2018 HOA Cash Collected** | **$** | **73,728.00** |

HOA Expenses

| | |
|---|---|
| Condo Insurance Expenses | (6,812.00) |
| Beaches and Parks | (3,945.00) |
| Amenities - Tradewinds Pool | (16,402.00) |
| Amenities - Other | (3,877.50) |
| Mosquito Spray and Garbage | (10,646.50) |
| Equipment | (8,845.50) |
| Salaries for local staff | (50,892.50) |
| Social Security | (6,091.00) |
| **HOA Expenses for 2018** | **(107,512.00)** |

| | | | |
|---|---|---|---|
| **HOA Net Cash** | **$** | **(33,784.00)** | Paid by Legacy |

Orchid Bay
General Fund HOA Income Statement
12/31/19

| HOA Income | | |
|---|---|---|
| Casita Income | $ | 21,600.00 |
| Condo Income | $ | 16,500.00 |
| Lot Income | $ | 69,593.00 |
| Less Pymts Not Received | $ | (25,675.00) |
| **2019 HOA Cash Collected** | **$** | **82,018.00** |

| HOA Expenses | |
|---|---|
| Condo Insurance Expense | (6,812.00) |
| Beaches and Parks | (2,842.50) |
| Amenities | (11,273.00) |
| Mosquito Spray and Garbage | (9,055.00) |
| Roads | (1,496.50) |
| Equipment | (12,014.00) |
| Salaries for local staff | (53,879.50) |
| Social Security | (6,090.00) |
| **HOA Expenses for 2019** | **(103,462.50)** |

| **HOA Net Cash** | **$** | **(21,444.50)** | Paid by Legacy |
|---|---|---|---|

# EXHIBIT 3

10-Q 1 blin20200331_10q.htm FORM 10-Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

## Form 10-Q

---

(Mark One)

☒ QUARTERLY REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2020

OR

☐ TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

*Commission File Number 333-139298*

---

# Bridgeline Digital, Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **52-2263942** |
| State or other jurisdiction of incorporation or organization | IRS Employer Identification No. |

| | |
|---|---|
| **100 Sylvan Road, Suite G7000** | |
| **Woburn, Massachusetts** | **01801** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(781) 376-5555**
(Registrant's telephone number, including area code)

(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒     No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files)  ☒ Yes    ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer" "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☒ | Smaller reporting company ☒ |
| | | Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

 Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).     Yes ☐  No ☒

Securities registered pursuant to Section (12)b of the Act:

| Title of each class | Trading Symbols(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 | BLIN | NASDAQ |

The number of shares of Common Stock par value $0.001 per share, outstanding as of May 11, 2020 was 3,412,281.

1

**Bridgeline Digital, Inc.**

**Quarterly Report on Form 10-Q**

**For the Quarterly Period ended March 31, 2020**

**Index**

|  |  |  | Page |
|---|---|---|---|
| **Part I** | **Financial Information** | | |
| Item 1. | Condensed Consolidated Financial Statements | | |
| | Condensed Consolidated Balance Sheets (unaudited) as of March 31, 2020 and September 30, 2019 | | 4 |
| | Condensed Consolidated Statements of Operations (unaudited) for the three and six months ended March 31, 2020 and 2019 | | 5 |
| | Condensed Consolidated Statements of Comprehensive Income/(Loss) (unaudited) for the three and six months ended March 31, 2020 and 2019 | | 6 |
| | Condensed Consolidated Statements of Stockholders' Equity (unaudited) for the three and six months ended March 31, 2020 and 2019 | | 7 |
| | Condensed Consolidated Statements of Cash Flows (unaudited) for the six months ended March 31, 2020 and 2019 | | 8 |
| | Notes to Unaudited Condensed Consolidated Financial Statements | | 9 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 26 |
| Item 3. | Qualitative and Quantitative Disclosures About Market Risk | | 35 |
| Item 4. | Controls and Procedures | | 35 |
| **Part II** | **Other Information** | | |
| Item 1. | Legal Proceedings | | 36 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | | 36 |
| Item 6. | Exhibits | | 37 |
| **Signatures** | | | 39 |

2

**Bridgeline Digital, Inc.**

**Quarterly Report on Form 10-Q**

**For the Quarterly Period ended March 31, 2020**

*Statements contained in this Report on Form 10-Q that are not based on historical facts are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements may be identified by the use of forward-looking terminology such as "should," "could," "may," "will," "expect," "believe," "estimate," "anticipate," "intends," "continue," or similar terms or variations of those terms or the negative of those terms. These statements appear in a number of places in this Form 10-Q and include statements regarding the intent, belief or current expectations of Bridgeline Digital, Inc. Forward-looking statements are merely our current predictions of future events. Investors are cautioned that any such forward-looking statements are inherently uncertain, are not guaranties of future performance and involve risks and uncertainties. Actual results may differ materially from our predictions. Important factors that could cause actual results to differ from our predictions include the impact of the weakness in the U.S. and international economies on our business, our inability to manage our future growth effectively or profitably, fluctuations in our revenue and quarterly results, our license renewal rate, the impact of competition and our ability to maintain margins or market share, the limited market for our common stock, the volatility of the market price of our common stock, the ability to maintain our listing on the NASDAQ Capital market, the ability to raise capital, the performance of our products, our ability to respond to rapidly evolving technology and customer requirements, our ability to protect our proprietary technology, dependence on third parties, the security of our software and response to cyber security risks, our ability to meet our financial obligations and commitments, our dependence on our management team and key personnel, our ability to hire and retain future key personnel, or our ability to maintain an effective system of internal controls, and our ability to respond to government regulations. Although we have sought to identify the most significant cause actual results to our business, we cannot predict whether, or to what extent, any of such risks may be realized, nor is there any assurance that we have identified all possible issues which we might face. We assume no obligation to update our forward-looking statements to reflect new information or developments. We urge readers to review carefully the risk factors described in our Annual Report on Form 10-K for the fiscal year ended September 30, 2019 as well as in the other documents that we file with the Securities and Exchange Commission. You can read these documents at www.sec.gov.*

Where we say "we," "us," "our," "Company" or "Bridgeline Digital" we mean Bridgeline Digital, Inc.

3

# PART I—FINANCIAL INFORMATION

**Item 1.        Condensed Consolidated Financial Statements.**

## BRIDGELINE DIGITAL, INC.
## CONDENSED CONSOLIDATED BALANCE SHEETS
(in thousands, except share and per share data)
(Unaudited)

| | March 31, 2020 | September 30, 2019 |
|---|---:|---:|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 234 | $ 296 |
| Accounts receivable, net | 874 | 979 |
| Prepaid expenses | 299 | 351 |
| Other current assets | 30 | 49 |
| Total current assets | 1,437 | 1,675 |
| Property and equipment, net | 267 | 299 |
| Operating lease assets | 385 | - |
| Intangible assets, net | 3,040 | 3,509 |
| Goodwill | 5,557 | 5,557 |
| Other assets | 101 | 115 |
| Total assets | $ 10,787 | $ 11,155 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Current portion of operating lease liabilities | $ 157 | $ - |
| Accounts payable | 2,236 | 1,740 |
| Accrued liabilities | 1,159 | 835 |
| Deferred revenue | 1,739 | 1,262 |
| Total current liabilities | 5,291 | 3,837 |
| Operating lease liabilities, net of current portion | 228 | - |
| Warrant liabilities | 593 | 3,514 |
| Other long term liabilities | 5 | 8 |
| Total liabilities | 6,117 | 7,359 |
| Commitments and contingencies | | |
| Stockholders' equity: | | |
| **Preferred stock - $0.001 par value; 1,000,000 shares authorized;** | | |
| **Series C Convertible Preferred stock:** | | |
| 11,000 shares authorized; 441 shares issued and outstanding at March 31, 2020 and September 30, 2019 | - | - |
| **Series A Convertible Preferred stock:** | | |
| 264,000 shares authorized; 154,894 shares at March 31, 2020 and 262,310 shares at September 30, 2019, issued and outstanding (liquidation preference $1,734 at March 31, 2020) | - | - |
| **Common stock - $0.001 par value; 50,000,000 shares authorized;** | | |
| 3,412,281 shares at March 31, 2020 and 2,798,475 shares at September 30, 2019, issued and outstanding | 3 | 3 |
| Additional paid-in capital | 78,014 | 75,620 |
| Accumulated deficit | (72,951) | (71,489) |
| Accumulated other comprehensive loss | (396) | (338) |
| Total stockholders' equity | 4,670 | 3,796 |

| | | | | |
|---|---|---|---|---|
| Total liabilities and stockholders' equity | $ | 10,787 | $ | 11,155 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

4

**BRIDGELINE DIGITAL, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
(in thousands, except share and per share data)
(Unaudited)

|  | Three Months Ended March 31, | | Six Months Ended March 31, | |
|---|---|---|---|---|
|  | 2020 | 2019 | 2020 | 2019 |
| Net revenue: | | | | |
| Digital engagement services | $ 899 | $ 911 | $ 1,995 | $ 1,984 |
| Subscription and perpetual licenses | 1,839 | 1,285 | 3,575 | 2,587 |
| Total net revenue | 2,738 | 2,196 | 5,570 | 4,571 |
| Cost of revenue: | | | | |
| Digital engagement services | 457 | 571 | 1,026 | 1,421 |
| Subscription and perpetual licenses | 727 | 1,036 | 1,517 | 1,675 |
| Total cost of revenue | 1,184 | 1,607 | 2,543 | 3,096 |
| Gross profit | 1,554 | 589 | 3,027 | 1,475 |
| Operating expenses: | | | | |
| Sales and marketing | 786 | 945 | 1,818 | 1,702 |
| General and administrative | 723 | 744 | 1,472 | 1,431 |
| Research and development | 426 | 489 | 816 | 907 |
| Depreciation and amortization | 249 | 78 | 507 | 104 |
| Goodwill impairment | - | - | - | 3,732 |
| Restructuring and acquisition related expenses | 367 | 304 | 372 | 304 |
| Total operating expenses | 2,551 | 2,560 | 4,985 | 8,180 |
| Loss from operations | (997) | (1,971) | (1,958) | (6,705) |
| Interest expense and other, net | (1) | (104) | (1) | (333) |
| Amortization of debt discount | - | (221) | - | (221) |
| Warrant liability expense | - | (11,272) | - | (11,272) |
| Change in fair value of warrant liabilities | 1,820 | 1,046 | 2,921 | 1,058 |
| Income (loss) before income taxes | 822 | (12,522) | 962 | (17,473) |
| Provision for income taxes | - | - | 3 | 4 |
| Net income (loss) | 822 | (12,522) | 959 | (17,477) |
| Dividends on convertible preferred stock | (27) | (78) | (106) | (157) |
| Deemed dividend on amendment of Series A convertible preferred stock | - | - | (2,314) | - |
| Net income (loss) applicable to common shareholders | $ 795 | $ (12,600) | $ (1,461) | $ (17,634) |
| Net income (loss) per share attributable to common shareholders: | | | | |
| Basic | $ 0.25 | $ (41.52) | $ (0.49) | $ (67.36) |
| Diluted | $ 0.17 | $ (41.52) | $ (0.50) | $ (67.36) |
| Number of weighted average shares outstanding: | | | | |
| Basic | 3,124,174 | 303,443 | 2,960,435 | 261,800 |
| Diluted | 4,412,935 | 303,443 | 3,027,147 | 261,800 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

5

**BRIDGELINE DIGITAL, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME/(LOSS)**
(in thousands)
(Unaudited)

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Net income (loss) | $ 822 | $ (12,522) | $ 959 | $ (17,477) |
| Other comprehensive income (loss): | | | | |
| Net change in foreign currency translation adjustment | (59) | 1 | (58) | 1 |
| Comprehensive income (loss) | $ 763 | $ (12,521) | $ 901 | $ (17,476) |

The accompanying notes are an integral part of these condensed consolidated financial statements.

6

# BRIDGELINE DIGITAL, INC.
## CONDENSED CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
(in thousands, except share data)
(Unaudited)

**For the Three and Six Months Ended March 31, 2020**

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance at October 1, 2019 | 262,751 | $ - | 2,798,475 | $ 3 | $ 75,620 | $ (71,489) | $ (338) | $ 3,796 |
| Stock-based compensation expense | | | | | 30 | | | 30 |
| Dividends on Series A convertible preferred stock | | | | | | (79) | | (79) |
| Deemed dividend on amendment of Series A convertible preferred stock (Note 8) | | | | | 2,314 | (2,314) | | |
| Net income | | | | | | 136 | | 136 |
| Foreign currency translation | | | | | | | 1 | 1 |
| Balance at December 31, 2019 | 262,751 | $ - | 2,798,475 | $ 3 | $ 77,964 | $ (73,746) | $ (337) | $ 3,884 |
| Issuance of common stock - warrant exercises | | | | | | | | - |
| Series A convertible preferred stock conversion to common | (107,416) | | 613,806 | | | | | - |
| Stock-based compensation expense | | | | | 50 | | | 50 |
| Dividends on Series A convertible preferred stock | | | | | | (27) | | (27) |
| Net income | | | | | | 822 | | 822 |
| Foreign currency translation | | | | | | | (59) | (59) |
| Balance at March 31, 2020 | 155,335 | $ - | 3,412,281 | $ 3 | $ 78,014 | $ (72,951) | $ (396) | $ 4,670 |

**For the Three and Six Months Ended March 31, 2019**

| | Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance at October 1, 2018 | 262,364 | $ - | 84,005 | $ - | $ 66,553 | $ (61,778) | $ (351) | $ 4,424 |
| Issuance of common stock, net of issuance costs | (54) | | 28,481 | - | 4,377 | | | 4,377 |
| Stock-based compensation expense | | | | | 97 | | | 97 |
| Preferred B stock conversion to common | | | 169,139 | | | | | - |
| Dividends on Series A convertible preferred stock | | | | | | (79) | | (79) |
| Net loss | | | | | | (4,955) | | (4,955) |
| Cumulative effect of the adoption of ASC 606 | | | | | | 78 | | 78 |
| Balance at December 31, 2018 | 262,310 | $ - | 281,625 | $ - | $ 71,027 | $ (66,734) | $ (351) | $ 3,942 |
| Common stock issued in connection with acquisition of business | | | 40,000 | | 476 | | | 476 |
| Stock-based compensation expense | | | | | 38 | | | 38 |
| Preferred B stock conversion to common | | | 3,201 | | | | | - |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dividends on Series A convertible preferred stock | | | | | | | | | | (78) | | | (78) |
| Net loss | | | | | | | | (12,522) | | | | | (12,522) |
| Foreign currency translation | | | | | | | | | | (1) | | | (1) |
| Balance at March 31, 2019 | 262,310 | $ | - | 324,826 | $ | - | $ | 71,541 | $ | (79,334) | $ | (352) | $ | (8,145) |

The accompanying notes are an integral part of these condensed consolidated financial statements.

7

**BRIDGELINE DIGITAL, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**
(in thousands)
(Unaudited)

| | Six Months Ended March 31, | |
|---|---|---|
| | 2020 | 2019 |
| Cash flows from operating activities: | | |
| Net income (loss) | $ 959 | $ (17,477) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Loss on disposal of property and equipment | - | 9 |
| Amortization of intangible assets | 470 | 66 |
| Depreciation | 28 | 34 |
| Other amortization | 9 | 22 |
| Goodwill impairment | - | 3,732 |
| Amortization of debt discount | - | 231 |
| Change in fair value of warrant liabilities | (2,921) | 10,215 |
| Stock-based compensation | 80 | 135 |
| Changes in operating assets and liabilities | | |
| Accounts receivable | 386 | 268 |
| Prepaid expenses | 59 | (558) |
| Other current assets and other assets | 16 | 394 |
| Accounts payable and accrued liabilities | 733 | 84 |
| Deferred revenue | 109 | 230 |
| Other liabilities | (18) | 66 |
| Total adjustments | (1,049) | 14,928 |
| Net cash used in operating activities | (90) | (2,549) |
| Cash flows from investing activities: | | |
| Software development capitalization costs | - | (11) |
| Purchase of property and equipment | - | (17) |
| Acquisition of businesses | - | (5,608) |
| Net cash used in investing activities | - | (5,636) |
| Cash flows from financing activities: | | |
| Proceeds from issuance of common stock, net of issuance costs | - | 4,373 |
| Proceeds from issuance of preferred stock, net of issuance costs | - | 8,878 |
| Borrowing on bank line of credit | - | 75 |
| Payments on bank line of credit | - | (2,156) |
| Payments on term notes from Montage Capital | - | (922) |
| Payments on promissory term notes | - | (941) |
| Cash dividends paid on Series A convertible preferred stock | - | (157) |
| Net cash provided by financing activities | - | 9,150 |
| Effect of exchange rate changes on cash and cash equivalents | 28 | 6 |
| Net increase (decrease) in cash and cash equivalents | (62) | 971 |
| Cash and cash equivalents at beginning of period | 296 | 644 |
| Cash and cash equivalents at end of period | $ 234 | $ 1,615 |
| Supplemental disclosures of cash flow information: | | |
| Cash paid for: | | |
| Interest | $ - | $ 271 |
| Income taxes | $ 3 | $ - |
| Non cash investing and financing activities: | | |
| Consideration paid in Common Stock in connection with acquisition of business | $ - | $ 480 |
| Dividends accrued on convertible preferred stock | $ 106 | $ 157 |
| Deemed dividend on amendment of Series A convertible preferred stock | $ 2,314 | $ - |

The accompanying notes are an integral part of these condensed consolidated financial statements.

8

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

## 1. Description of Business

*Overview*

Bridgeline Digital, The Digital Engagement Company™ (the "Company"), helps customers maximize the performance of their full digital experience from websites and intranets to online stores and campaigns and integrates Web Content Management, eCommerce, Marketing Automation, Site Search, Authenticated Portals, Social Media Management, Translation and Web Analytics to help organizations deliver digital experiences.

The Bridgeline Unbound platform is delivered through a cloud-based SaaS ("Software as a Service") multi-tenant business model, providing maintenance, daily technical operation and support; or via a traditional perpetual licensing business model, in which the software resides on a dedicated server in either the customer's facility or hosted by Bridgeline via a cloud-based hosted services model.

OrchestraCMS, delivered through a cloud-based SaaS, is the only content and digital experience platform built 100% native on Salesforce and helps customers create compelling digital experiences for their customers, partners, and employees; uniquely combining content with business data, processes and applications across any channel or device, including Salesforce Communities, social media, portals, intranets, websites, applications and services.

Celebros Search, delivered through a cloud-based SaaS, is a commerce-oriented, site search product that provides for Natural Language Processing with artificial intelligence to present very relevant search results based on long-tail keyword searches in seven languages.

The Company was incorporated under the laws of the State of Delaware on August 28, 2000.

*Locations*

The Company's corporate office is located in Woburn, Massachusetts. The Company maintains regional field offices serving the following geographical locations: Boston, Massachusetts; Chicago, Illinois; New York, New York; and Ontario, Canada. The Company has three wholly owned subsidiaries: Bridgeline Digital Pvt. Ltd. located in Bangalore, India, Bridgeline Digital Canada, Inc. located in Ontario, Canada, and Stantive Technologies Pty. Ltd. located in Australia.

*Going Concern*

The Company has incurred operating losses and used cash in its operating activities for the past several years. Cash was used to fund operations, develop new products, and build infrastructure. During the prior fiscal years and continuing into the current fiscal year, the Company has executed a restructuring plan that included a reduction of workforce and office space, which significantly reduced operating expenses. In March 2020, the Company executed a reduction in force plan for its domestic and Canadian operations aimed at improving efficiencies by combining functions, certain responsibilities and eliminating redundancies, which resulted in a reduction of 15 positions. The reduction in force was part of the Company's continuing and ongoing efforts to maintain a lower cost structure and was not an action taken in response to the coronavirus pandemic described below. The Company is continuing to maintain tight control over discretionary spending for the remainder of the 2020 fiscal year. The Company had zero debt at March 31, 2020.

In March 2020, the World Health Organization declared the outbreak of novel coronavirus disease ("COVID-19") as a pandemic. We expect our operations in all locations to be affected as the virus continues to proliferate. We have adjusted certain aspects of our operations to protect employees and customers while still meeting customers' needs for vital technology. We will continue to monitor the situation closely and it is possible that we will implement further measures. In light of the uncertainty as to the severity and duration of the pandemic, the impact on our revenues, profitability and financial position is uncertain at this time.

On April 17, 2020, the Company entered into a loan with an aggregate principal amount of $1,047,500, pursuant to the Paycheck Protection Program (See Note 7).

9

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

While the Company believes that future revenues and cash flows, as acquisitions completed in the fiscal 2019 second quarter continue to be integrated and a full year of operations occurs, will supplement its working capital and that it has an appropriate cost structure to support future revenue growth, based upon its current working capital and projected cash flows in the next twelve months, the Company will need additional sources of financing in place in order to ensure its operations are adequately funded. No definitive agreements for additional financing are in place as of the issuance date of this Form 10-Q and there can be no assurances that additional sources of financing could be obtained on terms that are favorable or acceptable to us and that revenue growth and improvement in cash flows can be achieved. Accordingly, management believes that there is substantial doubt about the Company's ability to continue as a going concern for at least twelve months following the issuance date of this Form 10-Q. No adjustments have been made to the accompanying condensed consolidated financial statements as a result of this uncertainty.

2. **Summary of Significant Accounting Policies**

*Basis of Presentation and Principles of Consolidation*

The condensed consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All significant inter-company balances and transactions have been eliminated in consolidation.

*Unaudited Interim Financial Information*

The unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP"), and with the instructions to Form 10-Q and Regulation S-X, and in the opinion of the Company's management these condensed consolidated financial statements include all adjustments, consisting of normal recurring adjustments and accruals, necessary for their fair presentation. The operating results for the three and six months ended March 31, 2020 are not necessarily indicative of the results to be expected for the year ending September 30, 2020. The accompanying September 30, 2019 Condensed Consolidated Balance Sheet has been derived from the audited financial statements at that date but does not include all of the information and footnotes required by US GAAP for complete financial statements. For further information, refer to the consolidated financial statements and footnotes thereto included in the Company's annual report on Form 10-K for the year ended September 30, 2019 as filed with the Securities and Exchange Commission on December 27, 2019.

*Reclassifications*

Certain amounts in the prior period financial statements have been reclassified to conform to the presentation in the current period financial statements. These reclassifications had no effect on the previously reported net loss.

*Leases*

In February 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") 2016-02, *Leases: Topic 842* ("ASU 2016-02" or "ASC 842"), which outlines principles for the recognition, measurement, presentation and disclosure of leases applicable to both lessors and lessees. The new standard requires lessees to recognize most leases on their balance sheets for the rights and obligations created by those leases.

The Company adopted the new lease standard during the fiscal 2020 first quarter using the effective date of October 1, 2019 as the date of initial application; therefore, the comparative prior periods presented have not been adjusted and continue to be reported under the previous lease standard. The Company applied the new standard using certain practical expedients, including:

- the package of practical expedients, which permits the Company not to reassess under the new standard our prior conclusions about lease identification, lease classification and initial direct costs;
- the short-term lease recognition exemption, which does not require the recognition of a right-of-use ("ROU") asset or lease liability for those leases that qualify;
- accounting for lease components and non-lease components as a single lease component for all underlying classes of assets.

10

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

As a result of adopting the new standard, substantially all of the Company's operating lease commitments were recognized as operating lease assets and liabilities, initially measured as the present value of future lease payments for the remaining lease term discounted using an incremental borrowing rate of 7.0%. At October 1, 2019, the adoption date, the Company recognized operating lease assets and liabilities of approximately $545.

The adoption of the new standard is non-cash in nature and had no impact on net cash flows from operating, investing or financing activities. See Note 12 for additional information regarding the Company's lease arrangements and updated summary of significant accounting policies related to our leases.

### Accounting Pronouncements Pending Adoption

*Intangibles – Goodwill and Other - Internal-Use Software*

In August 2018, the FASB issued ASU 2018-15, which addresses a customer's accounting for implementation costs incurred in a cloud computing arrangement that is a service contract. Under the new standard, customers will apply the same criteria for capitalizing implementation costs as they would for an arrangement that has a software license. ASU 2018-15 is effective for annual reporting periods beginning after December 15, 2019, including interim periods within those annual reporting periods, with early adoption permitted. The Company is currently evaluating the impact of the new standard on its consolidated financial statements and related disclosures.

*Fair Value*

In August 2018, the FASB issued ASU 2018-13, which changes the fair value measurement disclosure requirements of ASC 820. ASU 2018-13 will be effective for annual reporting periods beginning after December 15, 2019, including interim periods within those annual reporting periods, with early adoption is permitted for any eliminated or modified disclosures upon issuance of this ASU. The Company is currently evaluating the impact of the new standard on its consolidated financial statements and related disclosures.

*Financial Instruments – Credit Losses*

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments-Credit Losses (Topic 326)*, which requires entities to measure all expected credit losses for financial assets held at the reporting date based on historical experience, current conditions, and reasonable and supportable forecasts. This replaces the existing incurred loss model and is applicable to the measurement of credit losses on financial assets measured at amortized cost. ASU 2016-13 is effective for smaller reporting companies for annual reporting periods beginning after December 15, 2022, including interim periods within those annual reporting periods, with early adoption permitted. The Company is currently evaluating the impact of the new standard on its consolidated financial statements and related disclosures.

All other Accounting Standards Updates issued but not yet effective are not expected to have a material effect on the Company's future consolidated financial statements or related disclosures.

### 3. Accounts Receivable

Accounts receivable consists of the following:

|  | As of March 31, 2020 | | As of September 30, 2019 | |
|---|---|---|---|---|
| Accounts receivable | $ | 987 | $ | 1,067 |
| Allowance for doubtful accounts | | (113) | | (88) |
| Accounts receivable, net | $ | 874 | $ | 979 |

As of March 31, 2020, two customers represented approximately 18% and 14% of accounts receivable. As of September 30, 2019, three customers represented approximately 16%, 14% and 12% of accounts receivable. For the three months ended March 31, 2020 and 2019, one customer represented approximately 13% and 19% of the Company's total revenue, respectively. For the six months ended March 31, 2020, one customer represented approximately 12% of the Company's total revenue and for the six months ended March 31, 2019, two customers represented approximately 15% and 19% of the Company's total revenue.

11

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

**4. Fair Value Measurement and Fair Value of Financial Instruments**

The Company's other financial instruments consist principally of accounts receivable, accounts payable and warrant liabilities. The Company measures its financial assets and liabilities at fair value. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., exit price) in an orderly transaction between market participants at the measurement date. Additionally, companies are required to provide disclosure and categorize assets and liabilities measured at fair value into one of three different levels depending on the assumptions (i.e., inputs) used in the valuation. Level 1 provides the most reliable measure of fair value while Level 3 generally requires significant management judgment. Financial assets and liabilities are classified in their entirety based on the lowest level of input significant to the fair value measurement. The fair value hierarchy is defined as follows:

Level 1—Valuations are based on unadjusted quoted prices in active markets for identical assets or liabilities.

Level 2—Valuations are based on quoted prices for similar assets or liabilities in active markets, or quoted prices in markets that are not active for which significant inputs are observable, either directly or indirectly.

Level 3—Valuations are based on prices or valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement. Inputs reflect management's best estimate of what market participants would use in valuing the asset or liability at the measurement date.

The Company believes the recorded values for accounts receivable and accounts payable approximate current fair values as of March 31, 2020 and September 30, 2019 because of their short-term nature.

The Company's warrant liabilities are measured at fair value at each reporting period with changes in fair value recognized in earnings during the period. The fair value of the Company's warrant liabilities are valued utilizing Level 3 inputs. Warrant liabilities are valued using a Monte Carlo option-pricing model, which takes into consideration the market values of comparable public companies, considering among other factors, the use of multiples of earnings, and adjusted to reflect the restrictions on the ability of our shares to trade in an active market. The Monte Carlo option-pricing model uses certain assumptions, including expected life and annual volatility. The significant inputs and assumptions utilized were as follows:

|  | As of March 31, 2020 | | As of September 30, 2019 | |
|  | Montage Capital | Series C Preferred | Montage Capital | Series C Preferred |
|---|---|---|---|---|
| Volatility | 80% | 83.4% | 71% | 80.9% |
| Risk-free rate | 0.42% | 0.30% | 1.59% | 1.59% |
| Stock price | $ 0.67 | $ 0.67 | $ 1.91 | $ 1.91 |

The Company recognized gains of $1,820 and $1,046 for the three months ended March 31, 2020 and 2019, respectively and $2,921 and $1,058 for the six months ended March 31, 2020 and 2019, respectively, related to the change in fair value of warrant liabilities. The changes in fair value of warrant liabilities were due to changes in inputs, primarily a decline in stock price and the risk-free rate, to the Monte Carlo option-pricing model.

12

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

Assets and liabilities of the Company measured at fair value on a recurring basis as of March 31, 2020 and September 30, 2019 are as follows:

| | As of March 31, 2020 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Liabilities: | | | | |
| Warrant liability - Montage | $ - | $ - | $ 13 | $ 13 |
| Warrant liability - Series A, B and C | - | - | 580 | 580 |
| Total Liabilities | $ - | $ - | $ 593 | $ 593 |

| | As of September 30, 2019 | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Liabilities: | | | | |
| Warrant liability - Montage | $ - | $ - | $ 14 | $ 14 |
| Warrant liability - Series A, B and C | - | - | 3,500 | 3,500 |
| Total Liabilities | $ - | $ - | $ 3,514 | $ 3,514 |

The following table provides a rollforward of the fair value, as determined by Level 3 inputs, of the warrant liabilities:

| | Six Months Ended March 31, 2020 |
|---|---|
| Balance at beginning of period, October 1, 2019 | $ 3,514 |
| Additions | - |
| Exercises | - |
| Adjustment to fair value | (1,101) |
| Balance at end of period, December 31, 2019 | $ 2,413 |
| Additions | - |
| Exercises | - |
| Adjustment to fair value | (1,820) |
| Balance at end of period, March 31, 2020 | $ 593 |

## 5. Intangible Assets

The components of intangible assets, net of accumulated amortization, are as follows:

| | As of March 31, 2020 | As of September 30, 2019 |
|---|---|---|
| Domain and trade names | $ 10 | $ 52 |
| Customer related | 1,765 | 2,032 |
| Technology | 1,265 | 1,425 |
| Balance at end of period | $ 3,040 | $ 3,509 |

Total amortization expense related to intangible assets was $230 and $62 related to intangible assets for the three months ended March 31, 2020 and 2019, respectively, and $470 and $66 for the six months ended March 31, 2020 and 2019, respectively, and is reflected in Operating expenses on the Condensed Consolidated Statements of Operations. The estimated amortization expense for fiscal year 2020 (remaining), 2021, 2022, 2023, 2024 and thereafter is $428, $856, $761, $681, $304 and $10, respectively.

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

**6. Restructuring and Acquisition Related Expenses**

*Restructuring Activities*

During the three and six months ended March 31, 2019, the Company had certain expenditures related to restructuring plans, which had commenced in fiscal 2015, to improve efficiencies by implementing cost reductions in line with expected decreases in revenue. As part of these then on-going restructuring plans, the Company renegotiated several office leases and relocated to smaller space, negotiated sub-leases for the original space, executed a general work-force reduction and recognized costs for severance and termination benefits. These restructuring charges and accruals required estimates and assumptions, including contractual rental commitments or lease buyouts for vacated office space and related costs, and estimated sub-lease income. The Company's sub-lease assumptions include the rates to be charged to a sub-tenant and the timing of the sub-lease arrangement. All of the vacated lease spaces are currently contractually occupied by new sub-tenants for the remaining life of the lease. In the fiscal 2017 second quarter, the Company initiated a plan to shut down its operations in India, which was completed in the first half of fiscal 2020. During the three and six months ended March 31, 2020, expenditures related to these previous restructuring plans were minimal and the Company does not expect to incur significant expenditures in future periods.

In March 2020, the Company recognized $365 related to a reduction in force in its U.S. and Canada operations aimed at improving efficiencies by combining functions, certain responsibilities and eliminating redundancies which resulted in a reduction of 15 positions. During the three and six months ended March 31, 2020, the Company paid $155 related to this reduction in force.

As of March 31, 2020, and September 30, 2019, restructuring liabilities were $219 and $75, respectively, which are included in Accrued liabilities on the Condensed Consolidated Balance Sheets.

*Acquisition Related Expenses*

In connection with the fiscal 2019 second quarter acquisition of Stantive, the Company incurred legal, accounting and consulting fees of $304 during the three and six months ended March 31, 2019, which are included in Restructuring and acquisition related expenses in the Condensed Consolidated Statement of Operations. There were no acquisition related expenses incurred during the three and six months ended March 31, 2020.

**7. Debt**

During the six months ended March 31, 2019, the Company had a Line of Credit with Heritage Bank of Commerce (the "Line of Credit") and a term loan with Montage Capital II, L.P. (the "Montage Loan"). Borrowings under the Line of Credit accrued interest at the Wall Street Journal Prime Rate plus 1.75% and the Montage Loan bore interest at 12.75% per annum. During the six months ended March 31, 2019, interest expense was approximately $300 related to the Line of Credit and Montage Loan. The Company no longer maintains nor are any future borrowings available under the Line of Credit.

As more fully described in Note 8, in the fiscal 2019 second quarter, the Company concluded a private offering of Series C Convertible Preferred Stock, par value $0.001 per share. Proceeds were used, among other things, to pay-off in full the outstanding amounts on the Line of Credit and Montage Loan. As of and during the three and six months ended March 31, 2020, the Company had no debt and did not incur any related interest expense.

On April 17, 2020, Bridgeline Digital, Inc. entered into a loan with BNB Bank as the lender in an aggregate principal amount of $1,047,500 ("PPP Loan") pursuant to the Paycheck Protection Program ("PPP") under the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"). The PPP Loan is evidenced by a promissory note ("Note"). Subject to the terms of the Note, the PPP Loan bears interest at a fixed rate of one percent (1%) per annum, with the first six months of interest deferred, has an initial term of two years, and is unsecured and guaranteed by the Small Business Administration. The Company may apply to the Lender for forgiveness of the PPP Loan, with the amount which may be forgiven equal to the sum of payroll costs, covered rent obligations, and covered utility payments incurred by the Company during the eight-week period beginning on April 21, 2020, calculated in accordance with the terms of the CARES Act.

The Note provides for prepayment and customary events of default, including, among other things, cross-defaults on any other loan with the lender. The PPP Loan may be accelerated upon the occurrence of an event of default.

14

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

**8. Stockholders' Equity**

*Series A Convertible Preferred Stock*

The Company has designated 264,000 shares of its preferred stock as Series A Convertible Preferred Stock ("Series A Preferred Stock"). The shares of Series A Preferred Stock may be converted, at the option of the holder at any time, into such number of shares of common stock ("Conversion Shares") equal (i) to the number of shares of Series A Preferred Stock to be converted, multiplied by the stated value of $10.00 (the "Stated Value") and (ii) divided by the conversion price in effect at the time of conversion.

On December 31, 2019 (the "Amendment Date"), the Company filed a First Amended and Restated Certificate of Designations of the Series A Convertible Preferred Stock (the "Series A Amendment") with the Secretary of State for the State of Delaware, which amended and restated the Series A Preferred Stock, as more particularly set forth below:

*Conversion Price:* Reduced the conversion price from $812.50 per share to $1.75 per share, subject to adjustment in the event of stock splits or stock dividends.

*Mandatory Conversion:* The Company has the right, in its sole discretion, to require the holders to convert shares of the Series A Preferred Stock into Conversion Shares if (i) the Company's common stock has closed at or above $2.28 ($32.50 prior to the Series A Amendment) for fifteen (ten prior to the Series A Amendment) consecutive trading days and (ii) the Conversion Shares are (a) registered for resale on an effective registration statement or (b) may be resold pursuant to Rule 144.

*Company's Redemption Option:* The Company may redeem all or a portion of the outstanding shares of Series A Preferred Stock, at its option, provided that the Company provides ten business days' prior written notice of its intent to redeem the Series A Preferred Stock to the holder and in cash at a price per share of Series A Preferred Stock equal to 100% of the Stated Value of such shares of Series A Preferred Stock plus all accrued and unpaid dividends. Notwithstanding, the holder may convert its Series A Preferred Stock prior to the exercise of the Company's redemption option.

*Dividends:* Each outstanding share of Series A Preferred Stock is entitled to receive cumulative dividends, payable quarterly in arrears, at a rate of 5% per annum for the first eighteen months commencing on January 1, 2020, after which time the dividend rate will increase to 12% per annum (the dividend rate was 12% per annum prior to the Series A Amendment). Dividends are payable in cash or, at the election of the Company, by delivery of additional shares ("PIK Shares") of Series A Preferred Stock, subject to a cap of 64,000 PIK Shares, in the aggregate. Any accrued but unpaid dividends on the shares of Preferred Stock to be converted shall also be converted into common stock at the conversion price.

In the event of any liquidation, dissolution, or winding up of the Company, the holders of shares of Series A Preferred Stock will be entitled to receive in preference to the holders of common stock, the amount equal to the Stated Value per share of Series A Preferred Stock plus declared and unpaid dividends, if any. After such payment has been made, the remaining assets of the Company will be distributed ratably to the holders of common stock. The Series A Preferred Stock shall vote with the Common Stock on an as converted basis.

Prior to fiscal 2019, the Company had issued 64,000 shares of Series A Preferred Stock as PIK Shares to the Series A preferred shareholders, which is the maximum amount of cumulative PIK Shares authorized. Therefore, all future dividend payments will be cash dividends.

15

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

The Company determined that the Series A Amendment represents an extinguishment for accounting purposes. In making this determination, the Company considered the significance of the contractual terms added and revisions to existing contractual terms, including, but not limited to, the significant change in the conversion price and the addition of the Company's redemption option. These additions and revisions to existing contractual terms were considered to be qualitatively significant. The extinguishment of equity-classified convertible preferred stock is recognized as a deemed dividend measured as the difference between (1) the fair value of the consideration transferred; that is, the Series A Preferred Stock, as amended, and (2) the carrying value of the Series A Preferred Stock. At the Amendment Date, the fair value of the Series A Preferred Stock, as amended, was approximately $2,629 and its carrying value was approximately $315, resulting in a deemed dividend of $2,314 recognized as an increase to accumulated deficit and an increase to additional paid-in capital and is included as a component of net loss applicable to common shareholders. The estimated Amendment Date fair value of the Series A Preferred Stock was determined using the present value of probability weighted scenario analysis based on the per share publicly traded closing stock price of the Company's common stock.

*Series B Convertible Preferred Stock*

On October 16, 2018, in connection with a public offering, the Company issued 4,288 Series B Convertible Preferred Stock, par value $0.001 per share, with each share of Series B Convertible Preferred Stock convertible into 40 shares of the Company's common stock at a conversion price of $25.00 per share. As of September 30, 2019, all of the shares of Series B Convertible Preferred Stock were converted into 171,520 shares of common stock.

*Series C Preferred Convertible Stock and Associated Warrants*

On March 12, 2019, the Company entered into Securities Purchase Agreements with certain accredited investors (each, a "*Purchaser*"), pursuant to which the Company offered and sold to the Purchasers an aggregate of 10,227.5 units ("*Units*") for $1,000 per Unit, with such Units consisting of (i) an aggregate of 10,227.5 shares of the Company's newly designated Series C Convertible Preferred Stock, par value $0.001 per share ("*Series C Preferred stock*"); (ii) warrants to purchase an aggregate of 1,136,390 shares of Company common stock, par value $0.001 per share ("*Common Stock*"), subject to adjustment (as set forth below), with a term of 5.5 years ("*Series A Warrants*"); (iii) warrants to purchase an aggregate of 1,136,390 shares of Common Stock, subject to adjustment (as set forth below), with a term of 24 months ("*Series B Warrants*"); and (iv) warrants to purchase an aggregate of 1,420,486 shares with a term of 5.5 years ("*Series C Warrants*," and together with the Series A Warrants and Series B Warrants, the "*Series C Preferred Warrants*"). The Company also issued warrants to purchase an aggregate of 127,848 shares of the Company's Common Stock to the placement agents that were also subject to the same resets as described below.

At the time of issuance, no shares of Series C Preferred stock could be converted into Conversion Shares and no Series C Preferred Warrants could be exercised for shares of Common Stock, unless and until such time that the Company had obtained approval from its stockholders, at an annual or special meeting or via written consent, to (i) issue the Conversion Shares and warrants upon the conversion and exercise of the Series C Preferred stock and associated warrants, respectively, which number of shares in the aggregate exceeds 20% of the Company's shares of Common Stock issued and outstanding immediately prior to the Closing Date, as required by Nasdaq Marketplace Rule 5635(d) (the "*Issuance Approval*"), and (ii) amend its Amended and Restated Certificate of Incorporation, as amended ("*Charter*") to increase the number of shares of Common Stock available for issuance thereunder (or effect a reverse stock split of its issued and outstanding shares of Common Stock so as to effectively increase the number of shares of Common Stock available for issuance) by a sufficient amount to permit the conversion of all outstanding Series C Preferred stock into Conversion Shares and all Series C Preferred Warrants into warrant shares (the "*Authorized Share Approval*," and together with the Issuance Approval, the "*Stockholder Approvals*"). In addition, the Company may not effect, and a Purchaser will not be entitled to, convert the Series C Preferred stock or exercise any Series C Preferred Warrants, which, upon giving effect to such conversion or exercise, would cause (i) the aggregate number of shares of Common Stock beneficially owned by the Purchaser (together with its affiliates) to exceed 4.99% (or, at the election of the holder, 9.99%) of the number of shares of Common Stock outstanding immediately after giving effect to the exercise. The Stockholder Approvals were obtained on April 26, 2019 and the Company's Charter was amended on April 29, 2019. As of March 31, 2020, a total of 9,786.5 shares of Series C Preferred stock have been converted to 1,087,443 shares of Common Stock.

The Company determined that the Series C Preferred stock and the Series C Preferred Warrants are each separate freestanding financial instruments issued in a single transaction (the Private Placement) and that the Series C Warrants have been determined to be derivative liabilities, which are measured at fair value on a recurring basis. The net proceeds of that single transaction were allocated to each of the freestanding financial instruments based on their fair values. The purchase price was allocated to the Series C Preferred Warrants first leaving no value for the Series C Preferred stock, as the Series C Warrants were fair valued at $21.5

million and the total proceeds were only $10.3 million. The final allocation of the proceeds resulted in a charge against income of $11.2 million for the excess of the fair value over the net proceeds, which was recorded in the fiscal 2019 second quarter.

16

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

*Common Stock*

*Public Offering*

On October 16, 2018, the Company issued and sold in a public offering (the "*Offering*") an aggregate of (i) 28,480 Class A Units (the "Class A Units") at a price of $25.00 per Class A Unit, consisting of (i) one share of the Company's common stock and one five-year warrant to purchase one share of Company common stock at an exercise price of $25.00 per share and (ii) 4,288 Class B Units, consisting of one share of Series B Convertible Preferred Stock and a Warrant to purchase one share of common stock. The net proceeds to the Company from the Offering, after deducting the underwriter's fees and expenses, were approximately $4.4 million.

In addition, the Company granted the underwriter of the Offering a 45-day option (the "*Over-allotment Option")* to purchase up to an additional 30,000 shares of common stock and additional warrants to purchase an additional 30,000 shares of common stock. At the time of the Offering, the underwriter partially exercised the Over-allotment Option by electing to purchase from the Company additional warrants to purchase 8,000 shares of common stock.

*Amended and Restated Stock Incentive Plan*

The Company has granted common stock, common stock warrants, and common stock option awards (the "Equity Awards") to employees, consultants, advisors and former debt holders of the Company and to former owners and employees of acquired companies that have become employees of the Company. The Company's Amended and Restated Stock Incentive Plan (the "Plan") provided for the issuance of up to 5,000 shares of common stock. This Plan expired in August 2016. As of March 31, 2020, there were 3,246 options outstanding under the Plan. On April 29, 2016, the stockholders approved a new stock incentive plan, The 2016 Stock Incentive Plan (the "2016 Plan"). The 2016 Plan authorizes the award of incentive stock options, non-statutory stock options, restricted stock, unrestricted stock, performance shares, stock appreciation rights and any combination thereof to employees, officers, directors, consultants, independent contractors and advisors of the Company. In November 2019, the Company increased the number of common shares available for issuance under the 2016 Plan from 10,000 to 800,000 shares. There were no revisions to exercise prices, terms or any other underlying provisions of existing stock options outstanding. As of March 31, 2020, there were 589,955 options outstanding and 210,045 shares available for future issuance under the 2016 Plan.

*Compensation Expense*

Compensation expense is generally recognized on a graded accelerated basis over the vesting period of grants. Compensation expense is recorded in the Condensed Consolidated Statements of Operations with a portion charged to Cost of revenue and a portion to Operating expenses depending on the employee's department. During the three and six months ended March 31, 2020 and 2019, compensation expense related to share-based payments was as follows:

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| Cost of revenue | $ 5 | $ 3 | $ 7 | $ 7 |
| Operating expenses | 45 | 35 | 73 | 128 |
| | $ 50 | $ 38 | $ 80 | $ 135 |

As of March 31, 2020, the Company had approximately $399 of unrecognized compensation costs related to unvested options, which is expected to be recognized over a weighted-average period of 2.5 years.

17

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

*Common Stock Warrants*

The Company typically issues warrants to individual investors and placement agents to purchase shares of the Company's common stock in connection with public and private placement fund raising activities. Warrants may also be issued to individuals or companies in exchange for services provided for the Company. The warrants are typically exercisable six months after the issue date, expire in five years, and contain a cashless exercise provision and piggyback registration rights.

*Montage Warrant* - As additional consideration for the Montage Loan, the Company issued to Montage Capital an eight-year warrant (the "*Montage Warrant*") to purchase 1,326 shares of the Company's common stock at a price equal to $132.50 per share. The Montage Warrant contains an equity buy-out provision upon the earlier of (1) dissolution or liquidation of the Company, (2) any sale or distribution of all or substantially all of the assets of the Company or (3) a "Change in Control" as defined within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange Act of 1934. Montage Capital has the right to receive an equity buy-out of $250. If the equity buy-out is exercised, the Montage Warrant will be surrendered to the Company for cancellation. The fair value of the Montage warrant liability at March 31, 2020 and September 30, 2019 was $13 and $14, respectively.

*Series A, B and C Preferred Warrants - Reset Dates and Reset Price* - The Series A Warrants and Series B Warrants had an initial exercise price of $9.00 per share; *provided, however*, that the exercise price of the Series A Warrants and Series B Warrants could be reset up to three times (each, a "*Reset Date*"), as more specifically set forth in the Series C Warrants, to a price equal to the greater of (i) 80% of the average of the two lowest VWAP days out of the 20 consecutive trading days immediately preceding the Reset Date, and (ii) $4.00 (the "*Floor*") (the "*Reset Price*"). Upon the applicable Reset Date, the number of shares of Common Stock issuable pursuant to the Series A Warrants and Series B Warrants would also be adjusted, as more specifically set forth in the Series C Warrants. The Series C Warrants were not exercisable until the applicable Reset Date. At the First Reset Date, which was May 29, 2019, the Reset Price was set to the Floor price of $4.00 per share. Therefore, there will be no future Reset Dates or Reset Prices. The shares were fixed to the following at the Reset Date: the number of shares of Common Stock issuable upon exercise of the Series A Warrants is 2,556,875 shares, Series B Warrants is 2,556,875 shares, and Series C Warrants is 1,420,486. The number of shares of Common Stock issuable upon exercise of warrants issued to the placement agents is 127,848 shares.

During the six months ended March 31, 2020, no warrants were exercised. As of March 31, 2020, a total of 1,351,217 shares of Series C Warrants have been exercised and no Series A, B or placement agent warrants exercised. The fair value of the total warrant liability related to the Series A, B and C warrants and the placement agent warrants at March 31, 2020 and September 30, 2019 was $580 and $3,500, respectively.

18

Total warrants outstanding as March 31, 2020 were as follows:

| Type | Issue Date | Shares | Price | Expiration |
|---|---|---|---|---|
| Director/Shareholder | 5/12/2015 | 240 | $ 1,000.00 | 5/12/2020 |
| Director/Shareholder | 12/31/2015 | 120 | $ 1,000.00 | 12/31/2020 |
| Placement Agent | 5/17/2016 | 1,736 | $ 187.50 | 5/17/2021 |
| Placement Agent | 5/11/2016 | 1,067 | $ 187.50 | 5/11/2021 |
| Placement Agent | 7/15/2016 | 880 | $ 230.00 | 7/15/2021 |
| Investors | 11/9/2016 | 4,271 | $ 175.00 | 5/9/2022 |
| Director/Shareholder | 12/31/2016 | 120 | $ 1,000.00 | 12/31/2021 |
| Financing (Montage) | 10/10/2017 | 1,327 | $ 132.50 | 10/10/2025 |
| Director/Shareholder | 12/31/2017 | 120 | $ 1,000.00 | 12/31/2021 |
| Investors | 10/19/2018 | 3,120 | $ 25.00 | 10/19/2023 |
| Placement Agent | 10/16/2018 | 10,000 | $ 31.25 | 10/16/2023 |
| Investors | 3/12/2019 | 159,236 | $ 4.00 | 10/19/2023 |
| Investors | 3/12/2019 | 2,556,875 | $ 4.00 | 9/12/2024 |
| Investors | 3/12/2019 | 2,556,875 | $ 4.00 | 9/12/2021 |
| Investors | 3/12/2019 | 69,295 | $ 0.05 | 9/12/2024 |
| Placement Agent | 3/12/2019 | 127,848 | $ 4.00 | 9/12/2024 |
| Total | | 5,493,130 | | |

*Summary of Option and Warrant Activity and Outstanding Shares*

During the six months ended March 31, 2020, the Company granted options to purchase 681,353 shares at an exercise price of $1.40, of which 70,000 shares vest on November 20, 2020 and the remainder vest ratably over a three-year period commencing November 20, 2019 and 1,000 shares at an exercise price of $1.61 which vest ratably over a three-year period commencing on December 2, 2019. All such options granted expire ten years from the date of grant.

The weighted-average option fair values, as determined using the Black-Scholes option valuation model, and the assumptions used to estimate these values for stock options granted during the six months ended March 31, 2020, are as follows:

| | |
|---|---|
| Weighted-average fair value per share option | $ 0.96 |
| Expected life (in years) | 6.0 |
| Volatility | 76.29% |
| Risk-free interest rate | 1.61% |
| Dividend yield | 0.0% |

The expected option term is the number of years the Company estimates the options will be outstanding prior to exercise based on historical trends of employee turnover. Expected volatility is based on historical daily price changes of the Company's common stock for a period equal to the expected life. The risk-free interest rate is based on the U.S. Treasury yield in effect at the time of grant. The expected dividend yield is zero since the Company does not currently pay cash dividends on its common stock and does not anticipate doing so in the foreseeable future.

19

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

A summary of combined stock option and warrant activity for the six months ended March 31, 2020 are as follows:

| | Stock Options | | Stock Warrants | |
|---|---|---|---|---|
| | Options | Weighted Average Exercise Price | Warrants | Weighted Average Exercise Price |
| Outstanding, October 1, 2019 | 7,848 | $ 306.41 | 5,493,857 | $ 4.54 |
| Granted | 682,353 | 1.40 | - | - |
| Exercised | - | - | - | - |
| Forfeited/Exchanged | (97,000) | 1.50 | - | - |
| Expired | - | - | (727) | 936.30 |
| Outstanding, March 31, 2020 | 593,201 | $ 5.13 | 5,493,130 | $ 4.41 |
| Options vested and exercisable, March 31, 2020 | 7,307 | $ 303.13 | | |

As of March 31, 2020, there was no aggregate intrinsic value of options outstanding or exercisable, and the weighted average remaining contractual term was 9.6 and 5.9 years, respectively.

### 9. Net Income (Loss) Per Share Attributable to Common Shareholders

Basic income (loss) per share is computed by dividing net income (loss) applicable to common shareholders by the weighted average number of common shares outstanding. Diluted net income (loss) per share attributable to common shareholders is computed using the weighted average number of common shares outstanding during the period plus the dilutive effect of outstanding stock options and warrants using the "treasury stock" method and convertible preferred stock using the "as-if-converted" method. The computation of diluted earnings per share does not include the effect of outstanding stock options, warrants and convertible preferred stock that are considered anti-dilutive.

Basic and diluted net income (loss) per share is computed as follows:

| (in thousands, except per share data) | Three Months Ended March 31, | | Six Months Ended March 31, | |
|---|---|---|---|---|
| | 2020 | 2019 | 2020 | 2019 |
| **Numerator:** | | | | |
| Net income (loss) | $ 822 | $ (12,522) | $ 959 | $ (17,477) |
| Accrued dividends on convertible preferred stock | (27) | (78) | (106) | (157) |
| Deemed dividend on amendment of Series A convertible preferred stock | - | - | (2,314) | - |
| Net income (loss) applicable to common shareholders - basic earnings per share | $ 795 | $ (12,600) | $ (1,461) | $ (17,634) |
| Effect of dilutive securities: | | | | |
| Change in warrant derivative liability | (60) | - | (60) | - |
| Accrued dividends on convertible preferred stock | 27 | - | - | - |
| Net income (loss) applicable to common shareholders - diluted earnings per share | $ 762 | $ (12,600) | $ (1,521) | $ (17,634) |
| | | | | |
| **Denominator:** | | | | |
| Weighted-average shares outstanding for basic earnings per share | 3,124,174 | 303,443 | 2,960,435 | 261,800 |
| Effect of dilutive securities: | | | | |
| Warrants | 66,546 | - | 66,713 | - |
| Preferred stock | 1,222,215 | - | - | - |
| Weighted-average shares outstanding for diluted earnings per | 4,412,935 | 303,443 | 3,027,147 | 261,800 |

share

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Basic net income/(loss) per share | $ | 0.25 | $ | (41.52) | $ | (0.49) | $ | (67.36) |
| Diluted net income/(loss) per share | $ | 0.17 | $ | (41.52) | $ | (0.50) | $ | (67.36) |

Potential common stock equivalents excluded from the computation of diluted net income (loss) per share because inclusion would have been anti-dilutive included stock options and warrants to purchase common stock totaling 593,201 and 5,403,954, respectively, for the three months ended March 31, 2020, and for the six months ended March 31, 2020 included stock options and warrant to purchase common stock totaling 690,201 and 5,403,954, respectively, and preferred stock convertible into an aggregate of 934,109 common shares. For both the three and six months ended March 31, 2019, diluted net loss per share was the same as basic net loss per share as the effects of all the Company's potential common stock equivalents are anti-dilutive as the Company reported a net loss applicable to common shareholders for the periods and the impact of in-the-money warrants were also anti-dilutive.

20

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

## 10. Revenues and Other Related Items

*Disaggregated Revenues*

The Company disaggregates revenue from contracts with customers by geography and product grouping, as it believes this best depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors.

The Company's revenue by geography (based on customer address) is as follows:

|  | Three Months Ended March 31, | | Six Months Ended March 31, | |
|---|---|---|---|---|
| **Revenues:** | **2020** | **2019** | **2020** | **2019** |
| United States | $ 2,252 | $ 911 | $ 4,657 | $ 4,424 |
| International | 486 | 1,285 | 913 | 147 |
|  | $ 2,738 | $ 2,196 | $ 5,570 | $ 4,571 |

The Company's revenue by type is as follows:

|  | Three Months Ended March 31, | | Six Months Ended March 31, | |
|---|---|---|---|---|
| **Revenues:** | **2020** | **2019** | **2020** | **2019** |
| Digital Engagement Services | $ 899 | $ 911 | $ 1,995 | $ 1,984 |
| Subscription | 318 | 940 | 668 | 1,704 |
| Perpetual Licenses | 1,203 | (9) | 2,247 | 145 |
| Maintenance | 82 | 113 | 167 | 240 |
| Hosting | 236 | 241 | 493 | 498 |
|  | $ 2,738 | $ 2,196 | $ 5,570 | $ 4,571 |

*Deferred Revenue*

Amounts that have been invoiced are recorded in accounts receivable and deferred revenue or revenue, depending on whether the revenue recognition criteria have been met. Deferred revenue represents amounts billed for which revenue has not yet been recognized. Deferred revenue that is expected to be recognized during the succeeding 12-month period is recorded as current deferred revenue, and the remaining portion is recorded as noncurrent deferred revenue included in Other long-term liabilities. Deferred revenue during the six months ended March 31, 2020 increased by $477. As of March 31, 2020, approximately $5 of revenue is expected to be recognized from remaining performance obligations for contracts with original performance obligations that exceed one year. The Company expects to recognize revenue on approximately 99% of these remaining performance obligations over the next 12 months, with the balance recognized thereafter.

The following table summarizes the classification and net change in deferred revenue as of and for the six months ended March 31, 2020:

|  | Deferred Revenue | |
|---|---|---|
|  | **Current** | **Long Term** |
| Balance as of October 1, 2019 | $ 1,262 | $ 8 |
| Increase(decrease) | 701 | (3) |
| Balance as of December 31, 2019 | $ 1,963 | $ 5 |
| Increase(decrease) | (224) | - |
| Balance as of March 31, 2020 | $ 1,739 | $ 5 |

https://www.sec.gov/Archives/edgar/data/1378590/000143774920010783/blin20200331_10q.htm     31/54

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

*Deferred Capitalized Commission Costs*

The incremental direct costs of obtaining a contract, which primarily consist of sales commissions paid for new subscription contracts, are deferred and amortized on a straight-line basis over a period of approximately three years. The Company evaluated both qualitative and quantitative factors, including the estimated life cycles of its offerings, renewal rates, and its customer attrition to determine the amortization periods for the capitalized costs. The initial amortization period is generally the customer contract term, which is typically thirty-six (36) months, with some exceptions. Deferred capitalized commissions that will be recognized as expense during the succeeding 12-month period are recognized as current deferred capitalized commission costs, and the remaining portion is recognized as long-term deferred capitalized commission costs. Total deferred capitalized commissions were $41 and $70 as of March 31, 2020 and September 30, 2019, respectively. Current deferred capitalized commission costs are included in Other current assets in the Condensed Consolidated Balance Sheets and noncurrent deferred capitalized commission costs are included in Other assets in the Condensed Consolidated Balance Sheets.

## 11. Income Taxes

Income tax expense was $3 and $4 for the six months ended March 31, 2020 and 2019, respectively. Income tax expense consists of the estimated liability for state income taxes owed by the Company. Net operating loss carry forwards are estimated to be sufficient to offset any potential taxable income for all periods presented. As of March 31, 2020 and September 30, 2019, the Company has a full valuation allowance on its net deferred tax assets.

## 12. Leases

The Company leases facilities in the United States for its corporate and regional field offices. The Company is also a lessee/sublessor for certain office locations relating to its restructuring plans commenced in fiscal 2015.

*Determination of Whether a Contract Contains a Lease*

We determine if an arrangement is a lease at inception or modification of a contract and classify each lease as either an operating or finance lease at commencement. The Company reassesses lease classification subsequent to commencement upon a change to the expected lease term or a modification to the contract. Operating leases represent the Company's right to use an underlying asset as lessee for the lease term and lease obligations represent the Company's obligation to make lease payments arising from the lease.

A contract contains a lease if the contract conveys the right to control the use of the identified property or equipment, explicitly or implicitly, for a period of time in exchange for consideration. Control of an underlying asset is conveyed if we obtain the rights to direct the use of and obtain substantially all of the economic benefit from the use of the underlying asset. At commencement, contracts containing a lease are further evaluated for classification as an operating lease or finance lease based on their terms.

*ROU Model and Determination of Lease Term*

The Company uses the ROU model to account for leases, which requires an entity to recognize a lease liability and ROU asset on the lease commencement date. A lease liability is measured equal to the present value of the remaining lease payments over the lease term and is discounted using the incremental borrowing rate, as the rates implicit in the Company's leases are not readily determinable. The incremental borrowing rate is the rate of interest that the Company would have to pay to borrow, on a collateralized basis over a similar term, an amount equal to the lease payments in a similar economic environment. Lease payments include payments made before the commencement date and any residual value guarantees, if applicable. The initial ROU asset consists of the initial measurement of the lease liability, adjusted for any payments made before the commencement date, initial direct costs and lease incentives earned. When determining the lease term, the Company includes option periods when it is reasonably certain that those options will be exercised.

22

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

*Lease Costs*

For operating leases, minimum lease payments, including minimum scheduled rent increases, are recognized as operating lease costs on a straight-line basis over the applicable lease terms. Some operating lease arrangements include variable lease costs, including real estate taxes, insurance, common area maintenance or increases in rental costs related to inflation. Such variable payments, other than those dependent upon a market index or rate, are excluded from the measurement of the lease liability and are expensed when the obligation for those payments is incurred.

*Significant Assumptions and Judgements*

Management makes certain estimates and assumptions regarding each new lease and sublease agreement, renewal and amendment, including, but not limited to, property values, market rents, useful life of the underlying property, discount rate and probable term, all of which can impact (1) the classification as either an operating or finance lease, (2) measurement of lease liabilities and right-of-use assets and (3) the term over which the right-of-use asset and leasehold improvements are amortized. The amount of depreciation and amortization, interest and rent expense would vary if different estimates and assumptions were used.

The components of net lease costs were as follows:

| | Three Months Ended March 31, 2020 | | Six Months Ended March 31, 2020 | |
|---|---|---|---|---|
| **Condensed Consolidated Statement of Operations:** | | | | |
| Operating lease cost | $ | 102 | $ | 185 |
| Variable lease cost | | 20 | | 73 |
| Less: Sublease income, net | | (28) | | (55) |
| Total | $ | 94 | $ | 203 |

Cash paid for amounts included in the measurement of lease liabilities was $160 for the six months ended March 31, 2020, which all represents operating cash flows from operating leases. As of March 31, 2020, the weighted average remaining lease term was 3.1 years and the weighted average discount rate was 7.0%.

At March 31, 2020, future minimum rental commitments under non-cancelable leases with initial or remaining terms in excess of one year, which have commenced, were as follows:

| | Payments Operating Leases | | Receipts Subleases | | Net Leases | |
|---|---|---|---|---|---|---|
| **Fiscal year:** | | | | | | |
| 2020 (remaining) | $ | 111 | $ | 18 | $ | 93 |
| 2021 | | 114 | | - | | 114 |
| 2022 | | 88 | | - | | 88 |
| 2023 | | 88 | | - | | 88 |
| 2024 | | 30 | | - | | 30 |
| Total lease commitments | $ | 431 | $ | 18 | $ | 413 |
| Less: Amount representing interest | | (46) | | | | |
| Present value of lease liabilities | $ | 385 | | | | |
| Less: current portion | | (157) | | | | |
| Operating lease liabilities, net of current portion | $ | 228 | | | | |

23

## BRIDGELINE DIGITAL, INC.
### NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

In January 2020, the Company entered into a new lease arrangement for its offices in Woodbury, New York. As of March 31, 2020, the lease had not yet commenced as the new office space is currently under construction. The Company had originally expected to move into the new office space on or about May 1, 2020; however, due to the current state of the COVID-19 pandemic, there have been delays in construction, inclusive of obtaining necessary building permits from the local municipality. Due to the uncertainty associated with the COVID-19 pandemic, the Company cannot reasonably estimate when such construction efforts will be completed and by extension when the lease will commence. Future minimum non-cancellable payments upon commencement of the new lease are as follows:

| | | |
|---|---|---|
| From June 1, 2020 to May 31, 2021 * | $ | 78 * |
| From June 1, 2021 to May 31, 2022 | | 81 |
| From June 1, 2022 to May 31, 2023 | | 84 |
| From June 1, 2023 to May 31, 2024 | | 87 |
| From June 1, 2024 to end of lease term | | 90 |
| Total | $ | 420 |

* Future minimum non-cancellable lease payments during the period from June 1, 2020 to May 31, 2021 are approximately $6 per month following the date of substantial completion of construction of the associated office space. The amounts represented above are for a full 12-month period based on the original expectation of moving into the new office space on or about May 1, 2020. As described above, the Company cannot reasonably estimate when the commencement date will occur.

At September 30, 2019, future minimum rental commitments under non-cancelable leases with initial or remaining terms in excess of one year were as follows:

| Fiscal year: | Payments Operating Leases | | Receipts Subleases | | Net Leases | |
|---|---|---|---|---|---|---|
| 2020 | $ | 152 | $ | 73 | $ | 79 |
| 2021 | | 12 | | - | | 12 |
| Total lease commitments | $ | 164 | $ | 73 | $ | 91 |

## 13. Related Party Transactions

In November 2018, the Company engaged Taglich Brothers Inc, on a non-exclusive basis, to perform advisory and investment banking services to identify possible acquisition target possibilities. Michael Taglich, a director and shareholder of the Company, is the President and Chairman of Taglich Brothers Inc. Fees for the services were $8 per month for three months and $5 thereafter, cancellable at any time. Taglich Brothers Inc. could also earn a success fee ranging from $200 for a revenue target acquisition of under $5 million up to $1 million for an acquisition target over $200 million. In connection with the asset purchase of Stantive, during the second quarter of the Company's 2019 fiscal year, The Taglich Brothers earned a success fee of $200.

Michael Taglich also purchased 350 units in the amount of $350 of Series C Preferred Convertible stock and associated warrants in the private transaction consummated on March 13, 2019. Mr. Taglich' purchase was subject to stockholder approval pursuant to Nasdaq Marketplace Rule 5635(c), for which approval by the stockholders of the Company was obtained on April 26, 2019.

## 14. Legal Proceedings

The Company is subject to ordinary routine litigation and claims incidental to its business. As of March 31, 2020, the Company was not engaged with any material legal proceedings.

24

BRIDGELINE DIGITAL, INC.
NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
(in thousands, except share and per share data)

**15. Subsequent Events**

The Company evaluated subsequent events through the date of this filing and concluded there were no material subsequent events requiring adjustment to or disclosure in these interim condensed consolidated financial statements, except as already disclosed in these financial statements.

25

**Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations.**

*This section contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of a variety of factors and risks including the impact of the weakness in the U.S. and international economies on our business, our inability to manage our future growth effectively or profitably, fluctuations in our revenue and quarterly results, our license renewal rate, the impact of competition and our ability to maintain margins or market share, the limited market for our common stock, the ability to maintain our listing on the NASDAQ Capital Market, the volatility of the market price of our common stock, the ability to raise capital, the performance of our products, our ability to respond to rapidly evolving technology and customer requirements, our ability to protect our proprietary technology, the security of our software and response to cyber security risks, our ability to meet our financial obligations and commitments, our dependence on our management team and key personnel, our ability to hire and retain future key personnel, our ability to maintain an effective system of internal controls, or our ability to respond to government regulations. These and other risks are more fully described herein and in our other filings with the Securities and Exchange Commission.*

*This section should be read in combination with the accompanying unaudited condensed consolidated financial statements and related notes prepared in accordance with United States generally accepted accounting principles.*

### Overview

Bridgeline Digital, The Digital Engagement Company™, helps customers maximize the performance of their full digital experience from websites and intranets to eCommerce experiences. Bridgeline's Unbound platform is a Digital Experience Platform that deeply integrates Web Content Management, eCommerce, Marketing Automation, Site Search, Authenticated Portals, Social Media Management, and Web Analytics with the goal of assisting marketers to deliver exceptional digital experiences that attract, engage, nurture and convert their customers across all channels. Bridgeline offers a core accelerator framework for rapidly implementing digital experiences on the Bridgeline Unbound Platform which provides customers with cost-effective solutions in addition to velocity to market.

Bridgeline's Unbound platform combined with its professional services assists customers in digital business transformation, driving lead generation, increasing revenue, improving customer service and loyalty, enhancing employee knowledge, and reducing operational costs. The Bridgeline Unbound platform bridges the gaps between web content management, eCommerce, eMarketing, social and web analytics by providing all of these components in one unified and deeply integrated platform.

Our Unbound Franchise product empowers large franchises, healthcare networks, associations/chapters and other multi-unit organizations to manage a large hierarchy of digital properties at scale. The platform provides an easy-to-use administrative console that enables corporate marketing to provide consistency in branding and messaging while providing flexible publishing capabilities at the local-market level. The platform empowers brand networks to unify, manage, scale and optimize a hierarchy of web properties and marketing campaigns on a global, national and local level.

The Unbound platform is delivered through a cloud-based software as a service ("*SaaS*") model, whose flexible architecture provides customers with state-of-the-art deployment providing maintenance, daily technical operation and support; or via a traditional perpetual licensing business model, in which the software resides on a dedicated infrastructure in either the customer's facility or manage-hosted by Bridgeline via a cloud-based hosted services model.

OrchestraCMS, delivered through a cloud-based SaaS, is the only content and digital experience platform built 100% native on Salesforce and helps customers create compelling digital experiences for their customers, partners, and employees; uniquely combining content with business data, processes and applications across any channel or device including Salesforce Communities, social media, portals, intranets, websites, applications and services.

Celebros Search, delivered through a cloud-based SaaS, is a commerce oriented, site search product that provides for Natural Language Processing with artificial intelligence to present very relevant search results based on long-tail keyword searches in seven languages.

Bridgeline Digital was incorporated under the laws of the State of Delaware on August 28, 2000.

### Locations

The Company's corporate office is located in Woburn, Massachusetts. The Company maintains regional field offices serving the following geographical locations: Boston, MA; Chicago, IL; New York, NY; and Ontario, Canada. The Company has three wholly

owned subsidiaries: Bridgeline Digital Pvt. Ltd. located in Bangalore, India, Bridgeline Digital Canada, Inc. located in Ontario, Canada, and Stantive Technologies Pty, Ltd. located in Australia.

26

*Customer Information*

For the three months ended March 31, 2020 and 2019, one customer represented approximately 13% and 19% of the Company's total revenue, respectively. For the six months ended March 31, 2020, one customer represented approximately 12% of the Company's total revenue and for the six months ended March 31, 2019, two customers represented approximately 15% and 19% of the Company's total revenue.

### Results of Operations for the Three and Six Months Ended March 31, 2020 compared to the Three and Six Months Ended March 31, 2019

Total revenue for the three months ended March 31, 2020 was $2.7 million and $2.2 million for the three months ended March 31, 2019. We had net income of $822 thousand for the three months ended March 31, 2020 and a net loss of ($12.5) million for the three months ended March 31, 2019. Included in net income for the three months ended March 31, 2020 was a gain of $1.8 million as a result of the change in fair value of certain warrant liabilities. Included in net loss for the three months ended March 31, 2019 were one-time acquisition costs of $304 thousand and a warrant expense charge of $10.3 million, net related to the fair value allocation of Series C Preferred stock warrants. Basic net income (loss) per share attributable to common shareholders was $0.25 for the three months ended March 31, 2020 and ($41.52) for the three months ended March 31, 2019.

Total revenue for the six months ended March 31, 2020 was $5.6 million and $4.6 million for the six months ended March 31, 2019. We had net income of $959 thousand for the six months ended March 31, 2020 and a net loss of ($17.5) million for the six months ended March 31, 2019. Included in net income for the six months ended March 31, 2020 was a gain of $2.9 million as a result of the change in fair value of certain warrant liabilities. Included in net loss for the six months ended March 31, 2019 was a goodwill impairment charge of $3.7 million, one-time acquisition costs of $304 thousand, and a warrant expense charge of $10.3 million, net related to the fair value allocation of Series C Preferred stock warrants. During the six months ended March 31, 2020, the Company amended its Series A Convertible Preferred Stock resulting in a deemed dividend of $2.3 million charged against net income to arrive at net loss applicable to common shareholders for purposes of calculating earnings per share. Basic net loss per share attributable to common shareholders was ($0.49) for the six months ended March 31, 2020 and ($67.36) for the six months ended March 31, 2019.

| (in thousands) | Three Months Ended March 31, | | $ Change | % Change | Six Months Ended March 31, | | $ Change | % Change |
|---|---|---|---|---|---|---|---|---|
| Revenue | 2020 | 2019 | | | 2020 | 2019 | | |
| Digital engagement services | $ 899 | $ 911 | $ (12) | (1%) | $ 1,995 | $ 1,984 | 11 | 1% |
| % of total net revenue | *33%* | *41%* | | | *36%* | *43%* | | |
| Subscription and perpetual licenses | 1,839 | 1,285 | 554 | 43% | 3,575 | 2,587 | 988 | 38% |
| % of total net revenue | *67%* | *59%* | | | *64%* | *57%* | | |
| **Total net revenue** | 2,738 | 2,196 | 542 | 25% | 5,570 | 4,571 | 999 | 22% |
| **Cost of revenue** | | | | | | | | |
| Digital engagement services | 457 | 571 | (114) | (20%) | 1,026 | 1,421 | (395) | (28%) |
| % of digital engagement services revenue | *51%* | *63%* | | | *51%* | *72%* | | |
| Subscription and perpetual licenses | 727 | 1,036 | (309) | (30%) | 1,517 | 1,675 | (158) | (9%) |
| % of subscription and perpetual revenue | *40%* | *81%* | | | *42%* | *65%* | | |
| **Total cost of revenue** | 1,184 | 1,607 | (423) | (26%) | 2,543 | 3,096 | (553) | (18%) |
| **Gross profit** | 1,554 | 589 | 965 | 164% | 3,027 | 1,475 | 1,552 | 105% |
| **Gross profit margin** | *57%* | *27%* | | | *54%* | *32%* | | |
| **Operating expenses** | | | | | | | | |
| Sales and marketing | 786 | 945 | (159) | (17%) | 1,818 | 1,702 | 116 | 7% |
| % of total revenue | *29%* | *43%* | | | *33%* | *37%* | | |
| General and administrative | 723 | 744 | (21) | (3%) | 1,472 | 1,431 | 41 | 3% |
| % of total revenue | *26%* | *34%* | | | *26%* | *31%* | | |
| Research and development | 426 | 489 | (63) | (13%) | 816 | 907 | (91) | (10%) |
| % of total revenue | *16%* | *22%* | | | *15%* | *20%* | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Depreciation and amortization | 249 | 78 | 171 | 219% | 507 | 104 | 403 | 388% |
| % of total revenue | *9%* | *4%* | | | *9%* | *2%* | | |
| Goodwill impairment | - | - | - | 0% | - | 3,732 | (3,732) | (100%) |
| % of total revenue | *0%* | *0%* | | | *0%* | *82%* | | |
| Restructuring and acquisition related expenses | 367 | 304 | 63 | 21% | 372 | 304 | 68 | 22% |
| % of total revenue | *13%* | *14%* | | | *7%* | *7%* | | |
| **Total operating expenses** | **2,551** | **2,560** | **(9)** | **(0%)** | **4,985** | **8,180** | **(3,195)** | **(39%)** |
| | | | | | | | |
| **Loss from operations** | (997) | (1,971) | 974 | (49%) | (1,958) | (6,705) | 4,747 | (71%) |
| Interest expense and other, net | (1) | (104) | 103 | (99%) | (1) | (333) | 332 | (100%) |
| Amortization of debt discount | - | (221) | 221 | (100%) | - | (221) | 221 | (100%) |
| Warranty liability expense | - | (11,272) | 11,272 | (100%) | - | (11,272) | 11,272 | (100%) |
| Change in fair value of warrant liabilities | 1,820 | 1,046 | 774 | 74% | 2,921 | 1,058 | 1,863 | 176% |
| **Income (loss) before income taxes** | 822 | (12,522) | 13,344 | (107%) | 962 | (17,473) | 18,435 | (106%) |
| **Provision for income taxes** | - | - | - | 0% | 3 | 4 | (1) | (25%) |
| **Net income/(loss)** | **$ 822** | **$(12,522)** | **$13,344** | **(107%)** | **$ 959** | **$(17,477)** | **$18,436** | **(105%)** |
| **Non-GAAP Measure:** | | | | | | | | |
| **Adjusted EBITDA** | **$ (331)** | **$ (1,546)** | **$ 1,215** | **(79%)** | **$ (999)** | **$ (2,412)** | **$ 1,413** | **(59%)** |

27

**Revenue**

Our revenue is derived from two sources: (i) digital engagement services and (ii) subscription and perpetual licenses.

*Digital Engagement Services*

Digital engagement services revenue is comprised of implementation and retainer related services. In total, revenue from digital engagement services decreased $12 thousand, or 1%, to $899 thousand for the three months ended March 31, 2020 compared to $911 thousand for the three months ended March 31, 2019 and increased $11 thousand, or 1%, to $2.0 million for the six months ended March 31, 2020 compared to $2.0 million for the six months ended March 31, 2019. Digital engagement services revenue as a percentage of total revenue decreased to 33% from 41% for the three months ended March 31, 2020 compared to the three months ended March 31, 2019 and decreased to 36% from 43% for the six months ended March 31, 2020 compared to the six months ended March 31, 2019. The decrease as a percentage of total revenue is attributable to increases in revenues generated from subscription and perpetual licenses during the three and six months ended March 31, 2020.

*Subscription and Perpetual Licenses*

Revenue from subscription (SaaS) and perpetual licenses increased $554 thousand, or 43%, to $1.8 million for the three months ended March 31, 2020 compared to $1.3 million for the three months ended March 31, 2019 and increased $988 thousand, or 38%, to $3.6 million for the six months ended March 31, 2020 compared to $2.6 million for the six months ended March 31, 2019. The increase for the three and six months ended March 31, 2020 compared to the prior period is primarily due to license revenues of $760 thousand and $1.5 million, respectively, realized from our two acquisitions completed in the fiscal 2019 second quarter, partially offset by cancelled SaaS subscriptions for legacy customers. Subscription and perpetual license revenue as a percentage of total revenue increased to 67% from 59% for the three months ended March 31, 2020 compared to the three months ended March 31, 2019 and increased to 64% from 57% for the six months ended March 31, 2020 compared to the six months ended March 31, 2019. The increase as a percentage of total revenue is primarily attributable to the two acquisitions completed in the fiscal 2019 second quarter which resulted in the Company acquiring a larger proportion of subscription and perpetual licenses over digital engagement service contracts.

**Costs of Revenue**

Total cost of revenue decreased $423 thousand, or 26%, to $1.2 million for the three months ended March 31, 2020 compared to $1.6 million for the three months ended March 31, 2019 and decreased $553 thousand, or 18%, to $2.5 million for the six months ended March 31, 2020 compared to $3.1 million for the six months ended March 31, 2019. The gross profit margin increased to 57% for the three months ended March 31, 20120, compared to 27% for the three months ended March 31, 2019 and increased to 54% for the six months ended March 31, 2020 compared to 32% for the six months ended March 31, 2019. The increase in the gross profit margin for the three and six months ended March 31, 2020 compared to the prior period is primarily attributable to decreases in headcount and increases in the proportion of license revenue, which are generally associated with higher margins, to digital engagement service revenue.

*Cost of Digital Engagement Services*

Cost of digital engagement services decreased $114 thousand, or 20%, to $457 thousand for the three months ended March 31, 2020 compared to $571 thousand for the three months ended March 31, 2019 and decreased $395 thousand, or 28%, to $1.0 million for the six months ended March 31, 2019 compared to $1.4 million for the six months ended March 31, 2019. The decrease for the three and six months ended March 31, 2020 compared to the prior period is primarily due to the allocation of support team and third-party subcontractor costs. The cost of digital engagement services as a percentage of digital engagement services revenue decreased to 51% for the three months ended March 31, 2020 compared to 63% for the three months ended March 31, 2019 and decreased to 51% for the six months ended March 31, 2020 compared to 72% for the six months ended March 31, 2019. The decrease as a percentage of revenues for the three months ended March 31, 2020 compared to the prior period is primarily due to the overall decreases in digital engagement services revenue.

*Cost of Subscription and Perpetual License*

Cost of subscription and perpetual licenses decreased $309 thousand, or 30%, to $727 thousand for the three months ended March 31, 2020 compared to $1.0 million for the three months ended March 31, 2019 and decreased $158 thousand, or 9%, to $1.5 million for the six months ended March 31, 2020 compared to $1.7 million for the six months ended March 31, 2019. The decrease for the three and six months ended March 31, 2020 compared to the prior period is primarily due to a reduction of the workforce and less allocated time by the delivery team and third-party subcontractors on platform support projects. The cost of subscription and

perpetual licenses as a percentage of subscription and perpetual license revenue decreased to 40% for the three months ended March 31, 2020 compared to 81% for the three months ended March 31, 2019 and decreased to 42% for the six months ended March 31, 2020 compared to 65% for the six months ended March 31, 2019. These decreases are primarily attributable to a reduction of the workforce and less allocated time by the delivery team and third-party subcontractors on platform support projects.

28

**Operating Expenses**

*Sales and Marketing Expenses*

Sales and marketing expenses decreased $159 thousand, or 17%, to $786 thousand for the three months ended March 31, 2020 compared to $945 thousand for the three months ended March 31, 2019 and increased $116 thousand, or 7%, to $1.8 million for the six months ended March 31, 2020 compared to $1.7 million for the six months ended March 31, 2019.  Sales and marketing expenses represented 29% and 43% of total revenue for the three months ended March 31, 2020 and 2019, respectively, and 33% and 37% of total revenue for the six months ended March 31, 2020 and 2019, respectively. The decrease for the three months ended March 31, 2020 compared to the prior period is attributable to decreases in headcount. The increase for the six months ended March 31, 2020 compared to the prior period is attributable to an increase in headcount and personnel from acquisitions.

*General and Administrative Expenses*

General and administrative expenses decreased $21 thousand, or 3%, to $723 thousand for the three months ended March 31, 2020 compared to $744 thousand for the three months ended March 31, 2019 and increased $41 thousand, or 3%, to $1.5 million for the six months ended March 31, 2020 compared to $1.4 million for the six months ended March 31, 2019.  General and administrative expenses represented 26% and 34% of total revenue for the three months ended March 31, 2020 and 2019, respectively, and 26% and 31% of total revenue for the six months ended March 31, 2020 and 2019, respectively. The decrease for the three months ended March 31, 2020 compared to the prior period was primarily due to the decrease in overall support headcount and personnel expenses. The increase for the six months ended March 31, 2020 compared to the prior period was primarily due to an increase in headcount and personnel from acquisitions.

*Research and Development*

Research and development expense decreased $63 thousand, or 13%, to $426 thousand for the three months ended March 31, 2020 compared to $489 thousand for the three months ended March 31, 2019 and decreased $91 thousand, or 10%, to $816 thousand for the six months ended March 31, 2020 compared to $907 thousand for the six months ended March 31, 2019. Research and development expenses represented 16% and 22% of total revenue for the three months ended March 31, 2020 and 2019, respectively, and 15% and 20% of total revenue for the six months ended March 31, 2020 and 2019, respectively. The decrease for the three and six months ended March 31, 2020 compared to the prior period is primarily attributable to decreases in headcount and the increases in revenues.

*Depreciation and Amortization*

Depreciation and amortization expense increased $171 thousand, or 219%, to $249 thousand for the three months ended March 31, 2020 compared to $78 thousand for the three months ended March 31, 2019 and increased $403 thousand, or 388%, to $507 thousand for the six months ended March 31, 2020 compared to $104 thousand for the six months ended March 31, 2019. The increase is primarily due to amortization of intangible assets resulting from acquisitions. Depreciation and amortization represented 9% and 4% of total revenue for the three months ended March 31, 2020 and 2019, respectively, and 9% and 2% of total revenue for the six months ended March 31, 2020 and 2019, respectively,

*Goodwill Impairment*

During the six months ended March 31, 2019, the Company performed an interim impairment test, which resulted in an impairment charge of $3.7 million. An impairment charge is recognized for the amount by which the carrying amount exceeds the Company's fair value. There were no impairment charges for the six months ended March 31, 2020.

*Restructuring and Acquisition Related Expenses*

During the three and six months ended March 31, 2020, the Company recognized $365 thousand related to a reduction in force in its U.S. and Canada operations aimed at improving efficiencies by combining functions, certain responsibilities and eliminating redundancies, which resulted in a reduction of 15 positions.

During the three and six months ended March 31, 2019, the Company incurred acquisition related expenses of $304 thousand related to the acquisition of Stantive. There were no acquisition related expenses incurred during the three and six months ended March 31, 2020.

29

**Net Income (Loss)**

*Net Loss from Operations*

The loss from operations was ($1.0) million for the three months ended March 31, 2020 compared to a loss of ($2.0) million for the three months ended March 31, 2019 and ($2.0) million for the six months ended March 31, 2020 compared to a loss of ($6.7) million for the six months ended March 31, 2019. Operating expenses increased $9 thousand, or less than 1%, to $2.6 million for the three months ended March 31, 2020 compared to $2.6 million for the three months ended March 31, 2019 and decreased $3.2 million, or 39%, to $5 million for the six months ended March 31, 2020 compared to $8.2 million for the six months ended March 31, 2019. The decreases for the three months ended March 31, 2020 compared to the prior period were primarily due to reduction in headcounts and for the six months ended March 31, 2020 compared to the prior period were primarily attributable to a goodwill impairment charge of $3.7 million which occurred in the prior period and similar charges did not recur.

*Other Income (Expense), net*

The Company recognized a gain related to the change in fair value of warrant liabilities of $1.8 million for the three months ended March 31, 2020 compared to $1.0 million for the three months ended March 31, 2019 and $2.9 million for the six months ended March 31, 2020 compared to $1.1 million for the six months ended March 31, 2019. During the six months ended March 31, 2019, we also recognized a warranty liability expense of $11.3 million related to the excess of fair value allocated to warrants over the proceeds received from the issuance of Series C Preferred Convertible Stock and associated warrants.

During the three and six months ended March 31, 2019, interest expense, inclusive of amortization of debt discounts, was $325 thousand and $554 thousand, respectively. During the three and six months ended March 31, 2020, we did not have any interest expense as we did not have any debt outstanding.

*Income Taxes*

The provision for income tax expense was $3 thousand and $4 thousand for the six months ended March 31, 2020 and 2019, respectively. Income tax expense represents the estimated liability for federal and state income taxes owed. We have net operating loss carryforwards and other deferred tax benefits that are available to offset any potential taxable income.

**Adjusted EBITDA**

We also measure our performance based on a non-GAAP ("Generally Accepted Accounting Principles") measurement of earnings before interest, taxes, depreciation, amortization, stock-based compensation expense, impairment of goodwill and intangible assets, non-cash warrant related expenses, change in fair value of derivative instruments and restructuring and acquisition related charges ("Adjusted EBITDA").

We believe this non-GAAP financial measure of Adjusted EBITDA is useful to management and investors in evaluating our operating performance for the periods presented and provide a tool for evaluating our ongoing operations.

Adjusted EBITDA, however, is not a measure of operating performance under U.S. GAAP and should not be considered as an alternative or substitute for U.S. GAAP profitability measures such as (i) loss from operations and net income (loss), or (ii) cash flows from operating, investing and financing activities, both as determined in accordance with U.S. GAAP. Adjusted EBITDA as an operating performance measure has material limitations since it excludes the financial statement impact of income taxes, net interest expense, amortization of intangibles, depreciation, goodwill impairment, restructuring charges, loss on disposal of assets, other amortization, changes in fair value of warrant liabilities and stock-based compensation, and therefore does not represent an accurate measure of profitability. As a result, Adjusted EBITDA should be evaluated in conjunction with net income (loss) for a complete analysis of our profitability, as net income (loss) includes the financial statement impact of these items and is the most directly comparable U.S. GAAP operating performance measure to Adjusted EBITDA. Our definition of Adjusted EBITDA may also differ from and therefore may not be comparable with similarly titled measures used by other companies, thereby limiting its usefulness as a comparative measure. Because of the limitations that Adjusted EBITDA has as an analytical tool, investors should not consider it in isolation, or as a substitute for analysis of our operating results as reported under U.S. GAAP.

30

The following table reconciles net income (loss) (which is the most directly comparable U.S. GAAP operating performance measure) to Adjusted EBITDA (in thousands):

| | Three Months Ended March 31, | | Six Months Ended March 31, | |
| --- | --- | --- | --- | --- |
| | 2020 | 2019 | 2020 | 2019 |
| Net income (loss) | $ 822 | $ (12,522) | $ 959 | $ (17,477) |
| Provision for income tax | - | - | 3 | 4 |
| Interest expense, net | 1 | 104 | 1 | 333 |
| Amortization of debt discount | - | 221 | - | 221 |
| Warrant liability expense | - | 11,272 | - | 11,272 |
| Change in fair value of warrants | (1,820) | (1,046) | (2,921) | (1,058) |
| Amortization of intangible assets | 233 | 62 | 470 | 66 |
| Depreciation | 12 | 14 | 28 | 34 |
| Goodwill impairment | - | - | - | 3,732 |
| Restructuring and acquisition related charges | 367 | 304 | 372 | 304 |
| Other amortization | 4 | 7 | 9 | 22 |
| Stock based compensation | 50 | 38 | 80 | 135 |
| Adjusted EBITDA | $ (331) | $ (1,546) | $ (999) | $ (2,412) |

Adjusted EBITDA increased year over year, which is primarily attributable to increases in revenues and cost control measures.

## Liquidity and Capital Resources

### Cash Flows

### Operating Activities

Cash used in operating activities was $90 thousand for the six months ended March 31, 2020 compared to cash used in operating activities of $2.5 million for the six months ended March 31, 2019. The change in cash provided by operating activities compared to the prior period was primarily due to a decrease in loss from operations and increases in accounts payable.

### Investing Activities

We did not have any cash flows from investing activities for the six months ended March 31, 2020 compared to cash used in investing activities of $5.6 million for the six months ended March 31, 2019. Cash used in investing activities during the prior comparable period was primarily related to the acquisition of Stantive and Seevolution. The Company does not expect material expenditures for property and equipment during the 2020 fiscal year.

### Financing Activities

We did not have any cash flows from financing activities for the six months ended March 31, 2020 compared to cash provided by financing activities of $9.2 million for the six months ended March 31, 2019. Cash provided by financing activities for the six months ended March 31, 2019 was attributable to the public offering in October 2018 and a private offering in March 2019, partially offset by repayments of term and promissory notes.

### Capital Resources and Liquidity Outlook

In March 2020, the World Health Organization declared the outbreak of novel coronavirus disease ("COVID-19") as a pandemic, and we expect our operations in all locations to be affected as the virus continues to proliferate. We have adjusted certain aspects of our operations to protect employees and customers while still meeting customers' needs for vital technology. We will continue to monitor the situation closely and it is possible that we will implement further measures. In light of the uncertainty as to the severity and duration of the pandemic, the impact on our revenues, profitability and financial position is uncertain at this time.

31

At March 31, 2020, the Company had no debt. On April 17, 2020, the Company entered into a loan with an aggregate principal amount of $1,047,500, pursuant to the Paycheck Protection Program.

While the Company believes that future revenues and cash flows, as we continue to integrate and realize a full year of operations from acquisitions completed in the fiscal 2019 second quarter, will supplement its working capital and it has an appropriate cost structure to support future revenue growth, based upon its current working capital and projected cash flows in the next twelve months, the Company will need additional sources of financing in place in order to ensure its operations are adequately funded. No definitive agreements for additional financing are in place as of the date of this Form 10-Q and there can be no assurances that additional sources of financing could be obtained on terms that are favorable or acceptable to us and that revenue growth and improvement in cash flows can be achieved. Accordingly, management believes there is substantial doubt about the Company's ability to continue as a going concern for at least twelve months following the issuance of this Form 10-Q.

### Off-Balance Sheet Arrangements

We do not have any off-balance sheet arrangements, financings or other relationships with unconsolidated entities or other persons, other than our operating leases and contingent acquisition payments.

We currently do not have any variable interest entities. We do not have any relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purpose entities, which would have been established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes. Therefore, we are not materially exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in such relationships.

### Commitments and Contingencies

The Company leases its facilities in the United States and Canada. The following summarizes our cash contractual obligations and commitments by maturity as of March 31, 2020:

**(in thousands)**

| Payment obligations by year | FY20 (remaining) | FY21 | FY22 | FY23 | FY24 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| Operating leases | $ 137 | $ 193 | $ 170 | $ 173 | $ 117 | $ 60 | $ 850 |
| Sublease income | (18) | - | - | - | - | - | (18) |
| Net cash contractual obligations | $ 119 | $ 193 | $ 170 | $ 173 | $ 117 | $ 60 | $ 832 |

### Critical Accounting Policies

These critical accounting policies and estimates by our management were prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP") and should be read in conjunction with Note 2 *Summary of Significant Accounting Policies* to the Consolidated Financial Statements of our Annual Report on Form 10-K filed with the Securities and Exchange Commission on December 27, 2019.

The preparation of financial statements in accordance US GAAP requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses in the reporting period. We regularly make estimates and assumptions that affect the reported amounts of assets and liabilities. The most significant estimates included in our financial statements are the valuation of accounts receivable and long-term assets, including intangibles, goodwill and deferred tax assets, stock-based compensation, amounts of revenue to be recognized on service contracts in progress, unbilled receivables, and deferred revenue. We base our estimates and assumptions on current facts, historical experience and various other factors that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities and the accrual of costs and expenses that are not readily apparent from other sources. The actual results experienced by us may differ materially and adversely from our estimates. To the extent there are material differences between our estimates and the actual results, our future results of operations will be affected.

32

We consider the following accounting policies to be both those most important to the portrayal of our financial condition and those that require the most subjective judgment:

- Revenue recognition;

- Allowance for doubtful accounts;

- Accounting for cost of computer software to be sold, leased or otherwise marketed;

- Accounting for goodwill and other intangible assets; and

- Accounting for stock-based compensation.

**Revenue Recognition**

The Company derives its revenue from two sources: (i) Software Licenses, which are comprised of subscription fees ("SaaS"), perpetual software licenses, and maintenance for post-customer support ("PCS") on perpetual licenses and (ii) Digital Engagement Services, which are professional services to implement our products such as web development, digital strategy, information architecture and usability engineering, search. Customers who license the software on a subscription basis, which can be described as "Software as a Service" or "SaaS" do not take possession of the software.

Revenue is recognized when control of these services is transferred to the Company's customers, in an amount that reflects the consideration the Company expects to be entitled to in exchange for those services. If the consideration promised in a contract includes a variable amount, for example, overage fees, contingent fees or service level penalties, the Company includes an estimate of the amount it expects to receive for the total transaction price if it is probable that a significant reversal of cumulative revenue recognized will not occur. The Company's subscription service arrangements are non-cancelable and do not contain refund-type provisions. Revenue is reported net of applicable sales and use tax.

The Company recognizes revenue from contracts with customers using a five-step model, which is described below:

- Identify the customer contract;
- Identify performance obligations that are distinct;
- Determine the transaction price;
- Allocate the transaction price to the distinct performance obligations; and
- Recognize revenue as the performance obligations are satisfied.

*Allowance for Doubtful Accounts*

We maintain an allowance for doubtful accounts which represents estimated losses resulting from the inability, failure or refusal of our clients to make required payments.

We analyze historical percentages of uncollectible accounts and changes in payment history when evaluating the adequacy of the allowance for doubtful accounts. We use an internal collection effort, which may include our sales and services groups as we deem appropriate. Although we believe that our allowances are adequate, if the financial condition of our clients deteriorates, resulting in an impairment of their ability to make payments, or if we underestimate the allowances required, additional allowances may be necessary, resulting in increased expense in the period in which such determination is made.

*Accounting for Cost of Computer Software to be Sold, Leased or Otherwise Marketed*

We charge research and development expenditures for technology development to operations as incurred. However, in accordance with Codification 985-20 *Costs of Software to be Sold Leased or Otherwise Marketed*, we capitalize certain software development costs subsequent to the establishment of technological feasibility. Based on our product development process, technological feasibility is established upon completion of a working model. Certain costs incurred between completion of a working model and the point at which the product is ready for general release is capitalized if significant. Once the product is available for general release, the capitalized costs are amortized in cost of sales.

33

*Accounting for Goodwill and Intangible Assets*

Goodwill is tested for impairment annually during the fourth quarter of every year and more frequently if events and circumstances indicate that the asset might be impaired. The purpose of an impairment test is to identify any potential impairment by comparing the carrying value of a reporting unit including goodwill to its fair value. An impairment charge is recognized for the amount by which the carrying amount exceeds the reporting unit's fair value, however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit.

Factors that could lead to a future impairment include material uncertainties such as operational, economic and competitive factors specific to the key assumptions underlying the fair value estimate we use in our impairment testing that have a reasonable possibility of changing. This could include a significant reduction in projected revenues, a deterioration of projected financial performance, future acquisitions and/or mergers, and a decline in our market value as a result of a significant decline in our stock price.

*Accounting for Stock-Based Compensation*

At March 31, 2020, we maintained two stock-based compensation plans, one of which has expired but still contains vested and unvested stock options. The two plans are more fully described in Note 13 to the Consolidated Financial Statements of our Annual Report on Form 10-K filed with the Securities and Exchange Commission on December 27, 2019.

The Company accounts for stock-based compensation awards in accordance with ASC 718 *Compensation-Stock* Topic of the Codification. Share-based payments (to the extent they are compensatory) are recognized in our Consolidated Statements of Operations based on their fair values.

We recognize stock-based compensation expense for share-based payments issued or assumed after October 1, 2006 that are expected to vest on a straight-line basis over the service period of the award, which is generally three years. We recognize the fair value of the unvested portion of share-based payments granted prior to October 1, 2006 over the remaining service period, net of estimated forfeitures. In determining whether an award is expected to vest, we use an estimated, forward-looking forfeiture rate based upon our historical forfeiture rate and reduce the expense over the recognition period. Estimated forfeiture rates are updated for actual forfeitures quarterly. We also consider, each quarter, whether there have been any significant changes in facts and circumstances that would affect our forfeiture rate. Although we estimate forfeitures based on historical experience, actual forfeitures in the future may differ. In addition, to the extent our actual forfeitures are different than our estimates, we record a true-up for the difference in the period that the awards vest, and such true-ups could materially affect our operating results.

We estimate the fair value of employee stock options using the Black-Scholes-Merton option valuation model. The fair value of an award is affected by our stock price on the date of grant as well as other assumptions including the estimated volatility of our stock price over the term of the awards and the estimated period of time that we expect employees to hold their stock options. The risk-free interest rate assumption we use is based upon United States treasury interest rates appropriate for the expected life of the awards. We use the historical volatility of our publicly traded options in order to estimate future stock price trends. In order to determine the estimated period of time that we expect employees to hold their stock options, we use historical trends of employee turnovers. Our expected dividend rate is zero since we do not currently pay cash dividends on our common stock and do not anticipate doing so in the foreseeable future. The aforementioned inputs entered into the option valuation model we use to fair value our stock awards are subjective estimates and changes to these estimates will cause the fair value of our stock awards and related stock-based compensation expense we record to vary.

We record deferred tax assets for stock-based awards that result in deductions on our income tax returns, based on the amount of stock-based compensation recognized and the statutory tax rate in the jurisdiction in which we will receive a tax deduction.

34

**Item 3.**        **Qualitative and Quantitative Disclosures About Market Risk.**

Not required.

**Item 4.**        **Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

    As of the end of the period covered by this Quarterly Report on Form 10-Q, we carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) were effective as of March 31, 2020.

**Changes in Internal Control over Financial Reporting**

    There were no changes to our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) that occurred during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Limitations on Controls**

    Our disclosure controls and procedures and internal control over financial reporting are designed to provide reasonable assurance of achieving the desired control objectives. Our management recognizes that any control system, no matter how well designed and operated, is based upon certain judgments and assumptions and cannot provide absolute assurance that its objectives will be met. Similarly, an evaluation of controls cannot provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, have been detected.

35

## PART II – OTHER INFORMATION

**Item 1.**          **Legal Proceedings.**

From time to time we are subject to ordinary routine litigation and claims incidental to our business. We are not currently involved in any legal proceedings that we believe are material beyond those previously disclosed in our Annual Report on Form 10-K filed with the Securities and Exchange Commission on December 27, 2019.

**Item 2.**          **Unregistered Sales of Equity Securities and Use of Proceeds.**

There were no sales of unregistered equity securities in the six months ended March 31, 2020.

36

**Item 6.**　　　**Exhibits.**

| Exhibit No. | Description of Document |
| --- | --- |
| 1.1 | Underwriting Agreement (incorporated by reference to Exhibit 1.1 to our Form 8-K filed on October 19, 2018) |
| 3.1 | Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to our Quarterly Report on Form 10-Q filed on May 15, 2013) |
| 3.2 | Certificate of Amendment to Amended and Restated Certificate of Incorporation, dated May 4, 2015 (incorporated by reference to Exhibit 3.1 to our Current Report on Form 8-K filed on May 5, 2015) |
| 3.3 | Certificate of Designations of the Series A Convertible Preferred Stock (incorporated by reference to Exhibit 3.1 to our Current Report on Form 8-K filed on November 4, 2014) |
| 3.4 | Amended and Restated By-laws (incorporated by reference to Exhibit 3.1 to our current Report on Form 10-Q filed on February 17, 2015) |
| 3.5 | Certificate of Designations of the Series B Convertible Preferred Stock (incorporated by reference to Exhibit 3.1 to our Current Report on Form 8-K filed on October 19, 2018) |
| 3.6 | Amended and Restated By-laws (incorporated by reference to Exhibit 3.1 to our current Report on Form 8-K filed on December 14, 2018) |
| 3.7 | Certificate of Designations of the Series C Convertible Preferred Stock (incorporated by reference to Exhibit 3.1 to our Current Report on Form 8-K filed on March 13, 2019) |
| 3.8 | Certificate of Amendment to Amended and Restated Certificate of Incorporation, dated April 26, 2019 (incorporated by reference to Exhibit 3.1 to our Current Report on Form 8-K filed on April 26, 2019) |
| 3.9 | Certificate of Amendment to Amended and Restated Certificate of Incorporation, dated May 1, 2019 (incorporated by reference to Exhibit 3.1 to our Current Report on Form 8-K filed on May 1, 2019) |
| 4.1 | Registration Rights Agreement, dated November 3, 2016, by and between Bridgeline Digital, Inc. and the Investors party thereto (incorporated by reference to Exhibit 10.3 to our Current Report on Form 8-K Filed on November 4, 2016) |
| 4.2 | Form of Warrant (incorporated by reference to Exhibit 4.1 to our Form 8-K filed on October 19, 2018) |
| 4.3 | Form of Warrants (incorporated by reference to Exhibits 4.1, 4.2 ,4.3, 4.4 and 4.5 to our Form 8-K filed on March 13, 2019) |
| 4.4 | Registration Rights Agreement, dated March 12, 2019, by and between Bridgeline Digital, Inc. and the Investors party thereto (incorporated by reference to Exhibit 10.4 to our Current Report on Form 8-K Filed on March 13, 2019) |
| 10.1* | Employment Agreement with Mark G. Downey dated July 1, 2019 (incorporated by reference to Exhibit 10.1 to our Current Report on Form 8-K Filed on July 3, 2019) |

37

| 31.1 | [Certification required by Rule 13a-14(a) or Rule 15d-14(a).](#) |
| 31.2 | [Certification required by Rule 13a-14(a) or Rule 15d-14(a).](#) |
| 32.1 | [Certification required by Rule 13a-14(b) or Rule 15d-14(b) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350).](#) |
| 32.2 | [Certification required by Rule 13a-14(b) or Rule 15d-14(b) and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350).](#) |

| 101.INS* | XBRL Instance |
| 101.SCH* | XBRL Taxonomy Extension Schema |
| 101.CAL* | XBRL Taxonomy Extension Calculation |
| 101.DEF* | XBRL Taxonomy Extension Definition |
| 101.LAB* | XBRL Taxonomy Extension Labels |
| 101.PRE* | XBRL Taxonomy Extension Presentation |

*Management compensatory plan
**XBRL information is furnished and not filed or a part of a registration statement or prospectus for purposes of sections 11 and 12 of the Securities Act of 1933, as amended, is deemed not filed for purposes of section 18 of the Securities Exchange Act of 1934, as amended, and otherwise is not subject to liability under these sections.

38

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**Bridgeline Digital, Inc.**
(Registrant)

| May 14, 2020 | /s/   Roger Kahn |
|---|---|
| Date | **Roger Kahn** |
| | **President and Chief Executive Officer** |
| | (Principal Executive Officer) |

| May 14, 2020 | /s/   Mark Downey |
|---|---|
| Date | **Mark Downey** |
| | **Chief Financial Officer** |
| | (Principal Financial and Accounting Officer) |

39

# EXHIBIT 4

Tom replied to me on messenger instead of the forum... 12:39 PM

Lot. 33 was given to us as collateral for a loan we gave to CW. We have a lien on it. He then sold it to someone who paid in full over the course of 60 days. We learned of this and confronted CW the day after he received final payment. He denied receiving anything more than a deposit. The buyer cannot get title to get a building loan with our lien. CW twice filled falsified docs to remove lien which were not accepted. Made no attempt to pay us or refund buyer. Most recently approached buyer to partner with him in building bungalows on the lot which doesn't require him to have clear title since the land is not transfered to bungalow owners. She declined. 12:40 PM

# EXHIBIT 5

Since there seem to be many rumors and speculation about a 'double sale', we have added some additional clarity to the discussion – section 5 of the memo dated June 6, 2020 from Chris Williams. Our additions are in RED

We are informed that a person on social media has publicly accused us of having "double-sold" a single family
lot to two different buyers. Is this true?

No, this is untrue. We have never double-sold a lot. Here is the real story:

Correct – the lot was not sold twice.  The lender has never stated it was sold twice, though that phrase has been posted by others not familiar with the incident on social media.  A piece of property to which the developer did not possess clear title was sold to a buyer.  The lender did not purchase the lot.  It was given as collateral to the lender for a loan granted 1 year earlier to the developer.

Several years ago, we entered into a short-term loan agreement with several of our Orchid Bay owners. Per the terms of one of those loan agreements, we were to pay back the loan through the funding of a large construction loan that was set to be imminently funded. Regretfully, that "imminent funding" took several years to actually materialize, and when it did, the loan proceeds were too low to repay the debt in full.

The loan, now 24 months in arrears, represents ~3% of the recently advertised construction loan funding granted to Orchid Bay SA.

Through the years we have been making payments to that resident for that debt obligation. In fact, just last week we sent another payment to that resident and we stand fully committed to making him whole financially.

A total of 5 payments had been received from July 2019 thru November of 2019.  Then payments then stopped with no explanation from the developer.  A payment was unexpectedly received last week, the timing of which seems to be a coincidence to the recent discussions on this Facebook site.  Of note is the fact the payments represent an amount which covers primarily interest only.

Along the way though, our team erroneously sold the real estate parcel that we had provided to that resident as collateral for the loan that he gave us. This was an internal control error and not in any way intentional—we simply missed it. We are in the process of working out a resolution to this issue with that resident and are eager to rectify this unfortunate error. Moreover, we are in ongoing discussions with the buyer to whom we sold the parcel so as to make them whole financially, as well.

When the developer was approached by the lender to inquire about the sale of the collateral, the developer indicated he had no knowledge of the sale but would look into it.  After several weeks the developer accepted a call from the lender to discuss the matter.  In this follow up discussion on 12/6/2018 the developer acknowledged it had been sold but only a small deposit had been received from the buyer.  When in fact, three days earlier (12/3/2018) the developer had issued the buyer a payoff letter acknowledging the

lot had been paid in full.  At this time no attempt was made to repay the outstanding loan from the sale proceeds or refund the buyer.

As specified in the loan agreement the lot has a lien placed against it by the lender.  An attempt to remove the lien was made without the knowledge of the lender.  The attorney hired by the lender discovered this and brought this issue to the attention of the lender and Land's Department who restored the original lien.

The buyer, without clear title cannot proceed with building and has terminated the contract to have a home constructed.

There has been no recent activity to resolve this issue with the lender.  While the lender has made several good faith offers to resolve they are eventually met with no response from the developer.

Instead of an offer to refund the buyer, an offer was made to have the buyer consider partnering with the developer to build bungalows or villas on the property bypassing the need to have clear title to the land, thus leaving the loan and lien outstanding. The bungalow and villa owners do not receive land title and the land can be mortgaged to a third party.  The buyer has declined this offer.

# EXHIBIT 6

¶ 44.a.i



**Tom Kula** ask the folks who bought a lot that was already owned by someone else.. that's also what sanctuary bay did. We know where they are now.

Like · Reply · 1d

¶ 44.a.ii-iv



**Tom Kula** Yeah that will change the condo dynamics from 24 to 12 units only. Soon he'll be building on the lots that he sold but has not transfered titles to. Should we do anything about it? Hell yes! If we sit back and let others buy into the scam we are just as guilty as the developer. Soon it will be moot? Only for the sheep. Many of us have already taken legal action. Unfortunately much of our HOA money and new buyers money is spent on his legal fees and our court system allows him to continue to delay hearings. Belize laws turn a blind eye to this kind of developer fraud. His continued greasing of palms keeps him out of jail. Some are afraid to step up and do something and are willing to just take their lumps as lessons learned. Some of us are not just sitting back. He has stolen from us and we continue to look at every way possible to put a stop to this.

Like · Reply · 1d

¶ 44.b.i



**Joanne Lutterman Kula** Laurie Gyles exactly!! No accounting of funds or any records at all!!!

Like · Reply · 1d

¶ 48.a.i



**Kathi Osteen**
May 12

Good morning,

So happy to join you in this emerging OB group as we find our bearings. I think I know most of you and may have greeted some of you on your first trip here. I am so happy you all landed here! OB has been my home for over five years and I love it, I have my residency, work permit, 2 cats, 49 boyfriends! Like Jamie and some others, I was looking for a vibrant community and lots of green space, certainly not the resort experience. That was the OB that was Ari's dream. When his kids came along, he chose to change his worklife and turned OB over to CW, who had a different dream...OB should be a resort. I tried it, went to the Meet & Greets, not my style, so I looked around Corozal and found lots of fun and fun people and that has been my focus. I'm serving my second year as president of the Corozal Women's Forum, Women Sharing Knowledge and Friendship. We just finished the updated version of the Ralph's Dead booklet. Over a year ago Loreta Randall retired as the Northern Belize Warden for the US Embassy and put my name in to replace her and they gave me the title Citizen Liaison Volunteer (CLV), emphasis on the volunteer and I serve northern Belize with Eric Burson and Floyd Hunter. These days, I forward Embassy updates on the virus situation to anyone who is interested. At OB, I take care of two condos and one casita and served as their proxy at the first condo owners HOA meeting. I'm always writing something and International Living has so far published three of my articles, "Waiting on the Big Ferry", "Ralph's Dead, Now What" and "Get Hooked on Fishing in Belize" and I'm now working on an article about living off the grid in Belize. My book is 99% finished and I will publish it with Balboa Press this year. The work I really love doing is transformational coaching, with sessions on zoom, for clients from all over. By December I hope to finalize my masters certification. I also love volunteering when I can and it's a fun way to meet people, Graffiti Fest, Art in the Park, Oktoberfest at Cerros, CAP Vet clinic. NICH events, Mama Lo projects, lots of fun!

I'm posting because I had a moment I want to share with you....I finally said "enough"! To be clear, I do not like the way CW runs OB, he know this. Up to now, I have swept things under the rug, not said anything. This time it nagged at me. I realized how often I don't speak out, look the other way, stay quiet rather than make waves, overlook things. I know nothing will ever get resolved if I continue to be complacent and compliant...I need to focus on the opportunities I do have.

Barricading some of the roads in OB, didn't feel right at all. Then I was told I could not come and go from OB during the virus, even though Belize said I could buy food, medicine or do banking between certain hours. Both the barricades and the confinement, didn't make sense. If Stephen had not taken the barricades down, I would have. Enough! I'm tired of the BS, never liked being bullied and manipulated, and I decided to find out what my rights were as a ppty owner in OB, and ask who owns what, and what are our options.

I asked Dean...he needed the same answers...next stop was Ari. I told him this group was emerging, and I needed some truth. Here's what he told me to share with you.

CW received the title to the OB ppty, plus $1million of OB money, that's all gone

CW was to add $1million from his investors, never happened

The developer does not control and never will control the OB roads or front gate...owners make those policies

CW controls the pool, restaurant, pier, beaches..which ppty is all part of non-owner common area belonging to OB...at the moment we have no control over this.

CW refused to sign the document releasing the titles to owners, Ari flew to California and got it signed, including the title for the Inn.

CW recently got an unauthorized bank loan using OB titles. The funds go to him in increments, as he pays back the first payment, which he may not be able to do.

CW has never paid Ari his share of any sale at OB. He was to get a percentage.

Ari has a plan, it makes sense, I like it and I'm supporting it. He is happy to share it with anyone. He tried working with CW and found him to be delusional, so he's been working in the background with some OB owners like himself, who have not received what they were promised, not just the 14 villa owners. They do not believe CW has any intention of making anyone whole. If you are in this category, let me know. Ari would be happy to visit with you and add your grievances to the growing list...he would also be agreeable to a conference call with this group, as long as it's productive...he's heard the complaints!

I asked what can we do in the meantime, do we have any leverage. He said speak up and speak out. We could ask CW for an accounting of the HOA dues, or proof the GST is being paid on the water used. As a group we could easily vote on things like this. Ari suggested we write some policies for ourselves, rather than wait for an HOA to be formed. There is a boatload of talent and skills in this group, let's create some viable solutions on our own. We can to be more responsible as owners to create the OB we want for ourselves. love, Kathi

19                                    43 Comments  Seen by 71

👍 Like                    💬 Comment

¶ 48.b.i

 **Liz Diaz** I can show you evidence that he had done bad business before. I agree with Lindsey Stewart don't give him any more money. Get a completion date. Question his every motive and don't believe anything he says. He is a master of misconception. He created a news website with "FAKE NEWS". He is deceptive in every way. I'm sure he's sitting at home wondering where he could get more money. There was $1.5 in OB when he took over, WHERE IS IT! No one knows. And where is our money? My money should have been in an escrow! This isn't over for me. Chris Williams is bad news for OB. I feel sorry for people that are enchanted by him, I was in the beginning.

Like · Reply · 10w                                            1

# EXHIBIT 7

¶ 50.a.i

 **Tom Kula** Ari has said as recently as last week he wants to help. He would like to hear from everyone who has been harmed.

Like · Reply · 1d

¶ 50.b.i

 **Liz Diaz** YOUR SILENCE IS PERMISSION!!!!!!! Tell your story. We need to stop that bully. I sure hope that by now there AREN'T people still drinking the cool-aid. CW is a narcissist and a professional scammer. If you need proof, I can show you, actually any one at OB can. I also like Ari's Plan! GET RID OF THE CANCER!!

Like · Reply · 4w     4

¶ 50.c.i-iii



**Kathi Osteen**
May 12

Good morning,

So happy to join you in this emerging OB group as we find our bearings. I think I know most of you and may have greeted some of you on your first trip here. I am so happy you all landed here! OB has been my home for over five years and I love it, I have my residency, work permit, 2 cats, 49 boyfriends! Like Jamie and some others, I was looking for a vibrant community and lots of green space, certainly not the resort experience. That was the OB that was Ari's dream. When his kids came along, he chose to change his worklife and turned OB over to CW, who had a different dream...OB should be a resort. I tried it, went to the Meet & Greets, not my style, so I looked around Corozal and found lots of fun and fun people and that has been my focus. I'm serving my second year as president of the Corozal Women's Forum, Women Sharing Knowledge and Friendship. We just finished the updated version of the Ralph's Dead booklet. Over a year ago Loreta Randall retired as the Northern Belize Warden for the US Embassy and put my name in to replace her and they gave me the title Citizen Liaison Volunteer (CLV), emphasis on the volunteer and I serve northern Belize with Eric Burson and Floyd Hunter. These days, I forward Embassy updates on the virus situation to anyone who is interested. At OB, I take care of two condos and one casita and served as their proxy at the first condo owners HOA meeting. I'm always writing something and International Living has so far published three of my articles, "Waiting on the Big Ferry", "Ralph's Dead, Now What" and "Get Hooked on Fishing in Belize" and I'm now working on an article about living off the grid in Belize. My book is 99% finished and I will publish it with Balboa Press this year. The work I really love doing is transformational coaching, with sessions on zoom, for clients from all over. By December I hope to finalize my masters certification. I also love volunteering when I can and it's a fun way to meet people, Graffiti Fest, Art in the Park, Oktoberfest at Cerros, CAP Vet clinic, NICH events, Mama Lo projects, lots of fun!

I'm posting because I had a moment I want to share with you....I finally said "enough"! To be clear, I do not like the way CW runs OB, he know this. Up to now, I have swept things under the rug, not said anything. This time it nagged at me. I realized how often I don't speak out, look the other way, stay quiet rather than make waves, overlook things. I know nothing will ever get resolved if I continue to be complacent and compliant...I need to focus on the opportunities I do have.

Barricading some of the roads in OB, didn't feel right at all. Then I was told I could not come and go from OB during the virus, even though Belize said I could buy food, medicine or do banking between certain hours. Both the barricades and the confinement, didn't make sense. If Stephen had not taken the barricades down, I would have. Enough! I'm tired of the BS, never liked being bullied and manipulated, and I decided to find out what my rights were as a ppty owner in OB, and ask who owns what, and what are our options.

I asked Dean...he needed the same answers...next stop was Ari. I told him this group was emerging, and I needed some truth. Here's what he told me to share with you.

CW received the title to the OB ppty, plus $1million of OB money, that's all gone

CW was to add $1million from his investors, never happened

The developer does not control and never will control the OB roads or front gate...owners make those policies

CW controls the pool, restaurant, pier, beaches..which ppty is all part of non-owner common area belonging to OB...at the moment we have no control over this.

CW refused to sign the document releasing the titles to owners, Ari flew to California and got it signed, including the title for the Inn.

CW recently got an unauthorized bank loan using OB titles. The funds go to him in increments, as he pays back the first payment, which he may not be able to do.

CW has never paid Ari his share of any sale at OB. He was to get a percentage.

Ari has a plan, it makes sense, I like it and I'm supporting it. He is happy to share it with anyone. He tried working with CW and found him to be delusional, so he's been working in the background with some OB owners like himself, who have not received what they were promised, not just the 14 villa owners. They do not believe CW has any intention of making anyone whole. If you are in this category, let me know. Ari would be happy to visit with you and add your grievances to the growing list...he would also be agreeable to a conference call with this group, as long as it's productive...he's heard the complaints!

I asked what can we do in the meantime, do we have any leverage. He said speak up and speak out. We could ask CW for an accounting of the HOA dues, or proof the GST is being paid on the water used. As a group we could easily vote on things like this. Ari suggested we write some policies for ourselves, rather than wait for an HOA to be formed. There is a boatload of talent and skills in this group, let's create some viable solutions on our own. We can to be more responsible as owners to create the OB we want for ourselves. love, Kathi

👍 19                                                      43 Comments  Seen by 71

👍 Like                                              💬 Comment

¶ 50.d.i



¶ 50.e.i



**Dean Helmick** ✓ contact Ari Kahn at 516-684 9017
ari.kahn@outlook.com

Like · Reply · 1d · Edited                    👍 3

¶ 51.a

Here is a copy of Kathi's original e-mail          7:49 PM

This morning I posted an important message on the OB Homeowners Forum page concerning the status of Chris Williams, as developer, and the OB owners. My concern was how this would affect you, your bungalow, the others who came to OB with dreams and hopes, and are waiting on Chris.

Two years ago, 14 villa owners gave Chris their money, in good faith...they are also are friends, like you are...we ate together, we laughed together, and all were left in the lurch!   This breaks my heart.  I honestly don't believe Chris is able to deliver anything to anyone.

I realize this is hard for you to hear and know we all feel your frustration.  Ari, myself and some others are working behind the scenes to return OB ownership to the owners and we would love to have you join us.  You are not alone here.

If you are willing to share the details of your "arrangement" with Chris, we might be able to give you some helpful steps to take.

It took me 2 years to write out my thoughts, and I'm only sorry I waited so long!  Love, Kathi

--
                                                              7:49 PM

# EXHIBIT 8

¶ 53

 **Lindsey Stewart** I suspect that the financial risk of doing this is why most people don't want to take this step. I have this concern as well. But creating some serious problems for CW would stop him from selling to new people. This would get his attention. Can you really bring people down to a development where the residents are rebelling to the point of creating an escrow account? And not supporting his tours? This level of pushback would be his incentive to stop dumping on us. More letters, town hall meetings, phone calls as a group are meaningless. We know that much already. It is all noise to him.

Like · Reply · 3w

# EXHIBIT 9



**Tom Kula**
May 18 at 7:53 PM

I am taking orders for the t shirt design below. I plan to wear them during upcoming Sales Tours. If you are on campus I'll have mine on when I arrive in July.

Steve Czerwinski and 7 others                    9 Comments  Seen by 62

**Cindy Rodenhizer-greshler** Don't forget I'm a big size girl 😎.
Very funny
Like · Reply · 3w                                                2

**Laurie Gyles**
                                                    2
Like · Reply · 3w

**Theresa Raglen** A must order for me. I'll take a medium
Thank you.
Like · Reply · 3w                                        1

**Paul Shilling** 1 size large for Paul
Like · Reply · 3w                            1

**Elizabeth Lisa Ann Donnelly** 2 mediums for us
Like · Reply · 3w                                    1

    **Elizabeth Lisa Ann Donnelly** Who do I pay
    Like · Reply · 3w

  **Steve Czerwinski** It's really more of a Rebellion but still funny
Like · Reply · 3w

    **Elizabeth Lisa Ann Donnelly** Still want one though.
    Like · Reply · 3w                              1

**Liz Diaz** Small please one for every day of the week.
Like · Reply · 3w                                        2

# EXHIBIT 10

¶ 55



**Diana VanAlstine McKee**
June 8 at 6:49 AM

•••

This site is for the purpose for Orchid Bay owners to share our personal experience's though pictures, videos, and conversation and to **promote,** get to know each other  and i**nform members of activities and progress at our beautiful Orchid Bay Community**

I've been looking back at comments in the past.  This group is just for owners,  so how is it helpful to "WARN" others of what has happened in the past.  Or to complain about what has happened.  If we are in this group, we will have already purchased and we know what is going on.  I understand that future sales will be "discouraged", but how does that help those of us who have purchased land and/or are having houses built.  Can we not just move forward and stop bitching.  If you have wronged, getting everyone else riled up and making people cry is not going to help you. Get a lawyer, and do something about it.  You are just making those of us who are willing to put in the work and the time to get what we need angry and upset.  OB is part of my dream and I will continue to fight for what I want.  No one on this site will hear about my issues because it is none of your business AND IT WON'T HELP.

 1                          22 Comments  Seen by 62

¶ 56



**Theresa Raglen** How are we going to get the word out to discourage future buyers. You. That's the underling reason. I have talking points for you to answer those questions. Are you willing to do this ? The talking points are CW factual wrong doings.
If we want to stop this infighting bitchy to continue under the leadership of CW I
you describing will continue.
Is that the community you want to live in?
I am a villa owner scammed out of thousands of dollars.

Like · Reply · 1d

¶ 57



**Diana VanAlstine McKee** Theresa Raglen are you talking to me about discouraging people. Not I. I'm not going.to discourage anyone. I'm good.

Like · Reply · 11m

# EXHIBIT 11

 **Lindsey Stewart** I think that these are the big issues. I have nothing more to add. What is our leverage in getting some of these addressed? #1: We can continue asking. #2: We can stop paying our HOA dues until the place is run the way we want. #3: STOP SUPPORTING HIS CLIENT TOURS. Let's stop telling innocent people how happy we all are, how things are great with CW and how excited we are that they are coming to OB. In other words, stop helping CW sell to new people. For god's sake, no more cocktail parties or socializing with him and his marks. During these visits, he points to the nice people and pretty homes and says he created all of it. He created nothing at OB and deserves no credit. But he has taken a lot of money from a lot of people, delivered nothing in 4 years, and wants to keep reeling in new victims. It is heartbreaking to sit at Tradewinds amongst people who have put their faith in CW and get nothing in return. Let's stop enabling his scam. We all know what's up. Let's choose to not be his enablers. Let's not help him sell to new people. This is truly something to consider. We all want OB to succeed, but enabling a fraud will not achieve that goal. It will only postpone getting this place on its feet and continue to ruin our reputation. OB has a lot going for it. A third developer could make this work.

Like · Reply · 1d                                           5

 **Carrie Chaplin** I think option 2 might really work but only if we can collect it as an hoa and pay the groundskeepers, clean up guys, security and garbage collectors.
What happens if we don't pay our water bill? That's their biggest money maker.
Can they turn it off (and who would do it) and can we take it over turn it on and run it ourselves? Possession is 9/10th`s etc.

Like · Reply · 1d                                           1

 **Joanne Lutterman Kula** Carrie Chaplin I agree!! He locked everyone in during Covid so let's lock him out.

Like · Reply · 1d

 **Elizabeth Westerhoff** I'm curious on the legal side of things if we don't pay our HOA fees to the developer? I'm all for it if we can do it! Can we legally re-hire Orchid Bay staff? (grounds & security?) How do we set up payroll etc? Do we have enough money collectively as a small group to do this? Even though wages are not expensive, having security 24/7/365 adds up. We wouldn't have to maintain anything other than green space, roadside and beach area. What about the pool? It's owned by the developer but most of us use it. Maintenance, water & electricity? Just some thoughts that swirl inside my head.

Like · Reply · 1d                                           1

 **Carrie Chaplin** Lindsey Stewart I'm in. Anyone else! (Willing to hire atty and share fee)

Like · Reply · 1d                                            1

---

 **Lindsey Stewart** My vote would be to not send another letter. I feel that sending a letter would give him the opportunity to make more false promises and buy him time by having people wait for their execution. I would like to take action. I think we all have more than enough data on the guy to know he is a fraud and scam artist. Letters don't work with people like that. (As it is, he will use the virus to maximum effect for himself.)

Like · Reply · 1d                                            1

**Joanne Lutterman Kula** Laurie Gyles I agree. Take over the water and do not pay HOA dues to him. Instead set up accounts in Corozal. Take control and take Orchid Bay back as it is rightfully ours and our financial investments.

Like · Reply · 1d                                            1

---

 **Susan Marr Brace** Bad publicity will have a huge impact. (It will also affect everyone's investment, at least for the short term. )If the first item that comes up when a potential buyer googles "Orchid Bay", then that would be a huge deterrent to CW having more "marks".
As of now, only positive items come up at the top of a google search, so either CW is paying someone for SEO, and/or there's nothing recent on the web about OB that's negative. A legal case filing or major news story would go to the top of the search.
Does anyone have a court case against OB filed? Is so, perhaps you can get a newspaper interested in the story.

Like · Reply · 1d · Edited

---



**Jon Pbd** Tom Kula WOW! This guy is a total fraud and scam artist.

Like · Reply · 1d        👍 2

**Laurie Gyles** Tom Kula Wow! He admitted as much by saying that!

Like · Reply · 1d        👍 1

**Steve Czerwinski** Tom Kula Wow! You actually loaned him money??

Like · Reply · 1d

**Paul Shilling** Tom Kula bastard...i would love to see him on AMERICAN GREED SHOW...

Like · Reply · 1d

**Lindsey Stewart** Steve Czerwinski Easy now, Steve. Be nice. We are all in the same boat here. Don't blame the victim for trusting CW. Blame CW for stealing.

Like · Reply · 17h        👍 1

---

 **Stephen Honeybill** 🐝 The time has come for all of us to get together and ignore CW, Michael Harbushka, President of Orchid Bay, a person that was also accused in a scam 5 years ago along with CW is now making all the posts coming out of Orchid Bay. We should be going after him as well. The time for friendly zoom meetings is long since passed!!!

Like · Reply · 1d         5

---

 **Deborah Harter** Susan Marr Brace correct. The FTC and FBI were also involved during the Sanctuary Belize debacle...a twin to ours. I wish the 14 original Villa owners and Condo C and D owners who were defrauded out of their money and dream would file complaints with these entities and get an investigation started into these men and their company...they have more to get something going.

Like · Reply · 1d         3

---

 **Dean Helmick** ⊘ Welcome Beth and Hans to the Orchid Bay community. The Bungalow village is going to be a nice area to be. Do you have a completion date for your Bungalow? Can't wait to get you here!

Like · Reply · 7w · Edited

 **Lindsey Stewart** Dean, as an owner, am I allowed to be honest about how I feel about Chris Williams? I really don't want to enable that guy or bullshit anyone. People deserve to know the truth about his past dealings, the money he has taken from buyers over the past couple of years, and not delivering anything.

Like · Reply · 7w                           4

 **Dean Helmick** ⊘ Thank you Lindsey for speaking up. This is why we developed this FB site ....................

Like · Reply · 7w                           1

 **Lindsey Stewart** Dean Helmick Thank you dear😊 

Like · Reply · 6w                          1

---

 **Liz Diaz** Buyers please beware! Don't fall into his trap. My dream home turned into a nightmare I pray this isn't happening to you.

Like · Reply · 6w                           1

---

 **Lindsey Stewart** I am worried that all the green space around our "estate lot" #40 will not be honored. We were promised this when we bought. It is a matter of character and integrity. Now I know I am in trouble!

Like · Reply · 5w                           1

---

 **Lindsey Stewart** just compared the maps and yup, they are encroaching on the green space in front of lot 40.

Like · Reply · 3w

 **Carrie Chaplin** .A few years ago i asked who wanted to join Together to hire atty to look into all these issues.
Only a few people wanted to spend the money. Most thought the nice approach would get answers. It hasnt. Same questions and complaints raised over and over again. Same results! None.
Its nice i suppose to have a place to bitch and moan. If your serious about getting answers o still have draft letter withnissues laid put.

Like · Reply · 4w  2

 **Joanne Lutterman Kula** Carrie Chaplin Tom and I have consulted an attorney both here in the states and Belize. We would be interested in discussing with you.

Like · Reply · 3w

 **Carrie Chaplin** Joanne Lutterman Kula would love to discuss. My email is Caridust@gmail.com

Like · Reply · 3w

---

 **Elizabeth Westerhoff** Also it's a shame that the maintenance workers are not working as that is HOA money, which we all paid into but have no control over.

Like · Reply · 4w · Edited  4

 **Tom Kula** Elizabeth Westerhoff but CW is able to take vacations with that money

Like · Reply · 4w  2

 **Lindsey Stewart** that is right. Any excuse to pocket money for himself.

Like · Reply · 3w  1

---

 **Deborah Harter** Cindy Rodenhizer-greshler I believe the lady who owns the lot next to you is considering selling...another fed up owner. Many of the lot owners have not received what they were promised, namely utilities to their lot, build ready lots, and most importantly their Land Certificate of Title...so why would they spend money to clean up their lots...it's a difficult position for these folks as the current developer/management company doesn't care about anything or anyone except scamming more people to put down deposits on the new build stuff. 😂😂😂

Like · Reply · 4w  1

 **Cindy Rodenhizer-greshler** Charming is not a word I would ever put in the same sentence as CW

Like · Reply · 4w 

 **Tom Kula** Cindy Rodenhizer-greshler yes, you are like the rest of the gang. Pissed off with the developer's lack of accountability, continued fraud, and deception to those that have invested here.

Like · Reply · 3w

 **Joanne Lutterman Kula** Rick Smith I hate to say this to you but CW says whatever you want to hear. He is already involved in multiple lawsuits. You are another victim of CW.

Like · Reply · 3w 

 **Tom Kula** Rick Smith one of CWs sales guys. Obviously CW has been made aware of the posts on our private list. His MO is to separate the herd. Always has been. Then he'll promise you something to appease you for a while. Never delivering though. Good luck, but be wary.

Like · Reply · 3w

 **Laurie Gyles** There are at least 2 coupled that have put large deposits on condos in the second phase who I suspect are being offered villas or bungalows but want what they paid for. They will not be made whole by CW.

Like · Reply · 3w 

 **Andrea Gerdts** Do you think CW would ever agree to a Zoom meeting with everyone? Not any of the Townhall crap where he controls it, but face to face. I've never liked how he wouldn't address anyone's questions on Facebook, where others could see it, but instead wante… See More

Like · Reply · 3w  5

 **Elizabeth Lisa Ann Donnelly** Andrea Gerdts I like that.

Like · Reply · 3w  2

 **Joanne Lutterman Kula** Andrea Gerdts I doubt it will ever happen. He can get away with bullying one or two people but not a large group. Too many witnesses.

Like · Reply · 3w  2

 **Andrea Gerdts** Joanne Lutterman Kula and that right there speaks volumes about his character.

Like · Reply · 3w  1

 **Joanne Lutterman Kula** Andrea Gerdts exactly!!

Like · Reply · 3w

 **Paul Shilling** Andrea Gerdts the rampart gossipl IS TRUE IT IS NOT JUST IDLE GOSSIP. I HAVE NOT SEEN MY PAID FOR TITLE IN 4 YEARS..I HAVE NO PROOF I LIVE HERE. BECAUSE OF CW...BUT I KNow I'm one of the lucky ones ....i do have a house to live in

Like · Reply · 3w  3

 **Andrea Gerdts** Paul Shilling I know it's all true, but according to CW, it's gossip and negativity. That's why I'm glad that we have this forum to make everyone aware of the wrongs he has committed. Especially those of us not currently on site.

Like · Reply · 3w  3

 **Paul Shilling** CW IS THE NEGATIVITY here IN OB. The rest of us just want a fair deal..give us what we paid for...

Like · Reply · 3w  4

 **Lindsey Stewart** Divide and conquer. Has worked so far.

View 9 more comments

 **Barbara Petrohan** Ask folks who paid for a condo if they have any hope of either getting their money back or getting a condo. There are many innocent people who have been scammed and lost their investment in OB. If some have gotten something for their money, that does not change the fact that others have been scammed.

Like · Reply · 1d     2

 **Tom Kula** ask the folks who bought a lot that was already owned by someone else.. that's also what sanctuary bay did. We know where they are now.

Like · Reply · 1d

 **Dan McKee** Tom Kula was this a paper mix up? Were these people offered other lots?

Like · Reply · 17h

 **Tom Kula** Not a mix up. Other buyer still has nothing.

Like · Reply · 17h     1

 **Steve Czerwinski** Dan – One lot sold to two different people by different sales people. A fuck-up to be sure but not what you'd call a systemic problem. Sgt Friday: Just the facts ma'am, just the facts

Like · Reply · 17h · Edited     1

 **Tom Kula** Steve Czerwinski not 2 different sales people, and outright denial when confronted. Was paid in full for property,, yet denied that fact the very next day. No attempt to resolve (as in refund money). Systematic, maybe not. Outright fraud, absolutely. Get your facts first.

Like · Reply · 8h     1

# EXHIBIT 12

 **Larry Cornelius Sr.** Tom Kula likewise!

Like · Reply · 4w

 **Rick Smith** Barbara Petrohan you and I have talked. Please know I'm still holding strong to my original contract.

Like · Reply · 3w

 **Barbara Petrohan** Rick Smith If you have a contract for a condo unit that will never be built, what are you doing to protect or recoup your investment?

Like · Reply · 2w

 **Rick Smith** Barbara Petrohan treading water and trying to paddle upstream. We are in talks about converting to bungalow. Please note. CW hasn't yet admitted the condos aren't going to be built. He knows if he does, it will be a breach (for what that's worth ).

Like · Reply · 2w

 Write a reply...     

 **Kerry Snider** Hi Kathi Osteen. Could you please explain what Ari's plan is or can we contact him directly. We are owners and are trying to get all the info we can.

Like · Reply · 3w   2

 **Stephen Honeybill** Ari Kahn: 516 684 9017
 1
Like · Reply · 3w

**Deleted Post**

 **Tom Kula** Yeah that will change the condo dynamics from 24 to 12 units only. Soon he'll be building on the lots that he sold but has not transfered titles to. Should we do anything about it? Hell yes! If we sit back and let others buy into the scam we are just as guilty as the developer. Soon it will be moot? Only for the sheep. Many of us have already taken legal action. Unfortunately much of our HOA money and new buyers money is spent on his legal fees and our court system allows him to continue to delay hearings. Belize laws turn a blind eye to this kind of developer fraud. His continued greasing of palms keeps him out of jail. Some are afraid to step up and do something and are willing to just take their lumps as lessons learned. Some of us are not just sitting back. He has stolen from us and we continue to look at every way possible to put a stop to this.

Like · Reply · 1d



View 9 more comments

**Barbara Petrohan** Ask folks who paid for a condo if they have any hope of either getting their money back or getting a condo. There are many innocent people who have been scammed and lost their investment in OB. If some have gotten something for their money, that does not change the fact that others have been scammed.

Like · Reply · 1d                    👍 2

**Tom Kula** ask the folks who bought a lot that was already owned by someone else.. that's also what sanctuary bay did. We know where they are now.

Like · Reply · 1d          **DELETED POST**

**Dan McKee** Tom Kula was this a paper mix up? Were these people offered other lots?

Like · Reply · 17h

**Tom Kula** Not a mix up. Other buyer still has nothing.

Like · Reply · 17h          👍 1     **DELETED POST**

**Steve Czerwinski** Dan - One lot sold to two different people by different sales people. A fuck-up to be sure but not what you'd call a systemic problem. Sgt Friday: Just the facts ma'am, just the facts

Like · Reply · 17h · Edited          👍 1

**Tom Kula** Steve Czerwinski not 2 different sales people, and outright denial when confronted. Was paid in full for property,, yet denied that fact the very next day. No attempt to resolve (as in refund money). Systematic, maybe not. Outright fraud, absolutely. Get your facts first.

Like · Reply · 8h          😆 1     **DELETED POST**

Ajay Gupta, Esq. (#242132)
GUPTA EVANS AND ASSOCIATES, PC
1620 5th Avenue, Suite 650
San Diego, CA  92101
(619) 866-3444
(619) 330-2055 Facsimile
e-mail:  ag@SoCal.law

**Attorneys for Plaintiffs Christopher Williams
and Legacy Global Development LLC**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER WILLIAMS; LEGACY GLOBAL DEVELOPMENT LLC, | Case No.: |
| Plaintiffs, | **VERIFICATION OF CHRISTOPHER WILLIAMS** |
| v. | |
| THOMAS KULA; JOANNE KULA; ELIZABETH DIAZ; KATHI OSTEEN; STEPHEN HONEYBILL; LINDSEY STEWART; THERESA RAGLEN; ROGER "ARI" KAHN; and DOES 1-20, inclusive, | |
| Defendants. | |

**<u>VERIFICATION</u>**

     I, Christopher Williams, declare:

I am a Plaintiff in this action.  I have read the foregoing document titled:

**VERIFIED COMPLAINT**

and I know the contents thereof and the same are true and correct to the best of my knowledge, and as to those matters which are herein alleged upon information and belief, I believe them to be true and correct.

     I declare under penalty of perjury, under the laws of the United States, that the above is true and correct and that this declaration was executed on June 17, 2020 at San Diego, California

DATED:  June 17, 2020                  RESPECTFULLY SUBMITTED,

                                        _____

                                        Christopher Williams