1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**WARREN TERZIAN LLP**
Dan Terzian (SBN 283835)
*dan.terzian@warrenterzian.com*
Erick Kuylman (SBN 313202)
*erick.kuylman@warrenterzian.com*
700 S. Flower St., Suite 1000
Los Angeles, CA 90017
T: (213) 410-2620

*Counsel for Defendant*
*Ari Kahn*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

**Christopher Williams**; **Legacy Global Development LLC**,

Plaintiffs,

v.

**Thomas Kula**; **Joanne Kula**; **Elizabeth Diaz**; **Kathi Osteen**; **Stephen Honeybill**; **Lindsey Stewart**; **Theresa Raglen**; **Roger "Ari" Kahn**; and **Does 1-20**, inclusive,

Defendants.

Case No. 3:20-cv-01120-GPC-AHG

Hon. Gonzalo P. Curiel

**Defendant Ari Kahn's Memorandum of Points & Authorities in support of Special Motion to Strike (CCP § 425.16) or, alternatively, Motion to Dismiss for Lack of Personal Jurisdiction**

Judge:          Hon. Gonzalo P. Curiel
Courtroom:    2D
Hearing date:  August 14, 2020
Hearing time:  1:30 PM

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................6

BACKGROUND ............................................................................................7

STANDARDS OF REVIEW ........................................................................10

I.   Anti-SLAPP ........................................................................................10

II.  Motion to Dismiss for Lack of Personal Jurisdiction.........................11

ARGUMENT ...............................................................................................12

I.   Anti-SLAPP law applies to every cause of action in the complaint. .................12

    A.   Anti-SLAPP law applies to any claim where the principal thrust is partly based on protected activity...........................................................................12

        1.   Every claim is founded on protected activity. ...............................12

        2.   Every claim is based on statements made in a public forum.........13

        3.   Every claim is founded on protected statements made in connection with a public issue. ................................................13

II.  The complaint should be stricken because Plaintiffs are unlikely to prevail on any cause of action. ................................................................16

    A.   The First Amendment bars all causes of action in the complaint. ...........16

        1.   The First Amendment bars claims based on substantially true speech where the speaker believed they spoke the truth..........................17

        2.   The First Amendment protects substantially true speech and opinions..................................................................................20

        3.   Liability requires not just false speech, but defamatory speech. ...21

        4.   The claims are meritless because Kahn's statements were substantially true and because Kahn did not act with actual malice........21

    B.   Four claims should be dismissed (or all five claims narrowed) because a defamatory statement may be pursued under only one theory...........................24

    C.   The tortious interference claims should be stricken because their elements are not met..............................................................................25

    D.   All claims should be stricken because the Court does not have personal jurisdiction over Kahn.........................................................................26

        1.   General jurisdiction doesn't exist, as Kahn is a New Yorker........27

        2.   Specific jurisdiction doesn't exist because Kahn did not aim any conduct at California.......................................................................27

CONCLUSION ............................................................................................30

WARREN
TERZIAN LLP

# TABLE OF AUTHORITIES

**CASES**

*Annette F. v. Sharon S.*, 119 Cal. App. 4th 1146 (2004) ........................................11, 17

*Balzaga v. Fox News Network, LLC*, 173 Cal. App. 4th 1325 (2009) .........................11

*Baral v. Schnitt*, 1 Cal. 5th 376 (2016) .........................................................................25

*Barry v. State Bar of California*, 2 Cal. 5th 318 (2017) ...............................................27

*Bel Air Internet, LLC v. Morales*, 20 Cal. App. 5th 924 (2018) ..................................11

*Blatty v. New York Times Co.*, 42 Cal. 3d 1033 (1986) ...............................................17

*Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017) ...26

*Burdick v. Superior Court*, 233 Cal. App. 4th 8 (2015) ...............................................29

*Cabrera v. Alam*, 197 Cal. App. 4th 1077 (2011) ...........................................14, 17, 18

*Chan v. UBS AG*, No. 18-cv-04211, 2019 WL 6825747 (C.D. Cal. Aug. 5, 2019).....29

*Charme v. Int'l Broth. of Elec. Workers, Local 45*, 110 Cal. App. 4th 107 (2003) .....13

*Colyear v. Rolling Hills Cmty. Assn. of Rancho Palos Verdes*, 9 Cal. App. 5th 119 (2017) .......................................................................................................................13

*Cottle v. W. Skyways Inc.*, Case No. 17-cv-00049, 2017 WL 1383277 (E.D. Cal. Apr. 18, 2017)...................................................................................................................28

*Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468 (2000) ................13, 14

*Dwight R. v. Christy B.*, 212 Cal. App. 4th 697 (2013)...............................................12

*Emerson v. J. F. Shea Co.*, 76 Cal. App. 3d 579 (1978) ..............................................14

*First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, No. 15-cv-01893, 2016 WL 1323104 (N.D. Cal. Apr. 5, 2016)...........................................................................11

*Foothills Townhome Assn. v. Christiansen*, 65 Cal. App. 4th 688 (1998) ..................14

*Francis v. Wynn Las Vegas*, 557 F. App'x 662 (9th Cir. 2014) (mem.) .....................11

*Gaudin v. Remis*, 379 F.3d 631 (9th Cir. 2004) ..........................................................27

*Gilbert v. Sykes*, 147 Cal. App. 4th 13 (2007).......................................................16, 17

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011) .................27

*Grenier v. Taylor*, 234 Cal. App. 4th 471 (2015).........................................................13

*Harkonen v. Fleming*, 880 F. Supp. 2d 1071 (N.D. Cal. 2012)....................................11

*Hatset v. Century 21 Gold Coast Realty*, 649 F. App'x 400 (9th Cir. 2016) (mem.) ..29

*Hicks v. Richard*, 39 Cal. App. 5th 1167 (2019) ..........................................................19

*Innovative Bus. Partnerships, Inc. v. Inland Ctys. Reg'l Ctr., Inc.*, 194 Cal. App. 4th 623 (2011) ...............................................................................................................20

*Jackson v. Mayweather*, 10 Cal. App. 5th 1240 (2017) ...............................................13

*Karimi v. Golden Gate Sch. of Law*, 361 F. Supp. 3d 956 (N.D. Cal. 2019) ...............19

*Kashian v. Harriman*, 98 Cal. App. 4th 892 (2002)................................................17, 19

*Khawar v. Globe Int'l, Inc.*, 19 Cal. 4th 254 (1998) ....................................................17

*Long v. Walt Disney Co.*, 116 Cal. App. 4th 868 (2004) ..............................................25

*M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623 (2001)..............................................25

*Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir. 2013) .................................11, 19

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) ......................................20

*McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97 (2007)......................................21

*Mohazzabi v. Mohazzebi*, Case No. 19-cv-06453-SI, 2019 WL 6493969 (N.D. Cal. Dec. 3, 2019) ....................................................................................................29

*N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764 (1997)..............................26

*Navellier v. Sletten*, 29 Cal. 4th 82 (2002) .................................................................11

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118 (1990) .......................26

*Paradise Hills Assocs.*, 235 Cal. App. 3d 1528 (1991)................................................18

*Peterson v. Kennedy*, 771 F.2d 1244 (9th Cir. 1985)....................................................29

*Picot v. Weston*, 780 F.3d 1206 (9th Cir. 2015) ...........................................................28

*Reader's Digest Assn. v. Superior Court*, 37 Cal. 3d 244, 252–53 (1984) .................17

*Resolute Forest Prod., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005 (N.D. Cal. 2017)................................................................................................................17, 20

*Ruiz v. Harbor View Cmty. Assn.*, 134 Cal. App. 4th 1456 (2005)........................13, 14

WARREN
TERZIAN LLP

*Sarver v. Hurt Locker LLC*, No. 2:10-cv-09034-JHN, 2011 WL 11574477 (C.D. Cal. Oct. 13, 2011) ...................................................................................18, 20, 25

Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797 (9th Cir. 2004)11, 12, 27, 28

*Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798 (2002)................................13, 20

*Summit Bank v. Rogers*, 206 Cal. App. 4th 669 (2012)................................................20

*Thomas v. Quintero*, 126 Cal. App. 4th 635 (2005)...................................12, 14, 16

*Unelko Corp. v Rooney*, 912 F.2d 1049 (9th Cir. 1990) ............................................17

*ViaView, Inc. v. Retzlaff*, 1 Cal. App. 5th 198 (2016) .................................................29

*Walden v. Fiore*, 571 U.S. 277 (2014) .......................................................................28

*Yagman v. Kelly*, No. CV176022MWFPJWX, 2018 WL 2138461 (C.D. Cal. Mar. 20, 2018)...........................................................................................................29

*Young v. CBS Broadcasting, Inc.*, 212 Cal. App. 4th 551 (2012) ...............................17

*Youst v. Longo*, 43 Cal. 3d 64 (1987) .........................................................................26

**STATUTES**

Cal. Civ. Code § 3425.3 ...............................................................................................24

Cal. Civ. Code § 47 ...............................................................................................16, 18

Cal. Civ. Proc. Code § 410.10 .....................................................................................11

Cal. Civ. Proc. Code § 425.16 ...............................................................................10, 11

**RULES**

Fed. R. Civ. P. 4 ...........................................................................................................11

**WARREN TERZIAN LLP**

**Kahn's Memorandum of Points and Authorities**

# INTRODUCTION

Plaintiffs Chris Williams and Legacy Global Development ("Legacy") bought a thriving residential community in Belize, Orchid Bay, and run it into the ground. They've siphoned its money. They've threatened its residents. They've refused to build what they promised while also refusing to refund the money taken to build it. They've sold property knowing it had a lien that could be foreclosed at any time, hiding that from the buyer. They've sold others' property and kept the money for themselves.

Defendants are Plaintiffs' victims. Defendant Ari Kahn is one of Orchid Bay's former employees and investors; the rest are homeowners. And the homeowners are fed up. Their livelihoods are in Orchid Bay, and Plaintiffs are destroying them.

Defendants contacted Kahn about logistical and background questions on Orchid Bay. And Kahn truthfully answered them. That's it. He's not trying to retake Orchid Bay. He has no interest in that; Plaintiffs have saddled it with liabilities.

Plaintiffs now bring this complaint, claiming that Defendants are conspiring to remove Plaintiffs so that Kahn can retake ownership by a coordinated defamation campaign. Almost all of this is false. There is no defamation; everything Defendants said is true. And Kahn is not trying to take back Orchid Bay. Just one part is true: the homeowner Defendants want Plaintiffs out, but there's nothing unlawful about that.

This is a classic SLAPP suit. Courts have repeatedly recognized that these type of homeowner disputes are appropriate for anti-SLAPP motions. And this is especially true here, where the dispute—including Plaintiffs' scams—has been covered in many news articles.

On an anti-SLAPP motion, Plaintiffs lose on the merits and lose on jurisdiction. Defendants' conduct is all protected by the First Amendment. And all that conduct occurred outside California and was targeted on what's happening in Belize, not here.

While certainly the Court ***could*** grant the motion on jurisdiction and stop there, it shouldn't. Plaintiffs have ceaselessly harassed Defendants. This should end now, and the Court should grant the motion on the merits and on jurisdiction.

**Kahn's Memorandum of Points and Authorities**

WARREN
TERZIAN LLP

# BACKGROUND

Orchid Bay is a residential community in Belize. Declaration of Ari Kahn ("Kahn Dec.") at ¶ 3. The total community comprises over 114 acres, 135 land parcels, 24 casita beach houses, 12 condominium units, 12 incomplete condominium units, several single family houses, and in 2016, it also had 44 incomplete villas (which Williams later reconfigured to bungalows). *Id.* The Orchid Bay companies also own more than 1,100 acres of other land. *Id.*

The Orchid Bay community originated in the early-2000s. *Id.* at ¶ 3. In 2007, Kahn invested over $███ of his own money in the venture along with other investors who invested another ███ for a total of approximately ███ in equity investment was invested in the startup phase *Id.* at ¶ 4.

After investing, Kahn was hired as the CEO of the Orchid Bay development project. *Id.* at ¶ 5. The role came with a paycut for Kahn, with him earning 35% less than he did each of the prior five years. *Id.* Kahn took this paycut because he expected—and wanted—the business to grow. *Id.* Put the customers and business first, and eventually he will be compensated with its success. *Id.* That was his mantra. *Id.* During his entire time as CEO (which lasted through 2016), Kahn's salary never increased; he never took a raise, bonus, or commission. *Id.* Neither he nor any other investor received distributions or dividends. *Id.* They certainly could have. *Id.* The business was profitable every year since 2009 under Kahn's tenure and had plenty of acreage it could have directed as a bonus. *Id.*

In 2015, the Orchid Bay companies had over $███ in assets and just $███ in accounts payable. *Id.* at ¶ 6; Exhibit Z. Orchid Bay had over $███ in sales contracts, its second strongest in history plus it had $███ in revenues. Kahn Dec. at ¶ 6; Exhibit Y. Its bank also offered (unsolicited) to increase Orchid Bay's ███ credit line to ███. Kahn Dec. at ¶ 6. The credit line did not require that Orchid Bay actually use it (interest accrued only upon the drawn balance), and it was largely secured by unused property several miles from Orchid Bay. *Id.* All told,

WARREN
TERZIAN LLP

1    Orchid Bay had more than $████████ in sales over an eight-year span that included
2    the great recession. *Id.* at ¶ 6; Exhibit Y.

3        Yet 2015 also marked a time of change in Kahn's personal life. Kahn Dec. at ¶
4    9. He now had kids and wished to travel less and spend more time with his family in
5    New York. *Id.* He and the Orchid Bay investors thus began looking for a successor. *Id.*

6        That's how Williams and his company Legacy got involved. In late 2015, a third
7    party introduced Williams to Orchid Bay leadership. *Id.* at ¶ 10. Orchid Bay thought
8    Williams was a good fit because he provided documents showing that he had over ████
9    ████ in available cash and a net worth of over $██████, and he claimed an eager-
10   ness to invest that money into Orchid Bay. *Id.* So the Orchid Bay leadership felt he
11   could build upon Orchid Bay and deliver the quality its customers deserved. *Id.* In
12   2016, after Plaintiffs conducted comprehensive due diligence, Orchid Bay leadership
13   and Legacy entered an agreement to sell Orchid Bay to Williams. *Id.*

14       The sale contract had terms designed to prioritize the customers ████████
15   ████████████████████████████████████████████████
16   ████████████████████████████████████████████████
17   ████████████████████████████████████████████████
18   ████████████████████. *Id.* at ¶ 11.

19       On June 30, 2016, Legacy assumed day-to-day management of Orchid Bay. *Id.*
20   at ¶ 12. At that point, Orchid Bay had current assets (cash plus good accounts receiva-
21   ble) of more than $████████████████████████████████████
22   ████████████ in future receivables due upon completion of certain projects. *Id.*;
23   Exhibit U1. From June to September 2016, Kahn acted as an informal advisor to Leg-
24   acy and took no salary. *Id.* at ¶ 12.

25       Shortly after buying Orchid Bay, Plaintiffs began plundering its bank accounts.
26   *Id.* at ¶¶ 15, 19. Within days they drew ██████ on its line of credit and wired
27   ██████ to themselves. *Id.* at ¶ 19; Exhibit AA. They wrongly directed customers to
28   deposit money into Legacy's accounts—including a deposit of $██████—rather than

**Kahn's Memorandum of Points and Authorities**

WARREN
TERZIAN LLP

1  Orchid Bay's. Kahn Dec. at ¶ 15. He also directed over ██████ to another account he

2  controlled and more than $████ to Legacy's business partner Construction Manage-

3  ment. *Id.* at ¶¶ 15, 19; Exhibit AA.

4       Plaintiffs' performance was also poor. *Id.* at ¶ 20; Declaration of Stephen Hon-

5  eybill at ¶¶ 5–6 ("Honeybill Dec."). Before Williams acquired Orchid Bay, it was reg-

6  ularly transferring title to buyers. Kahn Dec. at ¶ 20. Immediately after Williams took

7  ownership,  that stopped, and people complained. *Id.*; Honeybill Dec. at ¶¶ 5, 7; *see*

8  Declaration of Theresa Raglen at ¶ 11 ("Raglen Dec."). Legacy's performance was all

9  downhill from there.

10       Plaintiffs couldn't execute on Orchid Bay's contracts—the very contracts they

11  bought and committed "to the completion of the project in its entirety . . . ." Declaration

12  of Thomas Kula at ¶ 4 ("Kula Dec."); Exhibit AD at AD004–05. Before the sale, Or-

13  chid Bay had started building and selling 44 villas. Kahn Dec. at ¶ 21. Orchid Bay had

14  sold several villas that were under construction, and when Williams took over, it was

15  his job to complete those villas, collect $████ of additional money upon comple-

16  tion from them (construction milestone payments), and sell the remaining villas. *Id.*

17       Yet Plaintiffs couldn't finish one villa. *Id.* at ¶ 22; Raglen Dec. at ¶¶ 6–7; Dec-

18  laration of Elizabeth Diaz at ¶¶ 3–6 ("Diaz Dec."). After three years of announcing

19  villa construction recompletion schedules, blowing them, and then announcing new

20  dates, Plaintiffs unilaterally (without the consent of the contracted villa buyers) piv-

21  oted. They repurposed the incomplete villas to another design and site plan they called

22  bungalows—which violated their villa contractual commitments. *See* Kahn Dec. at ¶

23  22; Raglen Dec. at ¶¶ 6–7; Declaration of Kathi Osteen at ¶ 4 ("Osteen Dec."); Diaz

24  Dec. at ¶¶ 3–6. Plaintiffs then attempted to disavow the villa contracts, refusing to build

25  what the buyers bought while refusing to refund their money. *See* Reglan Dec. at ¶ 6;

26  Osteen Dec. at ¶ 4; Diaz Dec. at ¶¶ 3–6. But it's not just past villa buyers they've

27  scammed, it's prospective buyers too. Declaration of Lindsey Stewart at ¶ 7 ("Stewart

28

WARREN
TERZIAN LLP

1  Dec."). Plaintiffs are actively scamming prospective buyers into thinking they are con-
2  structing new buildings for them, when they aren't. *Id.*

3       Plaintiffs' terrible performance is in stark contrast to Kahn's. Stewart Dec. at ¶
4  5. Kahn turned a profit every year since the 2009 recession; Plaintiffs have just losses.
5  Kahn Dec. at ¶ 23; Exhibit Y. Kahn built more than 50 dwellings; Plaintiffs built none.
6  Kahn Dec. at ¶ 23. Kahn built miles of infrastructure (water, sewer, electricity, roads);
7  Plaintiffs built none. *Id.* Kahn built a restaurant, pools, docks, palapas, beaches, parks,
8  and ponds; Williams installed temporary hammocks. *Id.*

9       Notwithstanding Legacy's terrible performance, Kahn repeatedly offered to help
10 them when asked so the Orchid Bay community would succeed. To that end, Kahn and
11 Orchid Bay's original investors reduced ███████████████████████████████
12 ████████████ and pushed payment out one year. *Id.* at ¶ 24. Kahn and two of the
13 investors even lent Williams over $█████ in 2018. *Id.*; Exhibit AE–AG. To date,
14 neither Williams nor Legacy has paid a dime to Kahn or any of the investors, in viola-
15 tion of the purchase agreement and loan terms. Kahn Dec. at ¶ 24.

16      Time's passing made clear that Williams and Legacy's terrible performance was
17 not just due to incompetence. It was also due to corruption. After refusing to build a
18 villa that Defendant Raglen had already contracted and paid for, Mr. Williams offered
19 to sell her a different one for $200,000. Raglen Dec. at ¶¶ 6–7. Omitted from Williams'
20 sales pitch was the fact that this particular villa was already owned by Defendant Diaz.
21 *Id.* at ¶ 7. Williams has sold property that, at the time of sale, was collateral on a de-
22 faulted loan and subject to foreclosure at any time—without telling the buyer and with-
23 out ever paying off that loan. Kula Dec. at ¶¶ 7–9, 19, 22–23, 26. He has also sold a
24 couple's property for them, but then kept the money for himself. *Id.* at ¶ 11.

## STANDARDS OF REVIEW

25
26 ### I.   Anti-SLAPP

27      California anti-SLAPP law grants defendants the right "to file a special motion
28 to strike to dismiss an action" that is "brought primarily to chill the valid exercise of

**WARREN TERZIAN LLP**

the constitutional rights of freedom of speech and petition for the redress of griev-ances." Cal. Civ. Proc. Code § 425.16(a); *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013) (internal quotation marks omitted). California Anti-SLAPP law applies in federal court. *See Makaeff*, 715 F.3d at 261. It also applies to claims by Cal-ifornia plaintiffs against foreign defendants' conduct outside California. *Francis v. Wynn Las Vegas*, 557 F. App'x 662, 664–65 (9th Cir. 2014) (mem.); *First Fin. Sec., Inc. v. Freedom Equity Grp., LLC*, No. 15-cv-01893, 2016 WL 1323104, at *1 (N.D. Cal. Apr. 5, 2016).

When a defendant files a special motion to strike, she has the burden to make "a threshold showing that the challenged cause of action is one arising from protected activity." *Navellier v. Sletten*, 29 Cal. 4th 82, 88 (2002). If the defendant meets that burden, the court must strike the challenged causes of action unless the plaintiff meets his burden to demonstrate, by admissible evidence, a probability of prevailing on the claim. *Id.* This requires "demonstrat[ing] a probability that he will prevail on each ele-ment" of the claim. *Harkonen v. Fleming*, 880 F. Supp. 2d 1071, 1078 (N.D. Cal. 2012); *see also Balzaga v. Fox News Network, LLC*, 173 Cal. App. 4th 1325, 1337 (2009). This also requires "consider[ing] the applicable burden of proof . . . ." *Annette F. v. Sharon S.*, 119 Cal. App. 4th 1146, 1166 (2004). So if the standard is clear and con-vincing evidence, the plaintiff "must therefore establish a probability that she will be able to produce clear and convincing evidence . . . ." *Id.* If found to be legally insuffi-cient or factually unsubstantiated, courts will strike the causes of action. *Bel Air Inter-net, LLC v. Morales*, 20 Cal. App. 5th 924, 934 (2018).

## II.    Motion to Dismiss for Lack of Personal Jurisdiction

"[T]he plaintiff bears the burden of demonstrating that jurisdiction is appropri-ate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). In doing so, "the plaintiff cannot simply rest on the bare allegations of its complaint . . . ." *Id.* (internal quotation marks omitted).

Federal courts sitting in diversity apply the personal jurisdiction rules of the forum state. *Id.* at 800; *see* Fed. R. Civ. P. 4(k)(1)(A). "California's long-arm jurisdictional statute is coextensive with federal due process requirements," so "the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger*, 374 F.3d at 800–01; *see also* Cal. Civ. Proc. Code § 410.10.

## ARGUMENT

Plaintiffs are unlikely to prevail on any claim. They target protected speech. They violate the single publication rule. They don't show tortious interference. And there is no personal jurisdiction. So the entire complaint should be stricken.

## I. Anti-SLAPP law applies to every cause of action in the complaint.

### A. Anti-SLAPP law applies to any claim where the principal thrust is partly based on protected activity.

In determining whether anti-SLAPP law applies, courts "disregard the labeling of the claim and examine its principal thrust or gravamen or the allegedly wrongful injury producing conduct that provides the foundation for the claim." *Dwight R. v. Christy B.*, 212 Cal. App. 4th 697, 710 (2013) (internal quotation marks omitted). If the claim is based on protected conduct—even if only "in part"—anti-SLAPP law applies. *Thomas v. Quintero*, 126 Cal. App. 4th 635, 653 (2005). This determination is made both from the pleadings and submitted evidence. Cal. Civ. Proc. Code § 425.16(b)(2). The statute should be "construed broadly" to apply. *Id.* § 425.16(a).

### 1. Every claim is founded on protected activity.

Every cause of action in the complaint is at least partly founded on protected activity—Defendants' exercising their right of free speech in connection with a public issue and in a public forum.

Two types of protected activity are relevant here: (1) statements made in a public forum on a matter of public interest (§ 425.16(e)(3)) and (2) any other conduct in furtherance of free speech on a matter of public interest (§ 425.16(e)(4)). In practice, the public interest requirements of both subdivisions are defined identically. *See Charme*

*v. Int'l Broth. of Elec. Workers, Local 45*, 110 Cal. App. 4th 107, 114–19 (2003) (treating this requirement as interchangeable). So necessarily if the narrower (e)(3) subdivision is met, the broader (e)(4) subdivision is met as well (because the sole difference is that (e)(4) does not have a public forum requirement). *See Ruiz v. Harbor View Cmty. Assn.*, 134 Cal. App. 4th 1456, 1470 n.5 (2005).

### 2.    Every claim is based on statements made in a public forum.

The complaint's claims are founded on statements made in public forum. Facebook posts are statements made in a public forum. *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1252 (2017); *Grenier v. Taylor*, 234 Cal. App. 4th 471, 481 (2015) ("Statements made on a Web site are made in a public forum."); *see also Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 693 (2012). The complaint is almost entirely based on Facebook posts. Complaint, ECF No. 1 at ¶¶ 40–41, 44, 52, 64, 68, 70, 72, 80–81, 91, 100. Therefore, the public forum requirement of (e)(3) is met.

### 3.    Every claim is founded on protected statements made in connection with a public issue.

The complaint's claims are all based on statements made in connection with a public issue and thus satisfy (e)(3) and (e)(4).

The public interest requirement "is to be construed broadly . . . ." *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 808 (2002) (quotation marks omitted). It's satisfied for wholly "private conduct that impacts a broad segment of society and/or that affects a community . . . ." *Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 479 (2000); *Ruiz*, 134 Cal. App. 4th at 1467 ("[T]he anti-SLAPP statute protects private conversations regarding a public issue."). So when members of a private community engage in speech "connected to a discussion, debate or controversy" in that community, the standard is met. *Grenier*, 234 Cal. App. 4th at 482–83. For this reason, courts have repeatedly found that anti-SLAPP law applies to speech by housing community members relating to issues affecting those communities. *Colyear v. Rolling Hills Cmty. Assn. of Rancho Palos Verdes*, 9 Cal. App. 5th 119, 131 (2017) ("[S]everal

1   courts have found protected conduct in the context of disputes within a homeowners

2   association."); *see also Damon*, 85 Cal. App. 4th at 479 ("These statements pertained

3   to issues of public interest within the Ocean Hills community."); *Ruiz*, 134 Cal. App.

4   4th at 1468–70 (holding that anti-SLAPP law applied to plaintiffs' requests for infor-

5   mation from the housing association because the housing association comprised "over

6   523 lots" and the "disputes were of interest to a definable portion of the public, namely,

7   the members of [housing association], because they would be affected by the outcome

8   of those disputes"); *see also Foothills Townhome Assn. v. Christiansen*, 65 Cal. App.

9   4th 688, 695–96 (1998) (holding that anti-SLAPP law applied to a dispute between a

10  homeowner and the HOA about the propriety of a fee), *disapproved of on other ground*

11  *by Equilon Enterprises v. Consumer Cause, Inc*., 29 Cal. 4th 53, 68 n.5 (2002); *Cabrera*

12  *v. Alam*, 197 Cal. App. 4th 1077, 1091 (2011); *cf. Emerson v. J. F. Shea Co.*, 76 Cal.

13  App. 3d 579, 592–93 (1978) ("by taking up the cudgels for his neighbors . . . and by

14  threatening to sue the developer, the plaintiff made himself a public figure in a sense.").

15      Consider this example, where a court found anti-SLAPP applied in circum-

16  stances similar to here. Certain tenants were "protest[ing] against the maintenance and

17  eviction practices of [the] landlord . . . ." *Thomas*, 126 Cal. App. 4th at 659. These

18  protests connected with "much broader community interests at stake . . . . For example,

19  [the landlord] was accused of wrongfully evicting and improperly retaining the security

20  deposits of more than 100 tenants. He was also accused of a pattern of refusing to make

21  needed repairs to his rental properties . . . ." *Id.* at 661. The protests were select tenants'

22  efforts "in discussing and finding a solution to the disputes . . . ." *Id.*

23      This is essentially the situation here. Orchid Bay is a community of approxi-

24  mately 150 persons. Kahn Dec. at ¶ 28; Exhibit Y. Its public advertising Facebook page

25  has about 15,000 likes and followers. Exhibit V.

26      Many in the Orchid Bay community are concerned they are being scammed by

27  Williams. Exhibits A, O, Q–R, AO; Raglen Dec. at ¶¶ 12, 15. For that reason, the com-

28  munity gathered on the Facebook private group and posted about "Stop[ping] the

Orchid Bay Scam" and how "Chris Williams MUST GO." Complaint, ECF No. 1, Exhibit 9 at 95. All the Defendants' speech detailed in the complaint relates to Plaintiffs' fraudulent theft of money from the development and new buyers. Complaint, ECF No. 1 at ¶¶ 48(a), (b), Exhibit 4 at 18, Exhibit 5 at 85. The alleged defamatory statements also involve the homeowners banding together to alert prospective buyers of Plaintiffs' scams. *See id.*, Exhibit 8 at 93, Exhibit 9 at 95, Exhibit 10 at 97, Exhibit 11 at 99.

Williams did not take these complaints well. He responded by threatening to sue the residents. *See* Exhibit S, Exhibits AP–AQ. He has gotten downright combative, stating that he "will go over-the-top aggressive every fucking time, you should just know that. I don't know why anyone would provoke me because I will go ballistic." Honeybill Dec. at ¶ 10; Exhibit W at 58:14 (making this statement in a discussion about Orchid Bay residents' discontent). After filing this complaint, he wrongly shutoff certain Defendants' water supply, endangering their lives. *Id.* at ¶ 11; Osteen Dec. at ¶ 6. Williams publicly shames and defames his victims (including Defendants) to the entire Orchid Bay community, aiming to force them to submit to his wrongful scams. *See* Raglen Dec. at ¶¶ 6–7, 9–10.

This very dispute has been covered repeatedly by the news. Various Belizean news websites reported on Orchid Bay residents' belief that "they were scammed out of money" and Williams' denial of those allegations. Exhibits A, O–R, AO. At least one outlet reported that a group of disgruntled Orchid Bay residents reported Williams to the FTC, which was investigating another Belize real estate scam. Exhibit A. Another outlet reported that Williams was intimidating Orchid Bay owners, to scare them away from leaving. Exhibit O. Yet another outlet reported that Orchid Bay gave all of "Belize . . . a black eye." Exhibit AO.

The newsworthiness of this dispute is amplified by Plaintiffs' repeated thrusting of themselves and Orchid Bay into the public spotlight. One website—bore a strikingly pro-Williams valence (republishing Mr. Williams' refutation of the fraud claims and his same false attacks). Exhibits P, T. Plaintiffs also published many press releases

WARREN
TERZIAN LLP

promoting Orchid Bay as a great living community and a great investment. Exhibits D–E, G–N. The speech at issue in the complaint directly relates to—and undermines—Plaintiffs' claims. This sought-after prominence alone establishes them as limited purpose public figures for their communities. *See Gilbert v. Sykes*, 147 Cal. App. 4th 13, 25–26 (2007) "[Counter-plaintiff's] sought-after prominence as an expert . . . as a means of personal enhancement transformed him into a limited purpose public figure.").

Plaintiffs may claim that their causes of action for tortious interference with contract are unconnected with speech and therefore not subject to anti-SLAPP. Not true.

"[T]he weapons of choice in SLAPP suits appear to be claims for "defamation, various business torts such as interference with prospective economic advantage, nuisance and intentional infliction of emotional distress." *Thomas*, 126 Cal. App. 4th at 657. And here, the gravamen for these claims are all founded on Defendants' speech. The claims for negligent and intentional interference with prospective economic relations is expressly founded on Defendants' alleged defamation. Complaint, ECF No. 1 at ¶¶ 91, 100. As for the claim of intentional interference, that claim is generically based on "Defendants' conduct," while simultaneously incorporating all preceding allegations. *Id.* at ¶¶ 65, 68. The only conduct of Defendants alleged in the complaint relates to their alleged defamation. *See id.* at ¶¶ 40–43, 48–51.

In short, anti-SLAPP law applies to each of Plaintiffs' causes of action, and the claims should be stricken if Plaintiffs can't show a likelihood to prevail.

**II.     The complaint should be stricken because Plaintiffs are unlikely to prevail on any cause of action.**

### A.     The First Amendment bars all causes of action in the complaint.

All causes of action fail because they are barred by the First Amendment.

Whenever a claim's "gravamen is the alleged injurious falsehood of a statement," First Amendment protections apply to that claim—regardless the claim's label. *Resolute Forest Prod., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1016 (N.D. Cal.

WARREN
TERZIAN LLP

2017); *see also Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1042–43, 1045 (1986) (holding that plaintiffs cannot avoid First Amendment limitations by "creative plead-ing[s]" that "affix a label other than 'defamation' to injurious falsehood claims"). This means that claims similar to defamation—tortious interference, trade libel—"are sub-ject to the same first amendment requirements that govern actions for defamation." *Unelko Corp. v Rooney*, 912 F.2d 1049, 1057–58 (9th Cir. 1990).

Here, every claim in the complaint attempts to punish Defendants for true speech that they believed to be true. The First Amendment applies and bars Plaintiffs' claims.

### 1.    The First Amendment bars claims based on substantially true speech where the speaker believed they spoke the truth.

The First Amendment supplies at least two significant protections for speech: persons can't be liable for speaking the truth, and they can't be liable for speaking what they believe to be true.

The extent of the latter protection pends on two things: whether the plaintiff is a public figure and whether a common interest privilege applies. If the answer to either is yes, the actual malice standard applies—meaning liability requires clear and con-vincing evidence that the defendant made the statement knowing it was false or with reckless disregard of its falsity. *See Reader's Digest Assn. v. Superior Court*, 37 Cal. 3d 244, 252–53, 256 (1984); *Kashian v. Harriman*, 98 Cal. App. 4th 892, 914–15, 931 (2002); *see also* Cal. Civ. Code § 47(c).

Courts have repeatedly granted anti-SLAPP motions on the grounds that the plaintiff could not sufficiently show actual malice. *See, e.g.*, *Annette F.*, 119 Cal. App. 4th at 1162–72; *Gilbert*, 147 Cal. App. 4th at 29; *Cabrera*, 197 Cal. App. 4th at 1092; *Young v. CBS Broadcasting, Inc.*, 212 Cal. App. 4th 551, 562–566 (2012).

By contrast, if the plaintiff is not a public figure and there is no common interest privilege, a negligence (rather than reckless) standard applies to knowledge of falsity. *Khawar v. Globe Int'l, Inc.*, 19 Cal. 4th 254, 274 (1998); *Sarver v. Hurt Locker LLC*,

No. 2:10-cv-09034-JHN, 2011 WL 11574477, at *8 n.11 (C.D. Cal. Oct. 13, 2011), *aff'd sub nom. Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016).[1]

> ### a.   The actual malice standard applies because Williams and Legacy are limited purpose public figures.

A person can be a public figure for all purposes or for limited ones. *Reader's Digest Assn.*, 37 Cal. 3d at 253. A limited purpose public figure "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure" for all issues that "relate[] to his role" in that public controversy. *Id.* at 253–54. Williams and Global Development are limited purpose figures because they have inserted themselves into the public controversy surrounding Orchid Bay.

Being a limited purpose public figure requires three things: (1) a public controversy; (2) the plaintiff's committing an act relating to the controversy; and (3) the alleged defamation relates to the plaintiff's participation in the controversy. *Cabrera*, 197 Cal. App. 4th at 1092.

Recall that anti-SLAPP law has its own public controversy requirement, as already discussed. *See Supra* Section I.A.3, p. 13. That anti-SLAPP analysis is "very similar" to the analysis performed for the public figure determination. *Cabrera*, 197 Cal. App. 4th at 1092. So for the same reasons that a public controversy exists for anti-SLAPP purposes, it exists here as well.

Beyond the cases already discussed, two more cases illuminate why this public controversy—and public figure standard—is met. Take *Paradise Hills Associates v. Procel*. That case involved a housing community of 39 homes, with plans to build and sell another 31 homes. *Paradise Hills Assocs.*, 235 Cal. App. 3d 1528, 1534 (1991). The defendant-homeowner claimed that the houses were inferior and not constructed as contractually required. *Id.* at 1534–45. The defendant-homeowner—and several

---

[1] Plaintiffs must prove recoverable damages to survive an anti-SLAPP motion. *Navellier v. Sletten*, 106 Cal. App. 4th 763, 774–75 (2003).

WARREN TERZIAN LLP

1  other homeowners—protested the plaintiff-developer by placing signs on their proper-

2  ties alerting potential buyers to her complaints about the developer. *Id.* at 1535 & n.1.

3  The plaintiff-developer then sued for tortious interference. *Id.* at 1535, 1543. The

4  court held that the defendant-owner's speech was protected by the First Amendment,

5  rejecting the argument that her speech did not involve matters of public interest. *Id.* at

6  1544. The court reasoned that the public "clearly ha[s] an interest in matters which

7  affect their roles as consumers," and protecting the defendant's speech was "instru-

8  mental" to protecting that public interest. *Id.* at 1544–45.

9  Then there is *Makaeff v. Trump*. There, customers of a for-profit university

10 posted "complaints on public Internet message boards" about the university. *Makaeff*,

11 715 F.3d at 267. And a newspaper reported on the university's business practices. *Id.*

12 These facts showed a public controversy on those practices. *Id.*

13 The university had injected itself into it by engaging in an advertising campaign

14 on its services—the same services featured in the online complaints and news. *Id.* at

15 267–70. This advertising "invited public attention, comment, and criticism"—and the

16 alleged defamation related to the same subject of the advertising (the defendant's crit-

17 icism of university's practices). *Id.* at 263, 267–70. Because of these facts, the court

18 found the university to be a limited public figure. *Id.* at 270.

19
20
   **b.    The actual malice standard also applies because the
           statements were protected by common interest privilege.**

21 The common interest privilege protects "communications made in good faith on

22 a subject in which the speaker and the hearer shared an interest or duty." Cal. Civ. Code

23 § 47(c); *Kashian*, 98 Cal. App. 4th at 914. Communications with community members

24 about the community's interests are protected by the common interest privilege. *Hicks

25 v. Richard*, 39 Cal. App. 5th 1167, 1177 (2019) (privilege protected "communications

26 between parents of parochial school children and church authorities overseeing the

27 school on subjects relating to the school"); *Karimi v. Golden Gate Sch. of Law*, 361 F.

28 Supp. 3d 956, 979 (N.D. Cal. 2019), *aff'd*, 796 F. App'x 462 (9th Cir. 2020).

This is the situation here. Defendants are all members of the Orchid Bay community. Kahn is the community's former owner and developer. Kahn Dec. at ¶¶ 4–5. The other Defendants are all homeowners there. *Id.* at ¶ 49; Honeybill Dec. at ¶ 3; Stewart Dec. at ¶¶ 3, 5; Diaz Dec. at ¶ 4; Osteen Dec. at ¶ 3. All the speech related to matters affecting the community. Kahn Dec. at ¶ 49.

### 2.   The First Amendment protects substantially true speech and opinions.

The statements at issue in the complaint are not false and are protected by the First Amendment. The First Amendments protects true and substantially true speech, and persons cannot be liable for such speech. *See Resolute Forest Prod., Inc*, 302 F. Supp. 3d at 1017; *Sarver*, 2011 WL 11574477, at *8–9 & n.11; *see also  Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 809 (2002); *Innovative Bus. Partnerships, Inc. v. Inland Ctys. Reg'l Ctr., Inc.*, 194 Cal. App. 4th 623, 632 (2011).

Substantial truth requires that "the gist or sting of the remark" is true—"irrespective of slight inaccuracy in the details . . . ." *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 697 (2012) (internal quotation marks omitted). "Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (internal quotation marks omitted).

Moreover, actionable claims require false ***facts***. *Summit Bank*, 206 Cal. App. 4th at 695–96. This means the statement must contain a "provable falsehood . . . ." *Id.* at 695. This doesn't exist for opinions, especially when the opinion doesn't imply any underlying facts. *Id.* at 695–96.

Context matters for determining whether a statement is an opinion. *Id.* at 696. And "courts . . . have recognized that online blogs and message boards are places where readers expect to see strongly worded opinions rather than objective facts." *Id.* at 696–97. For that reason, one court held on an anti-SLAPP motion that the following statements about a plaintiff made online were nonactionable opinions that did not imply any

underlying facts: "problem [company]"; "piss poor"; "screwed up"; left people "high and dry"; its customers "should leave 'before they close'." *See id.* at 697, 699.

### 3.   Liability requires not just false speech, but defamatory speech.

It's not enough for statements to be false. They must be defamatory. *McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 112 (2007). This requires that the statement contain a charge that would injure the plaintiff in some way. *Id.*

### 4.   The claims are meritless because Kahn's statements were substantially true and because Kahn did not act with actual malice.

Plaintiffs' claims are meritless. Every statement was substantially true. And even if that were not the case, Kahn was neither reckless nor negligent as to falsity.

#### a.   Kahn is not leading a conspiracy to retake Orchid Bay.

Kahn is not leading any conspiracy to retake control of the project by, in the complaint's words, "convinc[ing] the other Defendants that it is in their best interest to have Kahn's company re-take control of the project and that in order for that to happen, Defendants must defame and disparage Plaintiffs' reputation . . . ." Complaint, ECF No. 1 at ¶ 41.

Kahn is not seeking to retake the Orchid Bay community. Kahn Dec. at ¶ 51. Kahn has no desire to retake ownership of the Orchid Bay. *Id.*; Honeybill Dec. at ¶ 14; Osteen Dec. at ¶ 16; Diaz Dec. at ¶ 14. Williams has mismanaged Orchid Bay with extreme recklessness and fraud, and the potential liabilities (including criminal) flowing from Williams' mismanagement (the arbitrations filed based on Williams' misconduct, for examples) are extremely high. *Id.* at ¶¶ 51–52. He left Belize in June 2015. *Id.* at ¶ 53. He's never been back. *Id.* And he doesn't intend to ever go back. *Id.*

Kahn did not reach out to Defendants. *Id.* at ¶ 54. They reached out to him. *Id.*; Honeybill Dec. at ¶ 14; Diaz Dec. at ¶ 14. They told Kahn about their beliefs that Plaintiffs were mismanaging Orchid Bay. Kahn Dec. at ¶ 54; Honeybill Dec. at ¶ 14; Diaz Dec. at ¶ 14. They were desperate because Williams was destroying the value of their homes and their livelihoods. Kahn Dec. at ¶ 54; Diaz Dec. at ¶ 14. And they sought

WARREN
TERZIAN LLP

1 out Kahn was because they generally trusted him, as his management of Orchid Bay

2 was excellent. *Id.* at ¶ 54; Honeybill Dec. at ¶ 14; Diaz Dec. at ¶ 14.

3      Kahn repeatedly told Defendants that he had no interest in taking over Orchid

4 Bay because Williams appears to have attached significant and unknown liabilities to

5 Orchid Bay, creating a minefield for the future owner. Kahn Dec. at ¶ 52. For that

6 reason, he explained that neither he nor any of the other original owners wanted to take

7 over Orchid Bay. *Id.*; Osteen Dec. at ¶ 16; Honeybill Dec. at ¶ 14. He also explained

8 that Williams had violated the sales contract and owed Kahn and the other original

9 investors millions of dollars. Kahn Dec. at ¶ 52.

10      What's more, the complaint's allegations don't show anything defamatory. The

11 existence of a conspiracy, by itself, isn't defamatory.

### b. Kahn did not direct or encourage any campaign.

13      Kahn didn't direct any campaign against Plaintiffs on the Orchid Bay homeown-

14 ers Facebook private group. *Id.* at ¶ 55. He did not encourage anyone in any way what-

15 soever to post statements—of any kind—on the Facebook group. *Id.* Kahn does not

16 even have access to the group and has never made posts—directly or indirectly—on

17 the Facebook group. *Id.* Nor did Kahn direct or encourage any of Defendants (or any-

18 one else for that matter) to make any statements about Plaintiffs to prospective Orchid

19 Bay buyers, other owners, or anyone else. *Id.*

### c. Orchid Bay had $1–1.5 million when Plaintiffs took over.

21      Any statements that Orchid Bay had $1 to $1.5 million when Plaintiffs took

22 over are substantially true. Kahn discussed with Osteen and Diaz the state of Orchid

23 Bay's financial affairs at the time Plaintiffs took over. Kahn Dec. at ¶ 56; Osteen Dec.

24 at ¶ 10; Diaz Dec. at ¶ 10. In general terms, he told them that Orchid Bay's various

25 companies had about a million in cash, receivables, and available credit on the credit

26 line—in addition to the value of its assets and promise of prospective products. Kahn

27 Dec. at ¶ 56; Osteen Dec. at ¶ 10; Diaz Dec. at ¶¶ 10–11. These were not detailed fi-

28 nancial discussions with accountants, and the financial status was discussed at an

**WARREN TERZIAN LLP**

1    extremely high level in generalities about how Kahn left Orchid Bay with strong ac-

2    count balances. Kahn Dec. at ¶ 56, Osteen Dec. at ¶ 10; Diaz Dec. at ¶¶ 10–11.

3         When Kahn made these statements, he believed the statements were a true re-

4    flection of Orchid Bay's finances at a 10,000-foot level. *Id.* at ¶ 57. He truthfully ad-

5    vised based on his memory the amount of money Orchid Bay had access to in the

6    form of cash, good accounts receivable, and available line of credit. *Id.*

7         In fact, the statements were true and accurate. The total cash, accounts receiva-

8    ble, and available line of credit at its bank was $███████ for April 2016, $███

9    ███████ for May 2016, $███████ for June 2016, $███████ for July, and $███████

10   million for September. *Id.* at ¶ 58; Exhibit U1. Thus, the numbers stated on Facebook

11   were true—or at the very least substantially true.

12        Moreover, these statements were also true based on Williams' own representa-

13   tions. When he took over Orchid Bay, Williams represented to the entire community

14   that he had millions of dollars of funds and vast resources. Osteen Dec. at ¶ 11.

15        The reason why Kahn included the available credit line in his numbers is be-

16   cause it is readily available cash with no restrictions upon its usage. Kahn Dec. at ¶

17   59. So in his view and in his practice, the available line of credit was used as money to

18   build property and invest in the business, which would then yield large cash sales at

19   various points in the construction cycle. *Id.* When Kahn received those large chunks,

20   he would use them to pay down the line of credit. *Id.*

21        The reason why Kahn made these statements wasn't to conspire against Wil-

22   liams. *Id.* at ¶ 60. It was because Plaintiffs were lying to the Orchid Bay community—

23   they were trying to pass off their own failures as prior failures of Kahn. *Id.* Plaintiffs

24   were trying to deflect potential lawsuits for their non-performance and unwillingness

25   to provide refunds at him. Kahn thus spoke because he felt he needed to correct the

26   record.

27        Plaintiffs continue those lies and half-truths in the complaint. For instance, they

28   claim that Kahn was "found personally liable in two proceedings . . . brought by Orchid

WARREN
TERZIAN LLP

1   Bay residents . . . .” Complaint at ¶ 40. Yet they omit that they were also found liable

2   in those arbitrations. Kahn Dec. at ¶ 61; Exhibits AH–AI. They also omit that the lia-

3   bility was based on Plaintiffs’ failure to complete projects that Kahn had sold and that

4   Plaintiffs bought as part of the sale agreement (and which would have brought in addi-

5   tional revenues upon completion of the project). Kahn Dec. at ¶ 61.

6       Another half-truth is the complaint’s claim that Orchid Bay’s bank accounts in

7   Fall 2016 contained only $24,000 (Complaint at ¶ 42). Orchid Bay had multiple bank

8   accounts for multiple Orchid Bay entities, including some accounts opened by Wil-

9   liams. Kahn Dec. at ¶ 64. One account for Orchid Bay had a balance of about $24,000

10  in September 2016. *Id.* But the total balance of all Orchid Bay bank accounts was

11  $███████ in August 2016 and $███████ in September. *Id.*; Exhibits U1, U2.

12      Finally, Plaintiffs knew exactly how much was in Orchid Bay’s bank accounts

13  before buying—and they bought anyway. *Id.* at ¶ 65. Williams repeatedly accessed and

14  examined Orchid Bay’s bank account information as part of the sale process, along

15  with other forms of diligence. *Id.* at ¶¶ 10, 65; Exhibits AK–AM.

16
17      **d.   Kahn never said that Plaintiffs took a buyer’s $162,000 deposit that was made before Plaintiffs took over.**

18      The complaint claims that “Kahn told one such buyer that, when Plaintiffs took

19  over the project, Plaintiffs took that buyer’s approximately $162,000 deposit (made

20  prior to Plaintiffs’ takeover of the project from Kahn) and spent it on their own ex-

21  penses . . . .” Complaint, ECF No. 1 at ¶ 42. This refers to the buyer Rick Smith. Kahn

22  Dec., at ¶ 68. Kahn never made this statement. *Id.*; Exhibit C.

23      **B.   Four claims should be dismissed (or all five claims narrowed) because a defamatory statement may be pursued under only one theory.**

24      The complaint broadly seeks to punish the same allegedly defamatory statements

25  under multiple causes of action—defamation, trade libel, and various iterations of tor-

26  tious interference with contract. This violates the single publication rule.

27
28

WARREN
TERZIAN LLP

Allegedly defamatory statements can't be pursued under multiple causes of action. They must be pursued under only one. Cal. Civ. Code § 3425.3 ("No person shall have more than one cause of action for damages for libel . . . or any other tort founded upon any single publication or exhibition or utterance . . . ."). "[C]ourts have interpreted the single-publication rule to mean that a plaintiff may have only one cause of action for one publication rather than multiple causes of action for torts such as defamation, invasion of privacy, personal injury, civil rights violations, or fraud and deceit." *M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623, 630 (2001); *Sarver*, 2011 WL 11574477, at *10; *see also Long v. Walt Disney Co.*, 116 Cal. App. 4th 868, 873 (2004).

Thus Plaintiffs cannot pursue all statements under all causes of action. They must make their choice—now—as to which single cause of action they will pursue for all statements. The other causes of action should be stricken under the anti-SLAPP motion.

Alternatively, Plaintiffs may choose to assign certain statements to different causes of action. (Meaning they assign one statement to say defamation only, another to tortious interreference only, etc.) If Plaintiffs go that route, the anti-SLAPP motion should still be granted. "[A]n anti-SLAPP motion, like a conventional motion to strike, may be used to attack parts of a count as pleaded." *Baral v. Schnitt*, 1 Cal. 5th 376, 393 (2016). Therefore, to the extent Plaintiffs assign individual statements to certain causes of action, those statements should be stricken as a basis for the other causes of action.

## C. The tortious interference claims should be stricken because their elements are not met.

The Court should strike the causes of action for intentional interference with contractual relations and intentional and negligent interference with prospective economic advantage because their elements are not met. Alternatively, if there is sufficient evidence to substantiate these causes of action as to certain relationships, the Court should strike the allegations as to other relationships where this is lacking.

All three claims require that the defendants' statements be a substantial factor in causing the lost business opportunity. *See Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,

WARREN
TERZIAN LLP

50 Cal. 3d 1118, 1126 (1990) (intentional interference with contractual relations); *Youst v. Longo*, 43 Cal. 3d 64, 71 n.6 (1987) (intentional interference with prospective economic advantage); *N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 786 (1997) (negligent interference with prospective economic advantage).

The two intentional claims also require that the defendant knew of the relationship and intended to disrupt the relationship. *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1126; *Youst*, 43 Cal. 3d at 71 n.6. The claim for intentional interference with contract additionally requires that the defendant's statements prevented performance of an existing contract. *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1126.

Plaintiffs do not have a probability of prevailing for all these reasons. With the exception of Daniel Herrera and Thornton-Knight, Kahn didn't even communicate with any of other economic relationships during the period of the alleged conspiracy. Kahn Dec. at ¶ 70; Declaration of Kathleen Calligan at ¶ 6 ("Calligan Dec."); Declaration of Rick Smith at ¶ 6 ("Smith Dec."). Moreover, several of the potential business relationships either did not see the allegedly defamatory communications or were not influenced by them in any way. Calligan Dec. at ¶¶ 3–5; Smith Dec. at ¶¶ 3–5; Declaration of Mark Sorenson at ¶¶ 4–5; Declaration of Bridget Thonton-Knight at ¶¶ 3–6; Declaration of David Herrera at ¶¶ 7–8 ("David Herrera Dec."); Declaration of Daniel Herrera at ¶¶ 7–8 ("Daniel Herrera Dec."). Some are not even lost business opportunities as it is Williams who stopped communicating with them despite their desires to continue discussions. David Herrera Dec. at ¶¶ 5–6; Daniel Herrera Dec. at ¶¶ 5-6; Calligan Dec. at ¶ 3. Finally, the Facebook group is private, for owners. Complaint, ECF No. 1 at ¶ 55, Exhibit 10 at 97; Honeybill Dec. at ¶ 19; Diaz Dec. at ¶ 19. And there's no evidence these folks were members.

### D.    All claims should be stricken because the Court does not have personal jurisdiction over Kahn.

There are "two types of personal jurisdiction": general and specific. *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1780 (2017). Neither

WARREN
TERZIAN LLP

exists for Kahn. He is not a California citizen. And he did nothing to avail himself of California. So he should be dismissed for lack of personal jurisdiction.

Anti-SLAPP motions are properly granted for the reason of lack of jurisdiction. *Barry v. State Bar of California*, 2 Cal. 5th 318, 324–26 (2017) (holding that anti-SLAPP motions may be granted for any "nonmerits-based reason" that makes the plaintiff lack a probability of prevailing, such "as lack of subject matter jurisdiction" or the court's "lack[ing] the power to entertain the claims in the first place").

## 1.   General jurisdiction doesn't exist, as Kahn is a New Yorker.

The Court doesn't have general jurisdiction over Kahn because he is domiciled in New York. General jurisdiction exists where the person is domiciled. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). "A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return." *Gaudin v. Remis*, 379 F.3d 631, 636 (9th Cir. 2004).

Kahn's domicile is New York. He has lived there for 24 years. Kahn Dec. at ¶ 72. He files New York tax returns. *Id.* He is registered to vote there. *Id.* New York is his permanent home, and he intends to remain *Id.*

## 2.   Specific jurisdiction doesn't exist because Kahn did not aim any conduct at California.

None of Kahn's conduct is targeted at California. So specific jurisdiction does not exist.

Specific jurisdiction requires three things:

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; . . .

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802.

WARREN TERZIAN LLP

### a.   For specific jurisdiction to exist, the defendants must expressly target the forum state, not just the plaintiff.

"For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). This substantial connection must result from "contacts that the 'defendant *himself*' creates with the forum State." *Id.*; *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015) (this is "[t]he proper analysis in tort cases as well as contract cases"). It is the "defendant's contacts with the *forum State*" that matters— "not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285; *Picot*, 780 F.3d at 1214.

For this reason, "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285; *Picot*, 780 F.3d at 1214. And specific jurisdiction does not exist by virtue of the defendant's "direct[ing] his conduct at plaintiffs whom he knew had [forum] connections." *Walden*, 571 U.S. at 289; *Schwarzenegger*, 374 F.3d at 805 ("mere foreseeability" of harm in the forum is not enough for jurisdiction).

This requirement of a substantial connection to the forum typically "consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Schwarzenegger*, 374 F.3d at 802; *Walden*, 571 U.S. at 288 (holding that jurisdiction didn't exist and stating that "[n]o part of [the defendant's] course of conduct occurred in [the forum]"); *Cottle v. W. Skyways Inc.*, No. 17-cv-00049, 2017 WL 1383277 at *7 (E.D. Cal. Apr. 18, 2017) (holding that jurisdiction didn't exist where the defendant had not "actively sought [the plaintiffs] out for negotiations in California, or conducted negotiations with plaintiffs while physically in the forum"). In fact, post-*Walden*, there must be material performance in the forum that makes the forum hold a "special place" in the contract, not just some ancillary connection. *See Picot*, 780 F.3d at 1209, 1213 (holding that jurisdiction didn't exist even though the defendant had twice visited California in performing the contract).

By contrast, "ordinarily use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the forum state." *Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir. 1985) (internal quotation marks and brackets omitted). So if the non-resident defendant's conduct was limited to a phone call effecting an oral contract with the California plaintiff and then sending money to California, that is not enough for jurisdiction. *Mohazzabi v. Mohazzebi*, No. 19-cv-06453, 2019 WL 6493969 at *3 (N.D. Cal. Dec. 3, 2019).

These ordinary communications don't qualify as purposeful availment because they are connections to the plaintiff, not to the state. *Hatset v. Century 21 Gold Coast Realty*, 649 F. App'x 400, 402 (9th Cir. 2016) (mem.) (holding that jurisdiction didn't exist and stating that "these communications connect only [defendant] to [plaintiff], not to California specifically."); *Yagman v. Kelly*, No. CV176022MWFPJWX, 2018 WL 2138461, at *6 (C.D. Cal. Mar. 20, 2018) ("The fact that certain Individual Defendants . . . communicated with Plaintiff, who happens to be a California resident . . . does not subject them to specific jurisdiction in California."); *cf. Chan v. UBS AG*, No. 18-cv-04211, 2019 WL 6825747 at *9 (C.D. Cal. Aug. 5, 2019) (holding that there wasn't personal jurisdiction where the "Plaintiff wired certain initial funding from a California address" and experienced losses in California).

### i. Allegedly defamatory social media posts do not create personal jurisdiction.

"[P]osting defamatory statements about a person on a Facebook page, while knowing that person resides in the forum state, is insufficient in itself to create the minimum contacts necessary to support specific personal jurisdiction in a lawsuit arising out of that posting." *Burdick v. Superior Court*, 233 Cal. App. 4th 8, 13 (2015). This is especially true when the posts are on a website that does not specifically target California. *See ViaView, Inc. v. Retzlaff*, 1 Cal. App. 5th 198, 219 (2016).

WARREN
TERZIAN LLP

### b.   Kahn did not purposefully avail himself of California because none of his conduct targeted California.

Kahn did not purposefully avail himself of California. The conduct at issue in the complaint—allegedly defamatory statements by Kahn—were all made by Kahn in New York. Kahn Dec. at ¶ 74. The audience of those statements was various Defendants, none of whom live in California and all of whom have properties or interests in Orchid Bay. *Id.* Kahn's discussions with them were private—he did not make the statements to anyone outside the Orchid Bay residential community. *Id.*

Kahn did not post on the Orchid Bay Facebook group (again, he did not have access) or any other website. *Id.* at ¶ 74. Nor did he direct or suggest to others to post any statements or information to the Facebook group. *Id.* Kahn only became aware of the posts through this complaint. *Id.*

Even if he did, that still wouldn't matter. The Facebook group was a private group for Orchid Bay residents. Complaint, ECF No. 1 at ¶ 55, Exhibit 10 at 97; Honeybill Dec. at ¶ 19; Diaz Dec. at ¶ 19. Others—including prospective buyers—don't have access to the group and can't see what is written there. Honeybill Dec. at ¶ 19; Osteen Dec. at ¶ 21; Diaz Dec. at ¶ 19. So under the *Burdick* framework, the focus and audience centered on Belize, and there wasn't any targeting of California.

## CONCLUSION

The anti-SLAPP motion should be granted and the entire complaint stricken. Alternatively, if anti-SLAPP law does not apply, the case should be dismissed under Rule 12 for lack of personal jurisdiction. The Court should set a deadline for filing a motion or joint motion for fees under CCP § 425.16(c) for 35 days from its ruling.

Dated: July 13, 2020                    **WARREN TERZIAN LLP**


Dan Terzian

*Counsel for Defendant*
*Ari Kahn*

WARREN
TERZIAN LLP